**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., | |
| Plaintiffs, | |
| -against- | |
| ARGENTINE REPUBLIC and YPF S.A., | Case Nos.: |
| Defendants. | 1:15-cv-02739-LAP |
| | 1:16-cv-08569-LAP |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., | |
| Plaintiffs, | |
| -against- | |
| ARGENTINE REPUBLIC and YPF S.A., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

KIRKLAND & ELLIS LLP

Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV

KING & SPALDING LLP

Israel Dahan
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U.,*
*Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT .......................................................................................1

FACTUAL BACKGROUND ............................................................................................4

I.      YPF's Initial Public Offering in 1993 ................................................................4

II.     Plaintiffs' Purchases of YPF ADRs ..................................................................14

III.    Argentina's Campaign To Depress YPF's Share Price, Seizure of a
        Controlling Stake in YPF, and Refusal To Make a Tender Offer ....................16

IV.     Post-Breach Transfer of Plaintiffs' YPF Shares ..............................................20

PROCEDURAL BACKGROUND...................................................................................21

LEGAL STANDARD......................................................................................................24

ARGUMENT ..................................................................................................................24

I.      Defendants Are Liable for Breach of Contract .................................................24

II.     Defendants Are Liable for Damages Based on the Amount Calculated
        Under the Bylaws................................................................................................30

        A.      Plaintiffs Are Entitled to Expectation Damages ..................................30

        B.      Plaintiffs' Direct Compensatory Damages Are Calculated According
                to the Bylaws........................................................................................32

        C.      The Undisputed Facts Also Establish Plaintiffs' Indirect Damages and
                Prejudgment Interest ............................................................................36

CONCLUSION................................................................................................................40

# TABLE OF AUTHORITIES

Page

**CASES**

*Alloy Advisory, LLC v. 503 W. 33rd St. Assocs., Inc.*, 195 A.D.3d 436
(N.Y. App. Div. 1st Dep't 2021) ..................................................25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................24

*Argentine Republic v. Petersen Energía Inversora S.A.U.*, 139 S. Ct. 2741 (2019) ....................23

*Coppola v. Bear Stearns & Co.*, 499 F.3d 144 (2d Cir. 2007) ......................................24

*Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727 (S.D.N.Y. 1986) ............................................24

*Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020) ........................................40

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ........................................................7

*Petersen Energía Inversora S.A.U. v. Argentine Republic*:

2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016), *aff'd in part, dismissed in
part*, 895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) ........................22

895 F.3d 194 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019).........3, 7, 9, 12, 14, 19,
20, 22, 23, 26, 28, 29, 31

2020 WL 3034824 (S.D.N.Y. June 5, 2020) ...............................2, 7, 8, 12, 23, 24, 26, 28

**STATUTES AND RULES**

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ..................................22, 23

Civil Code of Argentina of 1871 ....................................................................................25

Art. 505 ......................................................................................30

Art. 521 ......................................................................................31

Art. 622 ......................................................................................37

Art. 889 ......................................................................................25

Art. 1083 ..................................................................................30-31

Art. 1197 ......................................................................................25

Art. 1723 ......................................................................................29

Fed. R. Civ. P.:

 Rule 44.1 ...........................................................................................................24

 Rule 56(a)..........................................................................................................24


**OTHER MATERIALS**

Alex Kicillof, *Dialogos Sin Corbata* 195 (2015)..........................................................21

Nathaniel C. Nash:

 *Argentina Races to Sell Oil Stake*, N.Y. Times, Apr. 16, 1993 ..........................5

 *World Markets; Valuing Argentina's Crown Jewel*, N.Y. Times, May 30, 1993................................................................................................................4, 5

Stanley Reed & Raphael Minder, *Repsol in $5 Billion Settlement With Argentina*, N.Y. Times, Feb. 25, 2014......................................................................21

Republica Argentina, *Versión Taquigráfica* (Mar. 13, 2014)..................................26, 28

SEC Release No. 33-6894, 48 SEC Docket 1440 (May 23, 1991)....................................7

SEC Release No. 33-8287, 81 SEC Docket 28 (Sept. 11, 2003).....................................7

Jude Webber, *YPF and Repsol shares hit the skids*, Financial Times, Feb. 29, 2012.................................................................................................................16

## PRELIMINARY STATEMENT

In the early 1990s, after decades of state control, the Argentine Republic ("Argentina" or "the Government"), with a new President committed to free-market principles and privatization, decided to privatize its crown jewel – the energy company YPF S.A. ("YPF," and together with Argentina, "Defendants") – to raise much-needed foreign capital.  To accomplish this objective, Argentina and YPF needed access to the New York Stock Exchange ("NYSE") along with other international markets.  But Defendants had a problem.  Because of Argentina's long history of defaults and economic nationalism, would-be investors were skeptical that Argentina's commitment to free markets would last, and they needed reassurance that they would be fully protected if the Argentine Government returned to its old ways and re-nationalized the company.  To address that problem, Defendants amended YPF's Bylaws to provide clear protections for would-be investors.  The amended Bylaws required anyone obtaining a specified stake in YPF, including expressly the Argentine Government, to make a tender offer to other shareholders at a price set by a predetermined, backward-looking formula that would often require an above-market offer.  Defendants repeatedly touted that extraordinary protection when marketing YPF's shares to potential investors in the United States, and that effort succeeded:  YPF's initial public offering ("IPO") raised billions of dollars, including $1.1 billion from NYSE-listed shares alone.

For nearly two decades thereafter, Argentina continued to state publicly that the amended Bylaws would protect private shareholders' interests, and YPF enforced the Bylaws.  During that time, Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together, "Eton Park," and together with Petersen, "Plaintiffs") purchased sizable stakes in YPF in the form of American Depositary Receipts ("ADRs") – with YPF

ensuring that Petersen abided by the Bylaws and made the requisite tender offer when Petersen's position crossed applicable ownership thresholds.

After the election of a populist president and YPF's discovery of an enormous oil reserve, Argentina yielded to the temptation to retake control of YPF.  Starting in January 2012, the Government leaked news of its planned takeover and drove down YPF's share price.  Then, in February 2012, an internal government memorandum recommended that the Government take over YPF but defy the Bylaws' tender-offer requirement given the billions it would cost the Government to honor its contractual commitments.  Instead, the memo advised that the Government should simply expropriate 51% of the company and refuse to make a tender offer to minority shareholders, forcing them to litigate if they wanted to receive their contractually provided payment.

Consistent with that plan, on April 16, 2012, the Argentine Government issued decrees seizing control of 51% of YPF, all from YPF's then-largest shareholder, without honoring the obligation to offer to buy out the minority shareholders.  The next day, Defendants proclaimed that they had no intention of making good on their obligations; they would not be "stupid" enough to "comply" with the tender-offer requirement in YPF's Bylaws.  Argentina has never paid the contractually required tender-offer price, and YPF has never enforced that requirement or any of the sanctions provided in its Bylaws for failure to comply.  Because Defendants did not fulfill – and publicly and expressly repudiated – their contractual obligations, Plaintiffs brought this suit years ago to recover the damages caused by Defendants' breaches.

As the Court has previously recognized, this suit is "at its core" a simple breach of contract case.  *See Petersen Energía Inversora S.A.U. v. Argentine Republic*, 2020 WL 3034824, at *13 (S.D.N.Y. June 5, 2020) ("*Petersen III*").  Both the contractual promise and the breach are crystal clear.  The elements for establishing breach of contract under Argentine law are

2

straightforward and nearly identical to those in U.S. law:  There must be a binding contract, Defendants must have breached that contract, and the breach must have caused harm to Plaintiffs.  In this case, the Second Circuit has already held that the Bylaws are an enforceable contract against both Argentina and YPF.  *See Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 199 (2d Cir. 2018) ("*Petersen II*"), *cert. denied*, 139 S. Ct. 2741 (2019).  The Bylaws required Argentina to make a tender offer if it took control and YPF to enforce that requirement and impose sanctions for noncompliance.  Argentina and YPF breached those obligations – indeed, expressly refused to comply with them.  And Plaintiffs were damaged as a result, as they were left with shares far less valuable than the cash tender-offer price that minority shareholders were promised in the Bylaws to protect the value of their investments in this exact scenario.  Because the undisputed facts establish that Plaintiffs have satisfied the elements of their breach-of-contract claim, the Court should grant summary judgment to Plaintiffs on liability.  The damages determination is equally straightforward because the Bylaws were designed to protect minority shareholders not with vague assurances, but with clear and mechanical formulas.

It is always appropriate to hold parties to their contractual promises, but when it comes to foreign governments and international capital markets, it is absolutely essential.  These were not offhand promises or ordinary contractual provisions.  They were unusual – and unusually clear – promises necessary to give would-be investors comfort and to allow a foreign nation with a checkered economic past to access U.S. capital markets and raise billions of dollars from investors.  If those promises can be shrugged off with impunity, Plaintiffs will be injured in the short run, but everyone – investors and future foreign governments alike – will lose in the long run.  This Court should uphold these clear promises and redress these clear breaches.

# FACTUAL BACKGROUND[1]

## I.    YPF's Initial Public Offering in 1993

Founded in 1922, YPF (originally *Yacimentos Petrolíferos Fiscales*) was the world's first state-owned oil company.  56.1 ¶¶ 1-2 (ECF No. 112-2 (Prospectus) at 4; PT_COFFEE_000000402 at 403; Ocampo Dec. 2021 Report for Argentina ¶ 44).  For decades following YPF's inception, Argentina operated the company as a "politically managed, government-owned monopoly."  56.1 ¶ 13 (ECF No. 112-2 (Prospectus) at 16).  Because the Government ran YPF, "the management and operation of the Company[ ] generally reflected broader Argentine political and social objectives rather than business strategies designed to maximize the Company's profitability."  56.1 ¶ 14 (ECF No. 112-2 (Prospectus) at 42); *see* 56.1 ¶ 15 (Coffee Sept. 2021 Report for Pls. ¶¶ 18, 19)[2] (explaining that YPF was run "less as a profit-making corporation and more as an agency of the state," with "important social welfare responsibilities").  That approach was consistent with the long-prevailing view in resource-rich Latin American countries like Argentina that natural resources, especially oil, were the countries' "crown jewel."  56.1 ¶ 16 (Nathaniel C. Nash, *World Markets; Valuing Argentina's Crown Jewel*, N.Y. Times, May 30, 1993); *see also id.* (Blackett Sept. 2021 Report for Pls. ¶ 38) (noting that "Argentina's oil assets were often perceived to be a national patrimony that should be governed by nationalist priorities"); *id.* (Ocampo Dec. 2021 Report for Argentina ¶ 47) (noting

---

[1] All undisputed facts herein are further set forth in Plaintiffs' Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment ("56.1").

[2] The following individuals submitted expert reports on behalf of Plaintiffs:  Professor Alberto B. Bianchi (Constitutional Law Professor and Member of the National Academy of Sciences of Buenos Aires); Richard Blackett (Former Head of Equity Capital Markets at Citigroup); Professor Charles W. Calomiris (Henry Kaufman Professor of Financial Institutions, Columbia Business School); Professor John C. Coffee Jr. (Adolf A. Berle Professor of Law, Columbia Law School); Professor Daniel R. Fischel (Lee and Brena Freeman Professor of Law and Business Emeritus, University of Chicago Law School); Professor Alejandro M. Garro (Senior Research Scholar and Adjunct Professor, Columbia Law School); Nancy C. Lissemore (Former Global Head of Depositary Receipt Business, Citigroup); Dr. Alfredo L. Rovira (*Profesor Titular Consulto*, High Council of the National University of Buenos Aires); and Ignacio Tirado (Professor of Commercial Law at the Universidad Autónoma de Madrid).

the "principle" in "Argentina, and throughout Latin America," that "citizens at large should

benefit, at least partly, from the exploitation" of "energy and mineral resources").

Perhaps not surprisingly, the Government-run YPF lost money "consistently and in large

amounts."  56.1 ¶ 17 (Coffee Sept. 2021 Report for Pls. ¶ 19).  YPF "lost more than $6 billion in

the 1980's" and, by the early 1990s, was "considered inefficient, antiquated and a bastion of

bureaucratic gridlock."  56.1 ¶ 18 (Nathaniel C. Nash, *World Markets; Valuing Argentina's

Crown Jewel*, N.Y. Times, May 30, 1993); *id.* (Nathaniel C. Nash, *Argentina Races to Sell Oil

Stake*, N.Y. Times, Apr. 16, 1993).  Additionally, Argentina's economy was in dire straits more

broadly after decades of nationalist policies under the Peróns and like-minded administrations.

56.1 ¶ 22 (Coffee Sept. 2021 Report for Pls. ¶ 20); *see also* 56.1 ¶ 19 (Ocampo Dec. 2021 Report

for Argentina ¶ 13) ("Following President Perón's removal from office in 1955, Argentina

entered an extended period of economic and political turbulence."); 56.1 ¶ 20 (Marx Dec. 2021

Report for YPF ¶ 51) ("Inflation spiked to 388% in 1988 and 4,924% in 1989").  As a result, the

Government of President Carlos Menem, which came to power in 1989 on a platform of reform

and free-market principles, embarked upon an ambitious privatization program – which included

the privatization of YPF through an initial public offering.  56.1 ¶¶ 23-25 (Marx Dec. 2021

Report for YPF ¶¶ 14, 53, 55); *see also* 56.1 ¶ 31 (ECF No. 112-2 (Prospectus) at 92-96).

Convincing private investors to invest in YPF was no mean feat.  Despite enthusiasm for

President Menem and his free-market principles, Argentina had a long history of political and

financial crises, owing in large part to populist economic policies like mandatory wage increases,

price-setting, currency devaluation, and Government-run monopolies, all of which elevated

internal political expedience over commitments to foreign investors.  56.1 ¶ 15 (Coffee Sept.

2021 Report for Pls. ¶ 18); 56.1 ¶ 27 (Blackett Sept. 2021 Report for Pls. ¶¶ 18-19); 56.1 ¶ 21

(Ocampo Tr. for Argentina 36:25-37:1) ("Argentina has had [a] history of financial crisis"); *see*

*id.* (ECF No. 112-2 (Prospectus) at 11); *id.* (PT_BLACKETT_000000291 at 292) ("The disrepair of Argentina's institutional infrastructure is a legacy of its Perónist past."). For example, in the 1950s, under the governance of the ardent populist Juan Perón, Argentina defaulted on its foreign debt. 56.1 ¶ 21 (PT_COFFEE_000000339 at 342-343). During the 1970s and 1980s, Argentina's foreign borrowing spiked from $8 billion to $46 billion, leading to additional default in the 1980s as inflation eclipsed over 3000% in 1989. *Id.* at 344-345. The country also suffered from a deeply engrained "perception of mismanagement and corruption." 56.1 ¶ 21 (Blackett Sept. 2021 Report for Pls. ¶ 24); *see id.* (Marx Tr. for YPF 51:22-25) (acknowledging that, in the late 1980s and early 1990s, "there were situations of significant skepticism as to the perspectives of Argentina"). And, by the early 1990s, Argentina had already demonstrated a propensity for "repeated swings between a more controlled, closed, and regulated economy and bouts of opening the economy up and trying to deregulate it." *Id.* (Blackett Sept. 2021 Report for Pls. ¶ 20). Accordingly, in light of Argentina's "checkered economic past" and "persistent economic ills," private investors were "very skeptical" of Argentina and viewed its economy as "not suitable for foreign investment." 56.1 ¶ 27 (Blackett Sept. 2021 Report for Pls. ¶ 19). In particular, foreign investors found Argentine investments "to carry a very real risk of the Government enforcing nationalist policies," especially when it came to YPF, which "held a special place in the national psyche" as Argentina's "national energy champion." *Id.* (Blackett Sept. 2021 Report for Pls. ¶¶ 12, 17).

To reassure would-be investors and induce them to purchase shares in a newly privatized YPF, therefore, Argentina needed "to transform YPF into an attractive vehicle for foreign investors." 56.1 ¶ 28 (Coffee Sept. 2021 Report for Pls. ¶ 3); *see generally id.* (PT_COFFEE_000000033). Argentina and YPF thus undertook a series of "extraordinary steps" to convince foreign investors – including NYSE investors – that YPF would be an attractive and

safe investment, despite Argentina's "history of exploiting foreign investors." *Id.* (Coffee Sept. 2021 Report for Pls. ¶ 22); *see also* Hicks Ex. 128 (*Petersen II*, 895 F.3d at 199) (noting that "Argentina and YPF took a number of steps to entice investors to participate in the IPO and thereby ensure its success"); Hicks Ex. 129 (*Petersen III*, 2020 WL 3034824, at *8) (observing that "Argentina and YPF . . . aggressively sought out American investors to buy a stake in YPF") (internal quotation marks omitted).

*First*, the Menem administration hired prominent American firms like McKinsey & Company, Arthur D. Little, and Andersen Consulting to restructure YPF's management, operations, and information technology. 56.1 ¶ 29 (PT_COFFEE_000000033 at 039-041). Relatedly, prominent American investment banks, accountants, and law firms – including Credit Suisse First Boston, Merrill Lynch, Price Waterhouse, Sullivan & Cromwell, White & Case, Andrews & Kurth, and Shearman & Sterling – were brought in to oversee the IPO. *Id.* (ECF No. 112-2 (Prospectus) at 1, 3; ███████████████████████; ████████████████████████).

*Second*, Argentina elected to offer shares in the United States as ADRs listed on the NYSE. 56.1 ¶ 31 (ECF No. 112-2 (Prospectus) at 92-96). ADRs are "certificates that represent an ownership interest in foreign securities on deposit with an intermediary." 56.1 ¶ 32 (SEC Release No. 33-8287, 81 SEC Docket 28, 28 (Sept. 11, 2003)).[3] Each ADR represents a specific number of underlying ordinary shares in the non-U.S. company. *See*, *e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 251 (2010). ADRs allow investors to acquire equity in foreign companies on U.S. stock exchanges and enjoy the protections of the U.S. exchanges and the regulatory oversight of the Securities and Exchange Commission ("SEC"). 56.1 ¶ 33

---

[3] More precisely, an ADR is "a negotiable security" issued by a U.S. depositary bank that evidences an "ownership interest" in an American Depositary Share ("ADS"), which, in turn, represents an "interest in shares in a non-US company." 56.1 ¶ 32 (Lissemore Sept. 2021 Report for Pls. ¶ 9); *see id.* (SEC Release No. 33-6894, 48 SEC Docket 1440, 1441 n.5 (May 23, 1991)) (describing an ADR as "the physical certificate that evidences ADSs").

(AR00092403 at 92408).  They also "eliminate the need for the U.S. investor to convert

dividends paid in a foreign currency into dollars" because the dividends "are collected by the

custodian, converted into dollars and transmitted by the depositary to the ADR holders."  *Id.* at

92407.  ADRs are thus the "most prevalent form through which foreign corporations list and

offer to the public equity securities in the United States."  *Id.* at 92406.  Argentina and YPF

entered into a deposit agreement with Bank of New York Mellon, whose New York office would

administer the ADRs and serve as YPF's depositary agent.  56.1 ¶ 34 (ECF No. 112-2

(Prospectus) at 92).  The ADRs were priced in U.S. Dollars, and the deposit agreement required

Bank of New York Mellon to make distributions to NYSE investors in U.S. Dollars.  *See id.* at

93; *see also* 56.1 ¶ 31 (AR00092490 at 92492) (explaining that ADSs in YPF "represent[ed]

[YPF] Class D Shares").[4]

     *Third*, and most relevant to this case, Argentina and YPF amended YPF's Bylaws before

YPF's 1993 IPO.  *See* 56.1 ¶ 35 (Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808);

Executive Order 1106/93 (May 31, 1993 Argentine decree approving the amended YPF

Bylaws)).  The corporate Bylaws constitute the contract that governs the relationship among

YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders.  *See* Hicks Ex. 29

(Garro Sept. 2021 Report for Pls. ¶ 11); Hicks Ex. 129 (*Petersen III*, 2020 WL 3034824, at *5)

(describing YPF Bylaws as "the document that formally governs the relationship between

Plaintiffs and Defendants").  Specifically, Argentina and YPF amended Sections 7 and 28 of

YPF's Bylaws "to incorporate protections for investors from (1) hostile takeovers and

     [4] Following the IPO, YPF's capital stock would be divided into four classes:  Class A shares would be
owned by the Argentine Government; Class B shares would be owned by Argentine provinces; Class C shares
would be offered to YPF's employees; and Class D shares would be sold to private investors.  56.1 ¶ 30 (ECF No.
112-2 (Prospectus) at 5).

(2) attempts by Argentina to renationalize the company." Hicks Ex. 128 (*Petersen II*, 895 F.3d at 199); *see* 56.1 ¶ 36; Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 25).

Under Section 7(d) of the Bylaws, it "shall be forbidden" for a shareholder to acquire 15% or more of YPF stock – a scenario the Bylaws define as an "acquisition of control" (in Spanish, *adquisiciones de control*) – without complying with Sections 7(e) and 7(f) of the Bylaws. 56.1 ¶ 37 (ECF No. 36-2 (YPF Bylaws) § 7(d); AR000018934 (YPF Bylaws in Spanish) § 7(d)). The pertinent language of Section 7(d) provides:

> If the terms of subsections e) and f) of this section are not complied with, it shall be forbidden to acquire shares or securities of [YPF], whether directly or indirectly, by any means or instrument . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of [YPF] which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

*Id.* (ECF No. 36-2 (YPF Bylaws § 7(d)).

Sections 7(e) and 7(f) in turn require shareholders who wish to acquire control of such shares to comply with certain obligations, including making a tender offer before taking control and adhering to any "additional or stricter requirements" imposed by the Governments and stock exchanges where YPF's shares are listed (including, therefore, SEC and NYSE requirements). *See* 56.1 ¶ 38 (ECF No. 36-2 (YPF Bylaws) § 7(e) (person "wishing" to make an "acquisition of" control ('*Adquisicion de Control*') shall make a tender offer ('*oferta publica de adquisicion*') for all shares of all classes of YPF); AR000018934 (YPF Bylaws in Spanish) § 7(e)); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 62-63). Most critical of all, Section 7(f) requires the acquiring shareholder to offer consideration for each share at the "highest" amount resulting from four different price provisions. 56.1 ¶ 39 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)). These

include such measures as the highest market price in the 30 days preceding notice of the takeover and the highest price at which the acquirer bought stock in the prior two years.  *See id.* § 7(f)(v)(A-C).  It is undisputed that the relevant price provision in this case is the "Formula D" provision, which establishes the per-share consideration as follows:

> [YPF's] net income per class D share during the last four complete fiscal quarters immediately preceding the notice date indicated in paragraph (i), multiplied by the higher of the following ratios:  the price/income ratio for that period for class D shares of stock (if any) or the highest price/income ratio for [YPF] during the two-year period immediately preceding the notice date indicated in paragraph (i). Such multiples shall be determined by applying the regular method used by the financial community for computing and reporting purposes.

56.1 ¶ 40 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).  Like the other price provisions in Section 7(f), Formula D incorporates a backward-looking formula that considers the market conditions preceding the date that the acquirer notifies the market of its intention to take over the shares.

56.1 ¶ 41 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(A)-(D)).  Otherwise, the acquirer "could take steps to depress the stock price and reduce the cost of taking control of YPF, which would erode the protection afforded by the tender-offer provisions."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 76); *see also* Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 29) (stating that the Bylaws' price provisions are "consistent with the transparency obligations imposed by Argentine securities regulations aimed at preventing unsubstantiated rumors impairing the value of minority investors' holdings").

Section 7(h) provides that any shares acquired "in breach of" Sections 7(e) and 7(f), including the tender-offer requirement, "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]."  56.1 ¶ 42 (ECF No. 36-2 (YPF Bylaws) § 7(h)).

Section 28 of the amended Bylaws specifically extends the requirements and sanctions of Section 7 to the Argentine Government, while setting certain Government-specific thresholds that trigger the tender-offer requirement.  Titled "Provisions applicable to acquisitions by the National Government," or "Normas especiales para adquisiciones del Estado Nacional" in the original Spanish, Section 28 provides in relevant part:

> The provisions of subsections e) and f) of Section 7 . . . shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock . . . .

56.1 ¶¶ 43-44 (ECF No. 36-2 (YPF Bylaws) § 28(A); AR000018934 (YPF Bylaws in Spanish) § 28).  Section 28(C) provides that the sanctions in Section 7(h) "shall be applied" to Argentina "with no kind of limitation whatsoever," unless "the acquisition in breach of the provisions of Section 7 and [Section 28] has occurred gratuitously," i.e., without intent to exceed the applicable acquisition thresholds, in which case the sanction is limited to "the loss of the right to vote."  56.1 ¶ 45 (ECF No. 36-2 (YPF Bylaws) § 28(C)).

In short, the protections set forth in amended Sections 7 and 28 of the Bylaws were "clearly designed" "to create a structure that would give U.S. investors (and other investors as well) sufficient assurance that they would invest in the Class D shares" notwithstanding Argentina's unstable economic past.  56.1 ¶ 46 (Coffee Sept. 2021 Report for Pls. ¶ 34).  The amended Bylaws "provided a method by which shareholders left behind in the event of expropriation by the Argentine Government have the right to be compensated under a preset pricing mechanism."  56.1 ¶ 47 (Fischel Sept. 2021 Report for Pls. ¶ 27); *see also* Hicks Ex. 128

(*Petersen II*, 895 F.3d at 200) (observing that "these shareholder protection measures appear to promise investors a compensated exit from their ownership position in the firm if Argentina were to decide to renationalize YPF").  Indeed, Section 28 gave "special attention to the acquisition of stock (and particularly Class D shares) by Argentina," which was "central to Argentina's and YPF's efforts to convince foreign investors that they could rely on Argentina, despite its long history of prior defaults and frequent disregard for the interests of foreign investors."  56.1 ¶ 46 (Coffee Sept. 2021 Report for Pls. ¶ 37).  Based on such protections, foreign investors "could (and did) believe themselves protected against exploitation and expropriation."  *Id.* (Coffee Sept. 2021 Report for Pls. ¶ 3); *see* 56.1 ¶ 48 (Mindich Tr. 60:18-19) (viewing the tender offer as "a right of minority shareholders").

Argentina and YPF "touted these protections" in the prospectus filed with the SEC in connection with the IPO.  Hicks Ex. 128 (*Petersen II*, 895 F.3d at 200); *see also* Hicks Ex. 129 (*Petersen III*, 2020 WL 3034824, at *13) (observing that, "through aggressive marketing tactics, the Republic and YPF affirmatively sought out investors in New York and induced them to buy a stake in YPF through YPF ADRs listed on the NYSE"); 56.1 ¶ 49 (ECF No. 112-2 (Prospectus) at 12-13).  In particular, the prospectus repeatedly referred to the amended Bylaws, the tender-offer requirement for acquisitions of control generally, and the applicability of that requirement to the Argentine Government specifically:

- "The By-laws require that certain acquisitions of shares of [YPF's] capital stock that would result in the acquiror owning or controlling Class D Shares representing the lesser of 15% or more of the outstanding capital stock or 20% or more of the Class D Shares . . . be preceded by a cash tender offer for all outstanding shares."

- "Special rules apply to acquisitions of shares by the Argentine Government while the Argentine Government holds Class A Shares representing at least 5% of [YPF's] outstanding capital stock as of the date of the final Prospectus."

- "The tender offer provisions mandated by the By-laws . . . could result in an offer price for the Class D Shares substantially in excess of the market price," which "could have the effect of discouraging a change in control by means of a tender offer."

- "Under [YPF's] By-laws, in order to acquire a majority of [YPF's] capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions."

- "Pursuant to the By-laws, (i) each acquisition of shares . . . as a result of which the acquiror, directly or indirectly . . . , would own or control Class D Shares that . . . represent the lesser of (A) 15% or more of the outstanding capital stock or (B) 20% or more of the outstanding Class D Shares . . . must be carried out in accordance with the procedure described [herein]."

- "The threshold levels at which an acquisition of shares by the Argentine Government is deemed to be a Control Acquisition, and the sanctions applicable to Control Acquisitions carried out by the Argentine Government . . . are different than those applicable to acquisitions of shares by other persons."

- "Prior to consummating any Control Acquisition, an Offeror must . . . make a public tender offer for all outstanding shares . . . . The tender offer must be carried out in accordance with a procedure specified in the By-laws and in accordance with any additional or stricter requirements of jurisdictions, exchanges or markets in which the offer is made or in which [YPF's] securities are traded."

- "With respect to acquisitions by the Argentine Government deemed to be Control Acquisitions . . . , the required tender offer need only be conducted for all outstanding Class D Shares."

- "Any Control Acquisition carried out by the Argentine Government other than in accordance with the procedure described . . . will result in the suspension of the voting, dividend and other distribution rights of the shares so acquired."

56.1 ¶ 49 (ECF No. 112-2 (Prospectus) at 10-11, 80-82). These provisions were critical not only to the success of the IPO but also to ensuring that future investors could purchase with confidence, knowing they were guaranteed a "compensated exit" in the event of a re-nationalization. 56.1 ¶ 50 (Coffee Dec. 2021 Report for Pls. ¶ 3). Thus, even years after the IPO, YPF continued to state publicly that Sections 7 and 28 were "added to" the Bylaws "in

contemplation of the 1993 initial public offering of YPF shares," were "modeled after contractual and regulatory provisions that protect the interest of shareholders in listed companies in major international capital markets," and were "designed to ensure fair and equal treatment of shareholders."  56.1 ¶ 51 (Form 6-K, Nov. 18, 1998 (PT_COFFEE_000000808 at 809)).  The "clear purpose" of Argentina's and YPF's amendments to Sections 7 and 28, therefore, was "to cause investors to believe that they were protected, as YPF had utilized the latest, state-of-the-art safeguards used in the United States."  56.1 ¶ 50 (Coffee Sept. 2021 Report for Pls. ¶ 38).

Argentina's "marketing efforts worked."  Hicks Ex. 128 (*Petersen II*, 895 F.3d at 200).
Through the sale of YPF securities, Argentina "raised billions of dollars in investment capital," with "the largest share (more than $1.1 billion in total) coming from the sale of ADRs in the United States on the NYSE."  *Id.*  The protections afforded by the Bylaws were "critical" to the IPO's success; given the historical backdrop and investors' concerns, Argentina "likely could not have achieved the valuation it did at the time of its IPO, or even completed the IPO itself, without providing prospective investors with protections in the event that Argentina either reverted to a nationalist agenda of maintaining state control or did not protect minority investors from a change-of-control event."  56.1 ¶ 52 (Blackett Sept. 2021 Report for Pls. ¶¶ 11, 50).

## II. Plaintiffs' Purchases of YPF ADRs

Plaintiffs Petersen and Eton Park both became major shareholders in YPF by purchasing NYSE-listed ADRs.  By the spring of 2012, Petersen and Eton Park were the second- and third-largest investors in YPF, respectively.  56.1 ¶ 61 (Harris Dec. 2021 Report for Defs. ¶ 17).

Between 2008 and 2011, Petersen purchased ADRs representing more than 100 million Class D shares of YPF – accounting for slightly more than 25% of YPF's outstanding Class D shares – in two separate acquisitions from YPF's then-majority owner, a Spanish oil company called Repsol S.A. ("Repsol").  *See* 56.1 ¶ 62 (ECF No. 98 (Argentina Answer) ¶¶ 6, 28; ECF

14

No. 99 (YPF Answer) ¶¶ 17, 28, 30).  In acquiring its shares, Petersen complied with YPF's

Bylaws, including by making a tender offer in accordance with Section 7 in connection with

exceeding the 15% ownership threshold.  56.1 ¶ 63 (May 21, 2008 Letter from YPF to CNV re

Stock Tender Offer by Petersen (AR00019185 at 19185-19191)).  Petersen contributed $110.1

million in cash to the purchase, *see* 56.1 ¶ 64 (ECF No. 98 (Argentina Answer) Fifth Affirmative

Defense), and financed the remainder with a consortium of major banks, providing the YPF

ADRs as collateral, *see id.* (ECF No. 98 (Argentina Answer) ¶ 6; ECF No. 99 (YPF Answer)

¶ 6); 56.1 ¶ 65 (Credit Agreement (PT_000000608); Seller Credit Agreement (PT_000012493)).

Argentina, as YPF's Class A shareholder, approved the acquisitions, *see* 56.1 ¶ 66 (AR00066972

at 66975); 56.1 ¶ 67 (AR00013174 at 13175), as did Argentine regulators, *see* 56.1 ¶ 68

(AR00009412; AR00012180) (2008 approvals); *id.* (AR00010116; AR00009417) (2011

approvals).  Even leaders less committed to free-market principles, like then-Argentine President

Cristina Kirchner, spoke positively of Petersen's acquisition and the attendant entry of Argentine

managers to the company.  *See* 56.1 ¶ 69 (AR00056196); *see also* 56.1 ¶ 70 ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ .

     Between late 2010 and early 2012, Eton Park, a prominent New York-based investment

fund, purchased ADRs representing approximately 11.95 million shares of YPF Class D stock.

56.1 ¶ 71 (ECF No. 128 (Engel Decl.) ¶ 2).  Eton Park did not engage in any acquisition-specific

financing to purchase its YPF ADRs.  56.1 ¶ 72 (Misrahi Tr. 23:10-24:12).  Eton Park

recognized the risks involved in investing in an Argentine company but was "reassured by the

existence of a minority protection . . . in terms of bylaws."  56.1 ¶ 73 (Misrahi Tr. 66:20-24).

YPF also met Eton Park's investment criteria because YPF had been listed on the NYSE "for a period of time."  *Id.* at 47:16-21.

## III.   Argentina's Campaign To Depress YPF's Share Price, Seizure of a Controlling Stake in YPF, and Refusal To Make a Tender Offer

████████████████████████████████████

████████████████████████  Eton Park initially viewed the discovery of Vaca Muerta as "a large potential driver of value" for its investment in YPF.  56.1 ¶ 75 (Mindich Tr. 103:2-3).  ████████████████████████████████████

████████████████████████████████

Argentina, by contrast, saw this augmentation of the national patrimony as a catalyst for returning to its old ways.  It soon began a campaign to retake control of YPF (and the newly discovered oil field) by depressing YPF's share price and ultimately seizing a majority stake in the company.  On January 29, 2012, an Argentine newspaper closely allied with the Kirchner regime, *Página 12*, reported rumors that the Argentine Government was considering re-nationalizing the company.  56.1 ¶ 77 (EP_000016307).  Rumors of a government takeover continued for the next several months, with a predictably negative effect on the value of YPF shares.  On February 29, the *Financial Times* reported "[m]ounting fears" that Argentine President Cristina Kirchner would shortly announce greater government intervention into YPF. 56.1 ¶ 85 (Jude Webber, *YPF and Repsol shares hit the skids*, Financial Times, Feb. 29, 2012 (PT_COFFEE_000000464 at 464)).  Based on that fear, YPF stock lost $4 billion in market value in a single week.  *Id.*  Between January and April 2012, YPF's share price fell from $35 to less than $15.  56.1 ¶ 86 (Sharon Jan. 2022 Report for Defs. at 13, Fig. 2).  As a result of these press leaks, Moody's downgraded YPF's credit rating on March 22, 2012.  *See* 56.1 ¶ 90

(Argentina's Response to Request for Admission No. 20); *see generally* Hicks Ex. 24 (Blackett Sept. 2021 Report for Pls. ¶¶ 59-62); Hicks Ex. 25 (Coffee Sept. 2021 Report for Pls. ¶¶ 44-45).

Shareholders like Eton Park understood that, "per the bylaws of YPF," if "anyone acquire[d] more than 14.9%, it would trigger a mandatory tender for the remaining of the minorities using the max" of the four price provisions listed in the Bylaws.  56.1 ¶ 87 (EP_000006324 at 6325).  But, unbeknownst to investors, Argentina planned to re-nationalize YPF without making the required tender offer.  On February 21, 2012, Argentine Secretary of Energy Daniel Cameron sent a memorandum to Roberto Baratta, the Argentine Government's appointed member on the YPF Board, regarding "the performance of YPF and its future."  56.1 ¶¶ 79-80 (AR00069033 at 69034).  In the memo, Cameron referred repeatedly to the Government's goal of energy "self-supply."  56.1 ¶ 80 (AR00069033 at 69034).  He then addressed "the magnitude of an eventual takeover of the company" and "explore[d] the different forms of accessibility to the company."  56.1 ¶¶ 81-82 (AR00069033 at 69038, 69040) (emphasis omitted).

The "first possibility of acquiring control of" YPF, Cameron wrote, "would be under the rules of its own bylaws," which "implies moving forward with a stock tender offer."  56.1 ¶ 82 (AR00069033 at 69040).  Cameron recognized that "YPF's bylaws" were "carefully intended at the outset to defend its future minority shareholders," and he noted that, when Petersen had triggered the takeover provision through its earlier share purchases, it had paid "a premium of almost 30%."  *Id.* at 69040-69041.  Cameron estimated that, if Argentina made a tender offer and all shareholders tendered their Class D shares, Argentina would have to pay "between 11 billion and 14.5 billion dollars."  *Id.* at 69041.  In Cameron's view, "this is not the path that will allow us greater possibilities."  56.1 ¶ 83 (AR00069033 at 69041).  Instead, he stressed, "**[t]he only**

**way to go is expropriation.**" *Id.*  That was so, he advised, even though the failure to make a tender offer would "probably involve lawsuits."  56.1 ¶ 84 (AR00069033 at 69042).

In a cover email to Baratta, Cameron explained that, based on the analysis contained in the memo, the Republic had "rejected the . . . Stock Tender Offer."  56.1 ¶ 79 (AR00069033 at 69033).  And he recommended "to move toward an expropriation law . . . with the acquisition of a simple majority."  *Id.*  In "a few days," he added, "we will write . . . the first bill" regarding expropriation.  *Id.*

On April 16, 2012, having already wiped out billions of dollars in YPF's market value through press leaks, Argentina formally executed its plan to seize control of the company.  First, the Government issued Decree 530/2012, which appointed Julio De Vido, Argentina's then-Minister of Planning, Public Investment, and Services, as an "Intervenor" to exercise the powers of YPF's Board of Directors and President for 30 days (later extended for another 30 days).  *See* Hicks Ex. 62 (Uslenghi Tr. for Argentina 26:24-27:6); *see also* 56.1 ¶ 97 (Bianchi Dec. 2021 Report for Pls. ¶ 26; Comadira Sept. 2021 Report for YPF ¶ 17 ("De Vido was ordered to exercise 'the powers conferred on the Board of Directors and/or the President of the Company in the Bylaws of YPF S.A.'")).  Argentina simultaneously issued Decree 532/2012, which appointed Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as YPF's Vice-Intervenor.  56.1 ¶ 99 (Rovira Dec. 2021 Report for Pls. ¶ 22; Comadira Sept. 2021 Report for YPF ¶ 18).  Through Decrees 530 and 532, Argentina took control of YPF's management.  Hicks Ex. 35 (Rovira Dec. 2021 Report for Pls. ¶ 22); *see also* Hicks Ex. 30 (Garro Dec. 2021 Report for Pls. ¶ 61) ("When Argentina took control of the YPF Board of Directors by virtue of the Intervention Decrees, Argentina's Minister De Vido was installed as Intervenor and Argentina's Secretary of Economic Policy as YPF Vice Intervenor, granting them the powers of the YPF Board.");  56.1 ¶ 100 (AR00019489 at 19495) (Kicillof stating that, as of

April 16, 2012, Argentina managed the operations of YPF). ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████; ████████████████████████; Hicks Ex. 128

(*Petersen II*, 895 F.3d at 202) (describing how "the Intervenor seized control of YPF's facilities,

replaced top management with government officials, and escorted YPF's then-CEO off the

premises").  As Argentina has admitted in this litigation, following the April 16 intervention, it

"occupied 51% of YPF's Class D shares," 56.1 ¶ 98 (ECF No. 98 (Argentina Answer) ¶ 36),

without making a tender offer.

Despite seizing control of YPF and exercising the rights of 51% of its shares, Defendants

did not comply with the tender-offer requirement that these actions triggered; in fact, they made

it abundantly clear that they had no intention to do so.  On April 17, 2012 – one day after

Argentina took control of YPF's board and operations – Kicillof, speaking both as Argentina's

Secretary of Economic Policy and Development Planning and as YPF's new Vice-Intervenor,

announced in a formal hearing of the Argentine Congress that Argentina and YPF would not

honor the Bylaws terms that they had, for years, touted as protecting minority private investors.

Kicillof described as "fools . . . those who think that the State has to be stupid and buy

everything according to the law of YPF itself, respecting its bylaws."  56.1 ¶ 102 (AR00019489

at 19513); 56.1 ¶ 103 (Argentina's Responses to Request for Admission Nos. 42-44, 58-59).  He

also dismissed the tender-offer requirement as an unfair "bear trap."  56.1 ¶ 102 (AR00019489 at

19513).  Consistent with Kicillof's declaration, Argentina never made a tender offer – nor did it

comply with any of the other requirements of Sections 7 and 28.  Likewise, YPF never enforced

the requirements and sanctions of Sections 7 and 28 with respect to Argentina.

On May 3, 2012, and consistent with Secretary Cameron's proposal some two months

earlier, Argentina introduced legislation – Law 26,741 – to expropriate from Repsol 51% of

YPF's shares.  *See* 56.1 ¶ 105 (AR00109771 at 109772); Hicks Ex. 128 (*Petersen II*, 895 F.3d at

203) (law declared that "the fifty-one percent (51%) equity interest in YPF . . . represented by the

same percentage of Class D shares of the said Company, held by Repsol YPF S.A., . . . is hereby

declared to be . . . subject to expropriation").  Law 26,741 also provided that, effective

immediately, "the Argentine Executive Branch shall . . . exercise all rights carried by the stock to

be expropriated."  56.1 ¶ 106 (AR00109771 at 109772); *see also* Hicks Ex. 23 (Bianchi Dec.

2021 Report for Pls. ¶ 120).  The legislation did not, however, override or modify the Bylaws.

Hicks Ex. 33 (ECF No. 46 (Rovira Decl. for Pls.) ¶¶ 36-39).  To the contrary, Law 26,741

"provide[d] that YPF shall remain a publicly-traded company after the expropriation, and 'shall

not be subject to any legislation or regulation applicable to the administration, management and

control of companies or entities partly owned by the national or provincial governments' of

Argentina, confirming that YPF would continue its normal commercial activities after the

expropriation."  Hicks Ex. 128 (*Petersen II*, 895 F.3d at 208); *see also* 56.1 ¶ 107 (AR00109771

at 109773).  The legislation was enacted on May 4, 2012 and took effect on May 7, 2012.  56.1

¶ 108 (ECF No. 98 (Argentina Answer) ¶ 35).

## IV.   Post-Breach Transfer of Plaintiffs' YPF Shares

After Argentina's takeover of YPF and Defendants' repudiation of their tender-offer

obligations under the Bylaws, Plaintiffs ceased to own their respective holdings in YPF.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████   Between May and November 2012, Petersen's lenders

foreclosed on the YPF ADRs that supported their loans.  *See* 56.1 ¶ 112 (PT_000015271 (June

13, 2012 Credit Suisse letter); PT_000003922 (May 24, 2012 Credit Suisse letter);

PT_000003894 (May 24, 2012 Credit Suisse letter); PT_000015267 (May 16, 2012 Credit Suisse

letter); PT_000015263 (May 11, 2012 Credit Suisse letter); PT_000007226 (Nov. 12, 2012 Repsol letter); PT_000007120 (Nov. 12, 2012 Repsol letter)).  Meanwhile, in July 2012, Petersen filed for insolvency in Spain.  *See* 56.1 ¶ 113 (PT_000043270).

Eton Park began selling its YPF ADRs after the expropriation and, by July 2013, had completely divested from the company.  56.1 ¶ 114 (Mindich Tr. 69:23-70:23).  Eton Park chose to sell its shares because it concluded that with the "newly nationalized company . . . [we were] very likely to perform quite a bit worse."  56.1 ¶ 115 (Mindich Tr. 71:10-13).  Specifically, YPF was "materially impaired by [its] state ownership," because management would "focus[ ] on whatever the state's interests were as opposed to the interest of the minority shareholders."  *Id.* at 71:15-20.  Argentina had also "done something that was very, very problematic from the standpoint of international capital markets which also made it . . . much less advisable to own an asset in Argentina."  *Id.* at 71:21-72:1.

## PROCEDURAL BACKGROUND

On May 15, 2012, Repsol filed a putative class action against Argentina in the Southern District of New York for breaching Sections 7 and 28 of the Bylaws.  56.1 ¶ 123 (Compl., *Repsol v. Republic of Argentina*, No. 12-cv-03877-LAP, ECF No. 1 (S.D.N.Y. May 15, 2012)).  Plaintiffs were members of that putative class; however, Repsol settled individually with Argentina on May 9, 2014, before the class had been certified.  *See* 56.1 ¶ 124 (*id.*, ECF No. 31).  Argentina reportedly paid Repsol $5 billion.  *See* 56.1 ¶ 125 (Stanley Reed & Raphael Minder, *Repsol in $5 Billion Settlement With Argentina*, N.Y. Times, Feb. 25, 2014); 56.1 ¶ 124 (*Petersen*, ECF No. 269-5 (settlement agreement)); *see also* 56.1 ¶ 125 (Alex Kicillof, *Dialogos Sin Corbata* 195 (2015) (Kicillof acknowledging that Repsol "ended up collecting five billion dollars);  ██████████████████████████████████████████████████████████████████████████████████████████████████  On February 27, 2014, Repsol also entered into a

separate settlement agreement with YPF.  56.1 ¶ 126 (Comadira Sept. 2021 Report for YPF ¶ 32).  As a result, Plaintiffs were required to bring these direct actions to continue to pursue their claims.

Petersen initiated this action in May 2015, alleging breach of contract, anticipatory contract breach, breach of the implied duty of good faith and fair dealing, and promissory estoppel.  *See* Hicks Ex. 5 (ECF No. 1).  Defendants sought dismissal based on, *inter alia*, the Foreign Sovereign Immunities Act of 1976 ("FSIA"), the act of state doctrine, *forum non conveniens*, and failure to state a claim.  *See* Hicks Exs. 6, 7 (ECF Nos. 28, 33).  This Court denied Defendants' motions, except that it dismissed Petersen's promissory estoppel claims against Argentina and YPF and its good-faith-and-fair-dealing claim against YPF.  *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 2016 WL 4735367, at *16 (S.D.N.Y. Sept. 9, 2016) ("*Petersen I*").  In denying Defendants' motions, the Court observed that "the particular conduct that constitutes the gravamen" of this case is "Argentina's failure to issue a tender offer and YPF's failure to enforce the tender offer requirements that are contained in the Bylaws."  *Id.* at *5.  The Court further noted that Argentina's seizure of YPF was "fully anticipated by Section 28 of the Bylaws."  *Id.* at *6.  And it remarked that "Sections 7 and 28 of the Bylaws plausibly can be read to impose liability on YPF when shares are acquired in the triggering amount absent a tender offer."  *Id.* at *15.

Defendants pursued an interlocutory appeal of the Court's FSIA and act of state holdings to the Second Circuit, which affirmed the FSIA holding and dismissed the act of state appeal. *See Petersen II*, 895 F.3d at 198-99.  The Second Circuit "agree[d] with" this Court that, "under the bylaws, Argentina's expropriation triggered an obligation to make a tender offer for the remainder of YPF's outstanding shares."  *Id.* at 206.  Section 28(A) of the Bylaws, the court

explained, "compels Argentina to make a tender offer in accordance with the procedures set forth in the bylaws if 'by *any means* or instrument' it 'becomes the owner [of], or exercises the control of,' at least 49% of YPF's capital stock." *Id.* (emphasis and brackets in *Petersen II*). Thus, "when Argentina expropriated Repsol's 51% stake in YPF, it incurred the obligation under section 28(A) of YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares," including shares held by Petersen and any other minority shareholder. *Id.* at 207. In short, the Second Circuit held, "when Argentina asserted control over Repsol's 51% stake in YPF via expropriation, it incurred a separate commercial obligation under the bylaws to make a tender offer for the remainder of YPF's outstanding shares." *Id.* at 209. As for YPF, the court noted that "every corporation is obligated to abide by its bylaws," which required YPF to "enforce the tender offer provision" and "enforce the penalties imposed by section 7(h)" of the Bylaws. *Id.* at 210. Defendants sought and were denied Supreme Court review of the Second Circuit's decision. *See* 139 S. Ct. 2741 (2019).

Meanwhile, Eton Park filed its own lawsuit against YPF and Argentina on November 3, 2016. *See* Hicks Ex. 14 (Compl., *Eton Park Capital Management, L.P. v. Argentine Republic*, No. 16-cv-8569, ECF No. 1 (S.D.N.Y. filed Nov. 3, 2016)). After the Supreme Court denied certiorari in Petersen's case, this Court related the two cases and Defendants moved for dismissal against both Plaintiffs' complaints, this time on the single ground of *forum non conveniens*. Hicks Exs. 10-12 (ECF Nos. 106, 110-111). The Court denied the motions. *See Petersen III*, 2020 WL 3034824. In so doing, the Court noted, among other things, that it "independently" has jurisdiction under the FSIA and "Argentine law does not itself require a forum in Argentina." *Id.* at *12.

**LEGAL STANDARD**

This Court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.' " *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court has held that Plaintiffs' claims are governed by Argentine law, but the parties disagree on the interpretation and application of that law.  Disputes about the meaning of foreign law "raise questions of law, rather than questions of fact." *Kashfi v. Phibro-Salomon, Inc.*, 628 F. Supp. 727, 737 (S.D.N.Y. 1986); *see also* Fed. R. Civ. P. 44.1.

**ARGUMENT**

**I.  Defendants Are Liable for Breach of Contract**

This case is, "at its core," a "relatively standard" breach-of-contract case.  *Petersen III*, 2020 WL 3034824, at *13.  It is a relatively easy case, too.  The facts are undisputed, and the breach is plain.  Argentina seized control of YPF and exercised the rights of 51% of YPF's Class D stock.  Under the applicable Bylaws – amended by Defendants to address *that very circumstance* – Argentina was thus obligated to have made a tender offer for Plaintiffs' shares at the price set forth under the provided formulae.  It did not; indeed, it defiantly refused to do so.  YPF similarly had a duty to enforce the requirements and sanctions of the Bylaws implicated by Argentina's seizing 51% of the Class D stock, but it never did so.  Instead, it affirmatively embraced Argentina's violation of the Bylaws.  As a result of these breaches, Plaintiffs suffered

enormous economic harm.  Under governing Argentine law – which is largely similar to American law – Argentina and YPF are liable to Plaintiffs for their breaches.[5]

The parties agree that the Civil Code of Argentina of 1871 ("Civil Code"), which was in force in 2012, applies in this case.[6]  The Civil Code is a general statute that codifies the civil law of Argentina and applies to all breaches of contract, including breaches of corporate Bylaws.  *See* Hicks Ex. 116 (Civil Code art. 889); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 12); ██████

████████████████████████████████████████████████████

██████████████████████████; Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 19, 21).  Although Argentina is a civil-law jurisdiction, "the elements of breach of contract under Argentine law are familiar to those acquainted with the Anglo-American law on contractual liability."  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 8(a)); *see id.* ¶ 11 (comparing Civil Code to U.S. law).  Under Argentine law, "the elements of a breach of contract to give rise to defendants' civil liability are:  (1) the existence of a valid and binding contract; (2) a breach of that contract; (3) damages to the plaintiff; (4) that the damages were attributable to the breaching party; and (5) the breaching party acted negligently or willfully or was subject to strict liability."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 11); *see* Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 13) (same); Hicks Ex. 118 (Civil Code art. 1197); *cf. Alloy Advisory, LLC v. 503 W. 33rd St. Assocs., Inc.*, 195 A.D.3d 436, 436 (1st Dep't 2021) ("The elements of a breach of contract claim are (1) the existence of a contract, (2) the plaintiff's performance, (3) the

---

[5] There can be no genuine dispute about the material facts of Defendants' conduct.  The Factual Background, *supra*, includes additional facts concerning the historical context in Argentina; these should not be disputed either, but in any event the Court need not resolve any dispute about them to award Plaintiffs summary judgment.

[6] The current civil code is the Civil and Commercial Code of Argentina, enacted in 2015; however, the code in force at the time of Argentina's and YPF's breaching conduct was the Civil Code.

defendant's breach, and (4) resulting damages.").  Here, based on the undisputed facts, Plaintiffs have readily satisfied these elements.

*First*, there is a "valid and binding contract" establishing a contractual duty on the part of both Argentina and YPF.  As the Second Circuit has already observed, YPF's Bylaws constituted "the contract governing the relationship among YPF, Argentina (in its capacity as a shareholder), and other YPF shareholders."  *Petersen II*, 895 F.3d at 199; *see also Petersen III*, 2020 WL 3034824, at *5 (describing YPF Bylaws as "the document that formally governs the relationship between Plaintiffs and Defendants"); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 11) (explaining that "corporate bylaws under Argentine law constitute a contract between and among the shareholders and the corporation itself"); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 21) (similar).  Under that contract – which Argentina and YPF amended to address the very situation implicated here – if Argentina wished to take control of 49% or more of YPF's capital stock, it was required to comply with detailed procedures, including the tender-offer requirement.  Thus, when Argentina took over YPF by seizing control of Repsol's 51% stake, "it incurred the obligation under . . . YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares."  *Petersen II*, 895 F.3d at 207; *see also* 56.1 ¶ 110 (Republica Argentina, *Versión Taquigráfica* 52 (Mar. 13, 2014)) (Kicillof acknowledging that "[t]he buyer was under obligation to offer this price as specified by the Bylaws").  Similarly, because "every corporation is obligated to abide by its bylaws," YPF had an "obligation" to "enforce the tender offer provision" and the sanctions in the Bylaws triggered by Argentina's noncompliance. *Petersen II*, 895 F.3d at 210; *see* Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 27); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 19).

*Second*, Defendants breached their obligations.  Notwithstanding the duties imposed by Sections 7 and 28 of the Bylaws, Argentina admitted it did not make a tender offer for Plaintiffs' shares, and YPF admitted it took no steps whatsoever to enforce that requirement or the sanctions for failure to comply with it.  *See* 56.1 ¶ 94 (Argentina's Response to Request for Admission No. 25); ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████; *see also* 56.1 ¶ 96 (Ltr. from D. Hernandez to A. Goldsmith (Oct. 9, 2020) at 4) (YPF counsel stating that "YPF did not take actions" or "enforce obligations" under Bylaws following Argentina's seizure).

To this day, neither Argentina nor YPF has ever complied with these obligations.  Indeed, Secretary of Economic Policy and Development Planning and YPF Vice-Intervenor Axel Kicillof announced in public remarks before the Argentine Senate on April 17, 2012 – the day after the Government enacted Decrees 530/2012 and 532/2012 and replaced YPF's Board of Directors – that Defendants had no intention at all of complying with their obligations, labeling as "fools" those who believe "that the State has to be stupid and buy everything according to the law of YPF itself, respecting its bylaws."  56.1 ¶ 102 (AR00019489 at 19513).  Kicillof, who was formally introduced to the Senate in his dual capacity as a high-ranking government official and YPF representative, spoke for both Argentina and YPF.  *See* 56.1 ¶ 103 (Argentina's Responses to Request for Admission Nos. 42-44, 58-59); *see also* Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 49); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 33-35); Hicks Ex. 36 (Rovira Jan. 2022 Report for Pls. ¶ 26) (quoting hearing transcript).  No Argentine or YPF representative ever disclaimed that pronouncement, which was consistent with Secretary Cameron's February

2012 analysis concluding that making a tender offer was prohibitively expensive and that Argentina should expropriate a "simple majority" of YPF and do nothing more.  56.1 ¶ 79 (AR00069033 at 69033).  Indeed, two years later, Kicillof praised the breach, telling a legislative committee that, if Argentina had acquired 51% of YPF using the tender-offer provisions "specified" in the Bylaws, Argentina would have had to pay some "10.671 billion dollars."  56.1 ¶ 110 (Republica Argentina, *Versión Taquigráfica* 31 (Mar. 13, 2014)).  Kicillof's unambiguous repudiation of Defendants' obligations confirms the breach.

*Third* and *fourth*, Plaintiffs have suffered damages, and those damages were caused by Defendants' breach.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 13); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 11).  Argentina's failure to make a tender offer to Petersen and Eton Park (and all other minority shareholders), and YPF's failure to enforce the tender-offer requirement, caused Petersen and Eton Park economic injury.  Plaintiffs were entitled to cash payments from Argentina in connection with its takeover of YPF.  After all, that was the *entire point* of the tender-offer requirement in the amended Bylaws – a protection Defendants "aggressively" touted during the IPO process (and years afterward) to assuage would-be investors reluctant to buy YPF shares given Argentina's troubled economic history and penchant for reneging on its obligations.  *Petersen III*, 2020 WL 3034824, at *13; *see also Petersen II*, 895 F.3d at 200; *supra* pp. 8-14.  But Plaintiffs never received their "compensated exit," *Petersen II*, 895 F.3d at 200, because of Defendants' failure – indeed, determined refusal – to comply with their obligations.

*Fifth*, Plaintiffs are absolved from showing that the breach is due to Defendants' fault, although the undisputed facts establish fault in all events.  Under Argentine law, if the breaching party promised merely to undertake its best efforts (*obligación de medios*), the non-breaching party must show that the breach was due to fault – either negligence (*culpa*) or willful or

fraudulent intent (*dolo*).  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 15); Hicks Ex. 48 (Kemelmajer Dec. 2021 Report for YPF ¶¶ 51, 54).  If, however, the breaching party promised to achieve a specific result (*obligación de resultado*), the non-breaching party need not establish fault by the breaching party; the breaching party is strictly liable.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 16); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 23, 29); Hicks Ex. 119 (Civil Code art. 1723).  Here, Sections 7 and 28 of the Bylaws obliged Argentina to achieve a specific result – to undertake a tender offer according to the requirements set out in the Bylaws.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 17); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 27); *see also Petersen II*, 895 F.3d at 206 (explaining that Section 28(A) required "Argentina to make a tender offer in accordance with the procedures set forth in the bylaws" if it acquired at least 49% of YPF's capital stock).  Similarly, the Bylaws "required a specific result from YPF"; among other things, YPF was obliged to deny voting rights to an acquirer who failed to tender and to comply with the tender-offer requirements of the jurisdictions where the shares and securities of the corporation are listed.  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 27).  Nothing in the amended YPF Bylaws suggests that Argentina's and YPF's obligations were limited to employing their "best efforts."  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 17).  Would-be investors with concerns about purchasing YPF shares given Argentina's history would not have been assuaged by vague promises to employ "best efforts"; they needed, and received, concrete assurances of specific outcomes should the events described in Sections 7 and 28 come to pass.

Regardless, even if Plaintiffs had to establish fault, that element is readily established here.  Defendants willfully breached the contract when Kicillof, speaking on behalf of both Defendants, made clear that Argentina would not tender and YPF would not require it to do so – just as Secretary Cameron had outlined two months earlier, and as Kicillof again touted barely

two years later.  56.1 ¶ 102 (AR00019489 at 19513); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 23); Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 35).  Indeed, Defendants have never contended that their failure to abide by their obligations was anything but intentional – the culmination of a concerted campaign to re-nationalize YPF without paying the contractually required amounts to minority shareholders.

## II.    Defendants Are Liable for Damages Based on the Amount Calculated Under the Bylaws

### A.    Plaintiffs Are Entitled to Expectation Damages

Not only do the undisputed facts clearly establish that Defendants are liable for breach of contract under Argentine law; they just as clearly establish that Plaintiffs are entitled to damages for that breach pursuant to the straightforward formulae set forth in the Bylaws.[7]  As noted, Bylaws are enforceable contracts.  Breaches of corporate bylaws, therefore, "are contractual breaches that give rise to contractual civil liability."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 21); *see* Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 8(e)) (explaining that shareholders' and management's "failure" to "abide by" bylaws "entitles the aggrieved shareholders . . . to those remedies for breach of contract that are available under the Civil Code, including compensatory damages").

Under Argentine contract law, a non-breaching party is entitled to obtain expectation damages.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 20-21); *see* Hicks Ex. 113 (Civil Code art. 505) (non-breaching party entitled to any of three remedies:  specific performance by the obligor, third-party performance, or "obtain[ing] the appropriate compensation from the obligor"); Hicks Ex. 34 (Rovira Dec. 2021 ¶ 40 n.32); *see also* Hicks Ex. 117 (Civil Code art.

---

[7] Plaintiffs initially considered not seeking summary judgment on damages, *see* ECF No. 339 at 1, but expert discovery revealed that there is no genuine dispute as to any material fact relevant to damages, with the possible exception of two issues that Plaintiffs are willing to set aside to obtain a resolution, *see infra* nn.13-14.

1083) ("Compensation for harm shall consist of returning things to their previous state, unless such is impossible, in which case compensation shall be set in money.  *The victim may also opt for money compensation*.") (emphasis added).  This is recognized under Argentine law as "[t]he principle of full indemnification."  Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 45).  In short, Argentine law permits a non-breaching party "to seek specific performance or compensatory damages."  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 20).  Plaintiffs are thus entitled to compensatory damages for Defendants' breach – damages that must place them in the position they would have been in the absence of the breach.  *Id.* ¶ 21; Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 45).[8]

Where a contract breach is with willful intent (*dolo*), a plaintiff may also recover damages for "indirect" consequences of the breach.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 23); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 47); Hicks Ex. 114 (Civil Code art. 521).  Proving "willful" intent does not require evidence of actual intent to inflict harm, bad faith, or ill will; the breaching party's deliberate decision not to perform suffices to establish *dolo*, even absent a bad-faith motive.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 24).  The undisputed evidence here satisfies that standard.  Even before Argentina seized control of YPF on April 16, 2012 under Decrees 530/2012 and 532/2012, it had plotted out its intent not to honor the Bylaws and make a tender offer to minority shareholders.  And shortly after Argentina seized control of YPF, Vice-Intervenor Kicillof made plain that Defendants had no intention of honoring their obligations – as they never did.  Accordingly, not only are Petersen and Eton Park entitled to direct damages based on the amount they would have received had YPF required

---

[8] Although Plaintiffs have the option under Argentine law to obtain specific performance rather than compensatory damages, the Second Circuit has already recognized that Plaintiffs cannot seek a specific-performance remedy because they are no longer shareholders.  *See Petersen II*, 895 F.3d at 209.

Argentina to carry out a tender offer under the Bylaws, but Petersen is also entitled to indirect

damages to compensate it for the additional losses it suffered when, predictably, its lenders

foreclosed on loans backed by its YPF ADRs.

> **B.     Plaintiffs' Direct Compensatory Damages Are Calculated According to the Bylaws**

The undisputed facts permit calculation of Plaintiffs' direct damages, which are

determined according to the amended Bylaws.  The Bylaws require that the tender offer be made

at the "highest" of four formulae.  56.1 ¶ 39 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)).  Each

formula calculates a tender-offer price based on backward-looking criteria as of a "notice date,"

i.e., the date the acquiring party gives notice to YPF of the tender offer.  56.1 ¶¶ 39-40 (ECF No.

36-2 (YPF Bylaws) § 7(f)(v)(A), (B), (C), (D)).

The parties agree that Formula D provides the highest price.  *See* 56.1 ¶ 116 (Harris Dec.

2021 Report for Defs. ¶ 39; Fischel Sept. 2021 Report for Pls. Ex. 2).  That formula states that

the required consideration is equal to the following:

> [YPF's] net income per class D share during the last four complete fiscal quarters
> immediately preceding the notice date indicated in paragraph (i), multiplied by the
> higher of the following ratios:  the price/income ratio for that period for class D
> shares of stock (if any) or the highest price/income ratio for [YPF] during the two-
> year period immediately preceding the notice date indicated in paragraph (i).
> Such multiples shall be determined by applying the regular method used by the
> financial community for computing and reporting purposes.

56.1 ¶ 40 (ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)).  Thus, Formula D requires the tender offer

to be priced at the product of (a) YPF's net income per share for the four quarters preceding the

"notice date" and (b) the higher of (i) the price/net income ratio over the same period and (ii) the

highest price/net income ratio during the two years before the "notice date."  *See id.*; Hicks Ex. 1

(ECF No. 36-2 (YPF Bylaws) § 7(f)(v)(D)); Hicks Ex. 47 (Harris Dec. 2021 Report for Defs.

¶ 22).  Formula D protects minority shareholders if an acquirer chooses to take control at a

moment when the price is particularly low relative to the income of the company by guaranteeing them a price based on the highest price-to-income ratio in the prior two years.

Accordingly, to calculate damages, the Court must determine what the "notice date" would have been assuming Argentina had completed the tender-offer procedures under the Bylaws by the time of the breach on April 16, 2012.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 30-32); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 58-77).  Damages must be determined as if Argentina had completed the tender-offer process by the time it took control of YPF (and not after) because that is what the amended Bylaws required and the IPO prospectus confirmed.  *See* 56.1 ¶ 38 (ECF No. 36-2 (YPF Bylaws) § 7(e) (person "wishing" to make an "acquisition of" control ('*Adquisicion de Control*') shall make a tender offer ('*oferta publica de adquisicion*') for all shares of all classes of YPF); AR000018934 (YPF Bylaws in Spanish) § 7(e); ECF No. 36-2 (YPF Bylaws) § 7(f)(ix) (control to be taken "once th[e] [tender-offer] procedure has finished")); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶¶ 62-63) (explaining that Bylaws § 7(e)-(f) are "based on the premise that an Offeror will have completed the tender offer before taking control"); 56.1 ¶ 49 (ECF No. 112-2 (Prospectus) at 10 ("The By-laws require that certain [control] acquisitions of shares of [YPF's] capital stock . . . *be preceded by* a cash tender offer for all outstanding shares.") (emphasis added); *id.* at 80 ("*Prior to consummating* any Control Acquisition, an Offeror must . . . make a public tender offer for all outstanding shares[.]") (emphasis added); *id.* at 11 ("Under [YPF's] By-laws, in order to acquire a majority of [YPF's] capital stock . . . , the Argentine Government *first* would be required to make a cash tender offer to all holders of Class D Shares on specified terms and conditions.") (emphasis added)).

The notice date for a tender offer completed by April 16, 2012 can be determined as a matter of law; the Bylaws and Argentine regulations establish that the notice date must precede the consummation of a control acquisition by at least forty business days.  More specifically, Section 7(f)(i) of the Bylaws provides that the acquiring party "shall notify [YPF] in writing about the takeover bid at least fifteen business days in advance to the starting date thereof."  56.1 ¶ 38 (ECF No. 36-2 (YPF Bylaws) § 7(f)(i)).  Section 7(f)(vii) of the Bylaws further provides that the tender offer must remain open for "a minimum term of TWENTY (20) days and a maximum term of THIRTY (30) days" from the date the bid is authorized by the Comisión Nacional de Valores de Argentina ("CNV"), Argentina's securities regulator.[9]  *Id.* § 7(f)(vii). CNV regulations, however, require that a tender offer be open for at least twenty-five business days.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 30(h), 31); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 68).  Adding the fifteen business days' advance notice and the minimum twenty-five business days that the offer must remain open results in a notice at least forty business days before the tender offer is completed and an acquirer consummates its acquisition. Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 32); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 69); *see also* Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 8).  Thus, assuming for purposes of calculating damages under Formula D of the Bylaws that Argentina had completed the tender offer on April 16, 2012, the "notice date" would have been February 13, 2012.  56.1 ¶ 117 (Fischel Sept. 2021 Report for Pls. ¶ 30).  The tender-offer price calculated as of February

---

[9] Although the time period for CNV approval varies, the quickest that it can be obtained is fifteen business days.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 30(b), (h)); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 67).

13 is thus the amount that Plaintiffs would have received "in the absence of the breach."  Hicks

Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 21).[10]

Calculating the tender-offer price under Formula D based on a notice date of February

13, 2012 involves no disputed facts.  Plaintiffs' expert Professor Daniel R. Fischel walks through

the analysis and demonstrates that the tender-offer price for a notice date of February 13 would

have been $88.35.  56.1 ¶ 118 (Fischel Sept. 2021 Report for Pls. ¶¶ 34-39).[11]  Once the tender-

offer price is determined, Plaintiffs' damages are simply the difference between what they would

have received for their shares in a tender offer and the value they retained after Argentina failed

to tender.  56.1 ¶ 119 (*id*. ¶¶ 40-41).  The latter figure is the closing price of YPF's shares on

April 18, 2012, the next trading day after the Government's takeover.  *See id*. ¶ 41 n.73

(explaining that trading in YPF's shares was halted on April 17, 2012 due to the seizure).  These

calculations result in $7.533 billion in direct damages for Petersen and $898 million in direct

damages for Eton Park – again, using a February 13, 2012 notice date.  56.1 ¶ 119 (Fischel Sept.

---

[10] To be clear, February 13, 2012 is the *latest* date by which Argentina could provide notice in connection
with completing a tender offer by April 16, 2012 and the minimum tender-offer period.  But the notice date could be
earlier still, in light of the Government's conduct before April 16, 2012 that triggered a notice obligation under
Argentine securities law (which Section 7(f) of the Bylaws incorporates.  *See* Hicks Ex. 27 (Fischel Sept. 2021
Report for Pls. ¶ 31 n.57); Hicks Ex. 34 (Rovira Sept. 2021 Report for Pls. ¶ 75).  There is no genuine issue of
material fact, however, that the notice date was any *later* than February 13, and thus, at the summary-judgment
stage, Plaintiffs' damages can be determined at least based on that date.  An earlier notice date would not produce a
lower damages amount.

[11] ADR holders who tender their ADRs receive dollars.  *See* Hicks Ex. 32 (Lissemore Jan. 2022 Report
for Pls. ¶¶ 18-25).  Here, YPF's Bylaws required the tender offer to be made to "all shareholders and holders of
securities convertible into shares of stock," 56.1 ¶ 38 (ECF No. 36-2 (YPF Bylaws) § 7(f)(i)(F)), which included
ADR holders, and to comply with NYSE rules, *see id.* § 7(f).  Petersen's and Repsol's YPF tender offers were
priced in dollars, *see* 56.1 ¶ 63 (PT_LISSEMORE_000000153 at 163; PT_FISCHEL_000000185 at 186), but an
offer priced in pesos would have been paid to holders in dollars under YPF's deposit agreement, *see* 56.1 ¶ 34
(ECF No. 112-2 (Prospectus) at 93).  The U.S. banking system cannot distribute foreign currency to ADR holders.
*See* 56.1 ¶ 34 ███████████████████████; Lissemore Jan. 2022 Report for Pls. ¶ 17).  Professor Fischel
provides the applicable exchange rate.  *See* 56.1 ¶ 118 (Fischel Sept. 2021 Report for Pls. ¶ 39 n.69).

2021 Report for Pls. ¶¶ 40-41).[12]  Defendants' damages expert Professor Jeffrey Harris did not identify any arithmetic errors in Professor Fischel's calculations.

To be sure, these are substantial sums.  But they are not inflated by punitive damages or any other artificial factor; they are a direct result of the scope of the breach and the formula that Defendants purposefully included in the Bylaws (and touted in the IPO prospectus) in order to provide the clear promise of recompense necessary to attract billions of dollars of foreign investment.  Indeed, as Professor Fischel explains, "[b]y requiring Argentina to commit to pay what could be a very high tender price to minority shareholders if it should decide it wanted to own a controlling stake . . . in YPF again," the Bylaws provided that "the cost of any such future expropriation could be high."  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶ 26).  The Bylaws thus "created a means by which to commit to a much lower likelihood of a future . . . expropriation, thereby incentivizing greater private capital investments."  *Id.*  In other words, the direct damages occasioned by Defendants' breaches are high – but that was the point.  The amounts that Argentina might be required to pay under the tender-offer requirement had to be high enough to dissuade Argentina from wanting to re-nationalize YPF and to assure private investors that such an event would not come to pass – or, if it did, that Argentina and YPF would make good on their promises and ensure that minority shareholders were properly compensated.

## C.     The Undisputed Facts Also Establish Plaintiffs' Indirect Damages and Prejudgment Interest

As noted, Defendants are liable for Plaintiffs' indirect damages because their breaches were undertaken with *dolo*, or willful intent.  *See supra* pp. 31-32.  Petersen incurred indirect damages from Defendants' breaches because they caused Petersen's lenders to foreclose on the

---

[12] Professor Fischel subtracted as well the small dividends that Plaintiffs received on some of their shares after the expropriation; if Argentina had conducted a tender offer, Plaintiffs would not have received those dividends, so their value should be subtracted.  56.1 ¶ 119 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2).

YPF ADRs that supported their loans (pursuant to a financing structure that Defendants reviewed and approved when they permitted Petersen to acquire its stake). Although Eton Park was able to sell its shares relatively quickly after the takeover, Petersen was not free to do so, and therefore cannot be said to have retained the full benefit of their value at that time. Instead, Petersen received only the value that its lenders credited to it when they foreclosed on the shares at even lower prices. Therefore, as indirect damages, Petersen should also receive the value that its shares lost between April 16, 2012 and their foreclosure – $156 million. 56.1 ¶ 120 (Fischel Sept. 2021 Report for Pls. ¶ 49).[13]

Plaintiffs are also entitled to prejudgment interest. Under Argentine law, prejudgment interest is a required component of compensation. *See* Hicks Ex. 115 (Civil Code art. 622). In the absence of agreement by the parties or a statutory rate – as is the case here – it is up to the court to determine the appropriate rate, "with the ultimate goal of compensating the creditor in full for the lost opportunity of the use of its money." Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶¶ 38-39); *see* Hicks Ex. 115 (Civil Code art. 622). Because Argentina should have launched a tender in New York on the NYSE for Plaintiffs' ADRs, the relevant prejudgment interest rate is New York's 9%. That rate generates $6.405 billion in prejudgment interest on the tender offer that Petersen should have received and $763 million on the tender offer that Eton Park should have received through September 24, 2021, with prejudgment interest continuing to accrue thereafter. *See* 56.1 ¶ 121 (Fischel Sept. 2021 Report for Pls. ¶¶ 44-47; Fischel Jan. 2022

---

[13] Although not suitable for determination at the summary-judgment stage, it bears emphasizing that there are further indirect damages based on the interest that accrued on Petersen's outstanding debts from 2012 onward. Because none of this interest would have accrued if Argentina had launched a tender offer and Petersen had paid off its loans in 2012, Defendants should compensate Petersen for these damages as well. Plaintiffs would forgo those claims in an effort to facilitate an expeditious resolution of the entire suit. But, if summary judgment is denied, Plaintiffs intend to seek this category of damages, which would require further factual determinations regarding the additional amounts owed by Petersen as a result of Defendants' breaches.

Report for Pls. Exs. R1, R2).  The additional $156 million Petersen lost as a result of the drop in value of its shares generates prejudgment interest of $133 million through September 24, 2021, with prejudgment interest continuing to accrue thereafter.  56.1 ¶ 122 (Fischel Sept. 2021 Report for Pls. ¶ 49).[14]  Defendants' damages expert Professor Jeffrey Harris did not identify any arithmetic errors in Professor Fischel's calculations.

As with the damages amounts, the magnitude of prejudgment interest is significant, but again entirely attributable to Defendants' conduct.  Eton Park and Petersen filed suit *six* and *seven years ago*, respectively, and before that were included in Repsol's putative class action filed ten years ago.  And yet the case is only now even reaching the summary-judgment stage, after Defendants pursued interlocutory appeals to the Second Circuit (one of which was dismissed), unsuccessfully sought certiorari before the U.S. Supreme Court, filed yet another unsuccessful motion to dismiss upon remand to this Court, and have constantly sought to push back the discovery and summary-judgment schedules.  All of this is of a piece with Defendants' original plan in February 2012 to breach the Bylaws and shirk their tender-offer obligations, knowing full well that shareholders would sue but betting (correctly) that Defendants could postpone payment by dragging out the litigation.

* * *

This is as straightforward a breach-of-contract case as they come.  That is no accident.  To be meaningful, the contractual promises here needed to be clear.  To say that Argentina had a

---

[14] In an effort to facilitate an expeditious resolution of this entire lawsuit, for purposes of this summary-judgment motion, Plaintiffs seek only the New York rate, but if further factual determinations remain necessary, Plaintiffs reserve the right to seek a higher rate at a later stage.  If the Court wishes to decide the prejudgment interest rate as a matter of law at the summary-judgement stage, and not delve into the factual issues surrounding Argentina's borrowing costs, it could impose either the New York rate or the prejudgment interest rate typically awarded by Argentine courts in commercial cases, which is between 6% and 8%.  Hicks Ex. 29 (Garro Sept. 2021 Report for Pls. ¶ 41 & n.67) (collecting examples).  Professor Fischel has provided the relevant calculations.  Hicks Ex. 27 (Fischel Sept. 2021 Report for Pls. ¶¶ 44-47); Hicks Ex. 28 (Fischel Jan. 2022 Report for Pls. Exs. R1, R2).

checkered history with international capital markets and an attraction toward economic nationalism is a substantial understatement.  To entice private investors into purchasing shares of a newly privatized company in the one sector most vulnerable to re-nationalization notwithstanding that history required not just promises, but pellucidly clear and readily enforceable promises.  Vague assurances that, in the event of a re-nationalization, investors might get some recompense based on the intricacies of Argentine corporate law would not have been remotely sufficient to get investors to part with their cash in exchange for a share in an until-then state-run oil company in a nation where economic nationalism had far deeper roots than free-market principles.  As a consequence, the YPF Bylaws were amended to make promises that were both extraordinary and extraordinarily clear, allowing the value of the promised tender offer to be calculated down to the penny.  Those clear promises were repeatedly emphasized in securities filings – during YPF's IPO and in subsequent years.  Defendants' clear promises had their intended effect of giving Argentina access to the NYSE and allowing YPF to raise substantial capital.  But, in the end, the clear promises did not prevent an equally clear breach.  Given that Defendants unambiguously breached their contractual promises – and deliberately so, as part of a considered scheme from which they knew litigation and ultimate liability would flow – summary judgment on both the merits and damages should follow directly.

Defendants will predictably try to divert the Court's attention away from their clear promises and clear breach by raising all manner of irrelevancies:  quibbles about timing, aspersions against Plaintiffs, implausible forays into Argentine corporate law – indeed, anything but their contractual promises and the absolute centrality of those promises to raising capital in the first place.  None of those makeweight considerations can change the simple and outcome-determinative reality that Defendants repeatedly made (and repeatedly touted) clear promises to

protect minority shareholders, and then utterly disregarded those clear promises, disparaging the option of honoring them as "stupid."

The Supreme Court recently reaffirmed "a principle as old as the Nation itself": "Government[s] should honor [their] obligations." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1331 (2020). But although that principle has long been "a cornerstone of fiscal policy" in this Nation, *id.*, even our government sometimes needs the courts to step in and enforce the government's promises, as *Maine Community* aptly demonstrates. The result should be no different when foreign governments and foreign companies come into the United States and make clear promises to induce would-be investors and gain access to U.S. capital markets. By enforcing those promises here, this Court will not only provide long-awaited justice for Plaintiffs but also allow future companies to raise money from U.S. investors who can remain secure in the knowledge that a promise is a promise, not an illusion or an invitation to debate the corporate law of a foreign sovereign.

## **CONCLUSION**

This Court should grant summary judgment to Plaintiffs.

Dated: April 14, 2022

Respectfully submitted,

KIRKLAND & ELLIS LLP

By:       /s/ Paul D. Clement
Paul D. Clement
George W. Hicks, Jr.
C. Harker Rhodes, IV
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone:  (202) 389-5000
Fax:  (202) 389-5200
Email:  paul.clement@kirkland.com
       george.hicks@kirkland.com
       harker.rhodes@kirkland.com


KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
Email:  mhansen@kellogghansen.com
       dho@kellogghansen.com
       agoldsmith@kellogghansen.com


KING & SPALDING LLP

Israel Dahan
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone:  (212) 556-2114
Fax:  (212) 556-2222
Email:  idahan@kslaw.com
       lharis@kslaw.com

-and-

Reginald R. Smith
1100 Louisiana Street
Houston, TX 77002
Phone:  (713) 751-3200
Fax:  (713) 751-3290
Email:  rsmith@kslaw.com

*Counsel for Plaintiffs Petersen Energía Inversora,
S.A.U., Petersen Energía, S.A.U., Eton Park Capital
Management, L.P., Eton Park Master Fund, Ltd.,
and Eton Park Fund, L.P.*