UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U.,<br><br>                    Plaintiffs,<br><br>-against-<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                    Defendants. | 15 Civ. 2739 (LAP)<br>16 Civ. 8569 (LAP)<br><br>OPINION & ORDER |
| ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P.,<br><br>                    Plaintiffs,<br><br>-against-<br><br>ARGENTINE REPUBLIC and YPF S.A.,<br><br>                    Defendants. | |

LORETTA A. PRESKA, Senior United States District Judge:

     Plaintiffs Petersen Energía Inversora, S.A.U. and Petersen Energía, S.A.U. (together, "Petersen") and Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P. (together, "Eton Park," and together with Petersen, "Plaintiffs"), who previously owned stakes in Argentine energy company YPF S.A. ("YPF"), commenced actions against the Argentine Republic (the "Republic") and YPF (collectively, "Defendants").

1

Petersen filed its Complaint in April 2015,[1] alleging breach of contract, anticipatory contract breach, breach of the implied duty of good faith and fair dealing, and promissory estoppel claims against both the Republic and YPF.  On September 9, 2016, the Court denied Defendants' motions to dismiss based on the Foreign Sovereign Immunities Act of 1976 ("FSIA"), the act-of-state doctrine, forum non conveniens, and failure to state a claim, except to grant Defendants' motions to dismiss Petersen's promissory estoppel claims against the Republic and YPF and its good faith and fair dealing claim against YPF.  See generally Petersen Energía Inversora, S.A.U. v. Argentine Republic (Petersen I), 2016 WL 4735367, at *16 (S.D.N.Y. Sept. 9, 2016).

After Defendants pursued an interlocutory appeal of the Court's FSIA and act-of-state holdings, the Court of Appeals affirmed the Court's FSIA holding and declined to reach the Court's act-of-state holding.  Petersen Energía Inversora S.A.U. v. Argentine Republic (Petersen II), 895 F.3d 194, 198-99 (2d Cir. 2018), cert. denied, 139 S. Ct. 2741 (2019).  The Court of Appeals "agree[d] with" this Court that, "under the bylaws, Argentina's expropriation triggered an obligation to make a tender offer for the remainder of YPF's outstanding shares" and

---

[1] Complaint ("Petersen Complaint"), dated Apr. 8, 2015 [dkt. no. 1].

that this obligation was "a separate commercial obligation."
Id. at 206-09.  Defendants thereafter petitioned for certiorari,
which was denied.

As this was ongoing, Eton Park filed its own lawsuit
against Defendants on November 3, 2016.[2]  The Eton Park Complaint
alleged breach of contract, anticipatory contract breach, and
breach of the implied duty of good faith and fair dealing claims
against both the Republic and YPF.  The Court subsequently found
the two cases to be related.  Upon remand, Defendants moved for
dismissal against both Plaintiffs' complaints, this time based
solely on forum non conveniens, which the Court denied.
Petersen Energía Inversora S.A.U. v. Argentine Republic
(Petersen III), No. 15 Civ. 2739 (LAP), 2020 WL 3034824, at *13
(S.D.N.Y. June 5, 2020).

Plaintiffs now move for summary judgment on their breach of
contract claims or, in the alternative, their anticipatory
breach claims, against Defendants and oppose the motions for

---

[2] Complaint ("Eton Park Complaint"), Eton Park Capital
Management, L.P. v. Argentine Republic, No. 16-cv-8569 (S.D.N.Y.
filed Nov. 3, 2016), ECF No. 1.  Unless otherwise noted, all
future docket references will be to the Petersen docket (15-cv-
2739).

summary judgment filed by the Republic and YPF.[3]  The Republic and YPF each affirmatively move for summary judgment on all of Plaintiffs' claims and oppose Plaintiffs' motion for summary judgment.[4]

For the reasons stated below, YPF's motion for summary judgment is granted, the Republic's motion for summary judgment

---

[3] (See Notice of Plaintiffs' Motion for Summary Judgment, dated Apr. 14, 2022 [dkt. no. 359]; Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Pls.' Mot."), dated Apr. 14, 2022 [dkt. no. 371]; Declaration of George W. Hicks, Jr. ("Hicks Decls."), dated Apr. 14, 2022 and May 26, 2022 [dkt. nos. 374, 391]; Plaintiffs' Combined Opposition to Defendants' Motions for Summary Judgment ("Pls.' Opp'n"), dated May 26, 2022 [dkt. no. 392]; Plaintiffs Combined Reply in Support of Their Motion for Summary Judgment ("Pls.' Reply"), dated June 23, 2022 [dkt. no. 405].)

[4] (See Defendant the Agentine Republic's Notice of Motion for Summary Judgment, dated Apr. 14, 2022 [dkt. no. 360]; The Republic's Memorandum of Law in Support of Its Motion for Summary Judgment ("Republic's Mot."), dated Apr. 14, 2022 [dkt. no. 373]; Declaration of Robert J. Giuffra, Jr. ("Giuffra Decl."), dated April 14, 2022 [dkt. no. 363]; Notice of Motion by Defendant YPF S.A. for Summary Judgment on All Remaining Claims, dated Apr. 14, 2022 [dkt. no. 367]; Memorandum of Law in Support of Defendant YPF S.A.'s Motion for Summary Judgment ("YPF's Mot."), dated Apr. 14, 2022 [dkt. no. 369]; Declaration of Mark P. Goodman ("Goodman Decl."), dated April 14, 2022 [dkt. no. 377]; Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Joint Opp'n"), dated May 26, 2022 [dkt. no. 402]; YPF's Supplemental Opposition to Plaintiffs' Motion for Summary Judgment ("YPF's Supp. Opp'n"), dated May 26, 2022 [dkt. no. 399]; The Republic's Reply Memorandum of Law in Support of Its Motion for Summary Judgment ("Republic's Reply"), dated June 23, 2022 [dkt. no. 410]; YPF's Reply in Support of Its Motion for Summary Judgment ("YPF's Reply"), dated June 23, 2022 [dkt. no. 412].)

is granted as to Plaintiffs' claim for breach of the duty of good faith and fair dealing and is otherwise denied. Plaintiffs' motion for summary judgment against the Republic is granted as to liability but denied as to damages.

## I.   Background

### A.   Facts

The Court assumes familiarity with this dispute, the facts of which have been set out at length in the prior opinions of this Court and the Court of Appeals.  Unless otherwise noted, the facts recounted herein are undisputed.

Originally founded in 1922 as a state-run company, YPF is currently a corporation (*sociedad anónima*) incorporated under the laws of Argentina.  (Plaintiffs' Counter to YPF's Rule 56.1 SUF ("Pls.' Counter to YPF's 56.1") [dkt. no. 394] ¶ 1; Defendants' Counter to Plaintiffs' Rule 56.1 SUF ("Defendants Counter 56.1") [dkt. no. 401] ¶ 3.)  Prior to 1993, YPF was wholly-owned and operated by the Republic.  (Pls.' Counter to YPF's 56.1 ¶ 4; Defendants' Counter 56.1 ¶ 2.)  YPF was privatized in 1993.  Prior to privatization, the Argentine executive branch issued Decree No. 1106/93 ("Executive Order 1106/93"), which stated that, in order to enact Argentine Law No. 24,145, the law which approved the privatization of YPF, "new Bylaws of YPF . . . shall be approved . . . to replace

[YPF's prior] Bylaws."   (Giuffra Decl., Ex. 73 (Executive Order 1106/93) at 1.)  To do so, the Republic approved the text of the amended Bylaws via Executive Order 1106/93 and "instruct[ed]" the Argentine Ministry of the Economy of Public Works and Services, "in its capacity as shareholder of YPF," to "submit for consideration . . . the replacement" bylaws and "cause the same to be approved."  (Id. at 2.)  Among other things, the Republic and YPF amended Sections 7 and 28 of YPF's bylaws. (Id.)

The language of Section 7(d) pertinent to the instant dispute provides:

> If the terms of subsections e) and f ) of this section are not complied with, it shall be forbidden to acquire shares or securities of [YPF], whether directly or indirectly, by any means or instrument . . . if, as a result of such acquisition, the purchaser becomes the holder of, or exercises the control of, class D shares of stock of [YPF] which, in addition to its prior holdings of such class (if any), represent, in the aggregate, FIFTEEN PERCENT (15%) or more of the capital stock, or TWENTY PERCENT (20%) or more of the outstanding class D shares of stock, if the shares representing such TWENTY PERCENT (20%) constitute, at the same time, less than FIFTEEN PERCENT (15%) of the capital stock.

(Giuffra Decl., Ex. 1 ("Bylaws") § 7(d).)  Sections 7(e) and 7(f) in turn require parties who wish to acquire control of such shares to comply with certain obligations, including making a

tender offer subject to certain formulae before taking control. (Bylaws § 7(e).)  Shares acquired "in breach of" Sections 7(e) and 7(f), including the tender offer requirement, "shall not grant any right to vote or collect dividends or other distributions that [YPF] may carry out, nor shall they be computed to determine the presence of the quorum at any of the shareholders' meetings of [YPF]."  (Bylaws § 7(h).)

Section 28 of the amended Bylaws extends the requirements and sanctions of Section 7 to the Argentine Government, while setting certain Government-specific thresholds that trigger the tender offer requirement.  Titled "Provisions applicable to acquisitions by the National Government," Section 28 provides in relevant part:

> The provisions of subsections e) and f ) of Section 7 . . . shall apply to all acquisitions made by the National Government, whether directly or indirectly, by any means or instrument, of shares or securities of [YPF], 1) if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of, the shares of [YPF], which, in addition to the prior holdings thereof of any class of shares, represent, in the aggregate, at least 49% of the capital stock; or 2) if the National Government acquires at least 8% of class D outstanding shares of stock, while withholding class A shares of stock amounting at least to 5% of the capital stock . . . .

(Bylaws § 28(A).)  Section 28(C) provides that the sanctions in Section 7(h) "shall be applied" to Argentina "with no kind of limitation whatsoever," unless "the acquisition in breach of the provisions of Section 7 and [Section 28] has occurred gratuitously," i.e., without intent to exceed the applicable acquisition thresholds, in which case the sanction is limited to "the loss of the right to vote."  (Bylaws § 28(C).)

From 2008 to 2011, Petersen purchased American Depositary Receipts ("ADRs") representing approximately 25% of YPF's ADRs. (Defendants' Counter 56.1 ¶ 62.)  Between November 2010 and March 2012, Eton Park owned American Depositary Shares ("ADSs") in an amount representing approximately 11.95 million Class D shares of YPF.  (Id. ¶ 71.)

On April 16, 2012, the Argentine executive branch submitted a bill to the National Congress that, if enacted, would begin the process of expropriating 51% of YPF's Class D shares from Spanish oil company Repsol S.A. ("Repsol"), a large YPF shareholder.  (Plaintiffs' Counter to the Republic's Rule 56.1 SUF ("Pls.' Counter to Republic's 56.1") [dkt. no. 393] ¶¶ 20-21, 59.)  At the same time, the Argentine executive branch issued emergency decree 530/2012 (the "Intervention Decree"), which provided for the immediate appointment of a temporary "intervenor" who was granted the "powers conferred by the YPF

S.A. Bylaws to the Board of Directors and/or the President of the company." (Pls.' Counter to Republic's 56.1 ¶¶ 60-62.) Argentina simultaneously issued Decree 532/2012, which appointed Axel Kicillof, then-Secretary of Economic Policy and Development Planning, as the "Vice- Intervenor" of YPF. (Defendants' Counter 56.1 ¶ 99.) On May 3, the National Congress enacted the proposed bill, which went into effect on May 7, 2012 as Argentine Law No. 26,741 (the "YPF Expropriation Law"). (Pls.' Counter to Republic's 56.1 ¶ 66; Giuffra Decl., Ex. 72 (YPF Expropriation Law).) The YPF Expropriation Law provided that the Republic would "exercise all the political rights associated with the shares subject to expropriation until the transfer of political and economic rights is completed." (YPF Expropriation Law Art. 9.) The Republic finally completed the expropriation of Repsol's shares on May 8, 2014 and took title to the expropriated shares on that date. (Pls.' Counter to Republic's 56.1 ¶ 98.)

The Republic did not commence a tender offer for outstanding shares of YPF capital stock in 2012. (Defendants' Counter 56.1 ¶ 109.) Nor has it commenced a tender offer since then.

**B.   Procedural History**

In April 2015, Petersen sued the Republic and YPF in this Court.  As relevant here, Petersen brought a breach-of-contract claim alleging that the Republic had violated the YPF Bylaws through its "acquisition of a controlling stake in YPF" without making a tender offer to other shareholders.  (Petersen Complaint ¶¶ 51-54.)  Petersen also brought a good-faith-and-fair-dealing claim based on the Republic's supposed "wide-ranging campaign against YPF's shareholders . . . to depress the value of YPF's shares."  (Id. ¶¶ 60-63.)  As to YPF, Petersen alleged that YPF breached its alleged obligations under the Bylaws by "(1) failing to enforce the bylaws' tender offer provisions vis-à-vis Argentina[;] . . . (2) failing to enforce the penalties that section 7(h) imposes on shareholders who have breached their tender offer obligations[,]" Petersen II, 895 F.3d at 210; and (3) "failing to distribute dividends to YPF's shareholders, including Petersen." Petersen I, 2016 WL 4735367, at *15.

Defendants moved to dismiss the Petersen Complaint, contending that the claims were barred by the FSIA or the act-of-state doctrine and otherwise failed to state a claim.  The Court dismissed Petersen's promissory estoppel claims against Argentina and YPF and its good-faith-and-fair-dealing claim

against YPF.  Id. at *16.  However, the Court held that
Petersen's breach-of-contract claims fell within the FSIA's
"commercial activity" exception to sovereign immunity, 28 U.S.C.
§ 1605(a)(2), holding that the Republic's expropriation
"triggered" the Republic's separate "commercial contractual
obligations" to commence a tender offer consistent with the
Bylaws. Id. at *6.  For similar reasons, the Court rejected the
Republic's act-of-state defense.  Id. at *7-8.  Thereafter, Eton
Park filed a substantively similar suit against the Republic and
YPF, and the Court treated the cases as related.

Defendants pursued an interlocutory appeal of the Court's
FSIA and act-of-state holdings to the Court of Appeals, which
affirmed the FSIA holding and dismissed the act-of-state appeal.
See Petersen II, 895 F.3d at 198-99.  The Court of Appeals
"agree[d] with" this Court that, "under the bylaws, Argentina's
expropriation triggered an obligation to make a tender offer for
the remainder of YPF's outstanding shares."  Id. at 206.
Section 28(A) of the Bylaws, the Court of Appeals explained,
"compels Argentina to make a tender offer in accordance with the
procedures set forth in the bylaws if 'by any means or
instrument' it 'becomes the owner [of], or exercises the control
of,' at least 49% of YPF's capital stock."  Id. (alteration in
original).  Thus, "when Argentina expropriated Repsol's 51%

stake in YPF, it incurred the obligation under section 28(A) of YPF's bylaws to make a tender offer for the remainder of YPF's outstanding shares."  Id. at 207.  As such, "when Argentina asserted control over Repsol's 51% stake in YPF via expropriation, it incurred a separate commercial obligation under the bylaws to make a tender offer for the remainder of YPF's outstanding shares."  Id. at 209.  Defendants sought and were denied certiorari.  See 139 S. Ct. 2741 (2019).

On their return to this Court, Defendants once again moved to dismiss, this time based solely on forum non conveniens.  In denying that motion, the Court noted, among other things, that "all agree that Argentine law applies to this action."  Petersen III, 2020 WL 3034824, at *13.  In addressing Defendants' argument that Argentine courts have "exclusive jurisdiction" over "'corporate' claims," the Court found that Section 5(11) of the Argentine National Code of Civil and Commercial Procedure, which applies to all "claims 'based on corporate relationships,'" was so broadly worded that Plaintiffs' claims were "corporate claims" for purposes of Section 5(11), even though Plaintiffs' claims were "contractual in nature."  Id. at *12.  The Court nonetheless retained jurisdiction, finding that Section 5(11) did "not speak to international jurisdiction and does not purport to address the ability of foreign courts to

address" claims that fell within the procedural ambit of Section 5(11).  Id.

## II.  **Legal Standards**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'"  Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The interpretation and application of foreign law is a legal question appropriate for resolution by the Court on summary judgment.  Fed. R. Civ. P. 44.1; Republic of Turkey v. Christie's Inc., 425 F. Supp. 3d 204, 214 (S.D.N.Y. 2019); see also Rutgerswerke AG & Frendo S.p.A. v. Abex Corp., No. 93 CIV. 2914 JFK, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2020).  The testimony of experts is "the basic mode of proving foreign law," Jonas v. Est. of Leven, 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) (internal quotations and citations omitted), but the Court may consider "any relevant material or source."  Fed. R. Civ. P.

44.1; see also Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co., Ltd., 138 S. Ct. 1865, 1873 (2018).  "Disagreement among legal experts on content, applicability, or interpretation of foreign law . . . does not create genuine issues of material fact."  Rutgerswerke AG, 2002 WL 1203836, at *16.  Disputes about the meaning of foreign law "raise questions of law, rather than questions of fact."  Kashfi v. Phibro-Salomon, Inc., 628 F. Supp. 727, 737 (S.D.N.Y. 1986); see also Fed. R. Civ. P. 44.1.

While the Court must "accord respectful consideration to a foreign government's submission," "the appropriate weight in each case will depend upon the circumstances" and where, as here, the foreign government "offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission."  Animal Sci. Prods., 138 S. Ct. at 1869, 1873.

## III. Discussion

The parties' motions for summary judgment are somewhat unique insofar as certain key facts are not in serious dispute. Rather, the parties argue primarily about the import of those facts, the interpretation of the Bylaws and Argentine law, and whether the operation of Argentine law bars Plaintiffs' claims.

For example, the Republic and YPF do not dispute that Sections 7 and 28 of YPF's Bylaws, on their face, required that

the Republic make a tender offer upon acquisition of more than 49% of YPF's capital stock.  There is also no question, or dispute, that the Republic failed to make the tender offer called for by the Bylaws at the time it acquired control of more than 51% of YPF's capital stock or any time thereafter.  As a consequence, there is no dispute that Plaintiffs never received a tender offer calculated pursuant to the Bylaws.  This harmed Plaintiffs because they never received the compensated exit that Sections 7 and 28 promised.  These facts, according to Plaintiffs, require summary judgment in their favor.

The Republic disagrees but not because it disagrees that these events occurred as set forth above.  Rather, it argues that Plaintiffs' claims fail because (i) Plaintiffs are not currently security holders and were not security holders when the Republic acquired Repsol's shares and therefore lack standing, (ii) the asserted claims are not cognizable under Argentine law because Argentine law does not recognize a breach of contract claim between shareholders and does not permit the damages claim Plaintiffs assert, (iii) the asserted claims impermissibly challenge the Republic's sovereign activity, and (iv) the asserted claims are barred by Argentine public law. YPF adopts the Republic's arguments to the extent they apply to YPF and further argues that (i) YPF did not owe Plaintiffs any

15

obligations pursuant to Sections 7 and 28 of the Bylaws, (ii) Plaintiffs cannot demonstrate that YPF's conduct caused their damages, (iii) the Section 7(h) claim was superseded and excused pursuant to Argentine law, (iv) Plaintiffs' claims are barred because they have not satisfied the Argentine corporate law prerequisites to suit for damages, and (v) Plaintiffs lack standing to assert their claims.

With the exception of its argument that Plaintiffs were not security holders at the necessary time, the Republic does not engage with the merits or substantive elements of Plaintiffs' breach of contract claim and instead argues that Plaintiffs lack the legal ability to assert their breach of contract claim for the legal reasons set forth above and addressed in greater detail below.  Even the Republic's standing arguments turn not on a factual dispute but on the meaning of the Bylaws and the legal effect of the security transfers.  YPF does dedicate much of its briefing to disputing whether Plaintiffs have established the elements of a breach of contract claim, specifically whether Plaintiffs have demonstrated (i) that the Bylaws required YPF to enforce the tender offer requirements and related sanctions and (ii) causation.  However, the first argument is, again, a legal question for the Court to resolve to the extent the Bylaws are unambiguous.  As a result, many of the parties' arguments turn

16

on the interpretation of the Bylaws and of Argentine law, matters that the Court must resolve as a matter of law.  The Courts legal conclusions will, in large part, resolve the parties' motions for summary judgment because, once the Court decides the legal issues, the relatively simple facts in this case will demand a particular outcome.

The Court therefore first considers whether Plaintiffs have carried their burden of demonstrating their entitlement to summary judgment on their breach of contract claims.  In doing so, the Court will decide the frequently dispositive legal questions.  To the extent Plaintiffs' claims survive, the Court will turn to the parties' arguments as to whether Argentine law nonetheless bars Plaintiffs' claims.[5]

### A. Plaintiffs are Entitled to Summary Judgment Against the Republic on their Breach of Contract Claims

Plaintiffs argue that, under Argentine law, "the elements of a breach of contract to give rise to defendants' civil

---

[5] Though it will not so state every time, when the Court analyzes Argentine law it will be mindful of the "respectful consideration" to which the Republic is due.  However, there is "cause for caution in evaluating the [Republic's] submission[s]" concerning Argentine law because they were made not only in the "context of litigation" but in the "context of litigation" against the Republic itself.  Animal Sci. Prods, 138 S. Ct. at 1869, 1873.  The Court will therefore assign the Republic's views "the appropriate weight" based on these circumstances. Id.

liability are" largely similar to a common law breach of
contract claim and include: "(1) the existence of a valid and
binding contract; (2) a breach of that contract; (3) damages to
the plaintiff; (4) that the damages were attributable to the
breaching party; and (5) the breaching party acted negligently
or willfully or was subject to strict liability." (Pls.' Mot.
25 (citing Hicks Decls., Ex. 34 (Rovira Sept. 2021 Report for
Pls.) ¶ 11; id., Ex. 29 (Garro Sept. 2021 Report for Pls.) ¶ 13
(same); id., Ex. 118 (Civil Code art. 1197)).) Defendants do
not dispute that these are the elements of an Argentine breach
of contract claim. Plaintiffs argue that these elements are
clearly satisfied here. The Court considers each element in
turn.

### 1. Plaintiffs' Have Demonstrated the Existence of a Valid and Binding Contract Against the Republic but Not Against YPF

As to the first element, Plaintiffs argue that the Bylaws
constitute a "valid and binding contract" that required the
Republic to make a tender offer for YPF's remaining outstanding
shares if it acquired control of more than 49% of YPF's capital
stock. (Pls.' Mot. 26.) The Republic disputes this element,
arguing that Plaintiffs were required to be, but were not,
security holders both today and when the Republic acquired legal
title to Repsol's shares in order to have standing to assert

18

rights under the Bylaws.  As to YPF, Plaintiffs argue that the Bylaws imposed a duty on YPF to "enforce the tender offer provision" and the sanctions in the Bylaws triggered by Argentina's noncompliance because it is "obligated to abide by its bylaws."  (Id. (quoting Petersen II, 895 F.3d at 210).)  YPF vigorously disputes that the Bylaws imposed any such obligation on it.  The Court first addresses YPF's argument that the Bylaws do not impose a duty to enforce Sections 7 and 28 of the Bylaws on it and then turns to the Republic's argument regarding Plaintiffs' right to enforce the Bylaws against it.

> a. **Plaintiffs' Breach of Contract Claims Against YPY Fail Because the Bylaws Do Not Require YPF to Enforce the Tender Offer Requirements or Sanctions for Failure to Do So**

Plaintiffs' theory of liability against YPF rests on the assertion that YPF was obligated to force the Republic to make the required tender offer or, failing that, to enforce the sanctions contained in the Bylaws.  YPF vigorously disputes that it owed any such duty based on the plain language in the agreement.  This argument is a legal argument about the meaning of the Bylaws, which the Court may determine as a matter of law if the Bylaws are unambiguous.  For the reasons set forth below, Plaintiffs' claim for breach of contract against YPF fails

because the Bylaws do not impose an obligation on YPF to enforce Sections 7 and 28 of the Bylaws.

At the threshold, the Court rejects Plaintiffs' argument that the Court of Appeals' decision in Petersen II bars YPF from arguing that it did not have a duty to enforce the relevant Bylaws provisions.  Plaintiffs argue that the Court of Appeals already held that "every corporation is obligated to abide by its bylaws" and that YPF had a specific contractual "obligation to enforce the tender offer provision" and the concomitant sanctions for failing to do so.  (Pls.' Mot. 26 (citing Petersen II, 895 F.3d at 210).)  In Plaintiffs' view, this establishes YPF's obligation to enforce the Bylaws as the law of the case and ends the matter.  The Court disagrees.  The Court of Appeals considered whether this Court's denial of YPF's motion to dismiss on sovereign immunity grounds was proper, not whether the claims themselves were meritorious.  Petersen II, 895 F.3d at 199.  The Court of Appeals' statement that "every corporation is obligated to abide by its bylaws," id. at 210, and conclusion that Petersen's "theory" of liability against YPF involved commercial rather than sovereign activity, pertained to Plaintiffs' allegations and was not a binding conclusion that YPF had, pursuant to the language of the Bylaws and as a matter of Argentine law, the obligation to enforce the relevant Bylaws

provisions.  Id.; see also Atlantica Holdings, Inc. v. Sovereign
Wealth Fund Samurk-Kazyna JSC, 813 F.3d 98, 107-08 (2d Cir.
2016) (noting in the FSIA context, relevant inquiry is only
whether complaint "allege[s] facts sufficient to establish an
exception to sovereign immunity" and does not require "analysis
of each individual claim").  As such, the Court of Appeals did
not decide this issue, and YPF is not foreclosed from arguing
that the Bylaws did not impose this obligation on it.  And, as
YPF notes, if it was not obligated to enforce Sections 7 and 28,
it could fail to do so and still "abide" by its Bylaws.  (YPF's
Mot. 10.)

Turning to the merits, as with the common law, Argentine
law looks first to the plain language of the agreement,
interpreted in the context of the agreement as a whole, to
determine the parties' obligations.  (Goodman Decl., Ex. 54
(Argentine Commercial Code ("ACC")) Art. 217 ("The words of
contracts and conventions must be understood in the sense given
to them by general usage, even if the obligator claims to have
understood them differently."); id., Ex. 54 (ACC) Art. 218 (the
literal terms govern, except when they are ambiguous: "Where it
is necessary to interpret a contractual clause, the following
bases shall serve for interpretation: 1) If there is ambiguity in
the words, the common intent of the parties must be sought

rather than the literal meaning of the terms."); id., Ex. 56
(Argentine Supreme Court of Justice, <u>Mevopal S.A. v. Banco
Hipotecario Nacional</u>, 1985) at 307:2216 ("[W]hen the terms or
expressions used in a contract are clear and conclusive . . .
one has no option but to apply them, without the need for
additional interpretative work . . . .").)

    The kernel of the dispute here is how the Bylaws' use of
passive voice when establishing the tender offer requirement,
and the consequences of a failure to comply with the tender
offer requirement, should be interpreted.  For example, the
Bylaws state that, if a potential acquirer failed to comply with
the tender offer requirements, the potential acquirer "shall be
forbidden to acquire shares or securities," (Bylaws § 7(d)), but
nowhere state that <u>YPF</u> "shall forbid" the acquisition.
Similarly, Section 7(h) provides that shares acquired in breach
of the tender offer requirements "shall not grant any right to
vote or collect dividends or other distributions."  (Bylaws
§ 7(h).)  It does not, however, provide that <u>YPF</u> "shall prevent"
any entity that improperly acquired shares from voting or
collecting dividends.  Nor do Plaintiffs point to any language
imposing an affirmative obligation on YPF.  The Bylaws, in other
words, are silent as to how these imperatives are to be enforced
and YPF's role in any such enforcement, and "[s]ilence . . .

22

does not generally create ambiguity."  Cf. Spinelli v. Nat'l
Football League, 96 F. Supp. 3d 81, 126 (S.D.N.Y. 2015).

     Standing alone, the relevant provisions could, as the Court
held at the motion to dismiss stage, plausibly be read to
require YPF to enforce the tender offer requirements or the
concomitant sanctions.  However, in both the relevant provisions
and the Bylaws more generally, the Bylaws are quite clear when
an affirmative obligation is imposed and on whom it is imposed,
and this context renders those provisions unambiguous.  For
example, the Bylaws unequivocally provide that "the Bidder shall
[a]rrange a takeover bid;" "[t]he Corporation shall send" the
notice by mail; and "[t]he Board of Directors shall call [sic]
special meeting of class A shares of stock."  (Bylaws §§ 7(e),
7(f)(ii), (iii).)  The Bylaws further require that "[t]he Board"
shall meet at least once a quarter and that a meeting shall be
called by "the Chairman of the Board of Directors," (Bylaws
§ 15); that "[t]he absolute majority of the board members" shall
constitute a quorum; that "[t]he Board" shall adopt resolutions
by a majority vote of the members present, (Bylaws § 16); and
that "[t]he Board of Directors shall have wide powers to
organize, conduct and manage the affairs of the Corporation,"
(Bylaws § 17).  The fact that the Bylaws are careful to specify
who owes what obligations and under what circumstances —

including as to "the Corporation" itself – demonstrates that the Bylaws impose no affirmative obligation requiring YPF to enforce the relevant Bylaw provisions when the Bylaws do not say so. Read in context, Sections 7 and 28 are unambiguous and do not impose any duty on YPF.

Plaintiffs argue that this interpretation would lead to an absurd result because it would leave "nobody" to enforce the relevant provisions. (Pls.' Opp'n 45-46.) The Court disagrees. That YPF was not required to enforce the relevant provisions does not mean that those provisions were unenforceable or without consequence. Indeed, as set forth in more detail below, the Court grants summary judgment to Plaintiffs on their breach of contract claim against the Republic based on the *Republic's* failure to do what the Bylaws unequivocally required *it* to do. As such, the "shall" language still has meaningful force under the Court's reading of the Bylaws, and there is no absurd result.

The Court also rejects Plaintiffs' argument that the Argentine doctrine of *actos propios* estops YPF from taking a position contrary to its prior representations in its IPO Prospectus, SEC filings, and other statements. (Pls. Opp'n 46-47.) As the Court previously held, the alleged representations in these extraneous documents were substantially similar to the

24

alleged promises in the Bylaws.  Petersen I, 2016 WL 4735367, at
*16.  This remains true.  (See, e.g., Hicks Decls., Ex. 3 (YPF
Prospectus) at 10-11, 80-82 ("Any Control Acquisition carried
out by the Argentine Government other than in accordance with
the procedure described . . . will result in the suspension of
the voting, dividend and other distribution rights of the shares
so acquired").)  Given that the representations in these
documents are substantively similar to the Bylaws and are at
best ambiguous as to whether YPF would be required to enforce
the Bylaws itself, they are necessarily not inconsistent with
YPF's current position.[6]

     The Court also finds that YPF was not a guarantor for the
Republic's obligations.  Under Argentine law, a company is not a
guarantor for its shareholders unless: (i) the company expressly
agrees to serve as guarantor; (ii) the company takes a
unilateral act that is later ratified by the obligee; or (iii)
there is a judicial or statutory mandate requiring the company

---

[6] Plaintiffs also assert in footnotes that dismissal of the
breach of contract claim against YPF necessitates revival of
Plaintiffs' promissory estoppel claims.  (Pls.' Opp'n 43 n.22,
47 n.23.)  Plaintiffs' assertion is hard to square with their
expert's previous acknowledgment that Argentine law does not
recognize promissory estoppel as an autonomous source of
obligations.  Petersen I, 2016 WL 4735367, at *16.  However, the
issue is not properly before the Court and the Court declines to
consider whether Plaintiffs' promissory estoppel claims should
be revived absent a proper application and briefing.

to act as guarantor.  (Goodman Decl., Ex. 27 (Kemelmajer Rebuttal Rep.) at ¶ 30 (citing the Argentine Civil Code, Arts. 1986, 1987, 1998).)  Plaintiffs do not dispute this, and, indeed, disavow their reliance on a guarantor theory of liability, but argue in the alternative that YPF can be found to be a guarantor "if it agreed to serve as a guarantor, or if there is a legal mandate that compelled YPF to act as guarantor" and that the Bylaws and YPF's statements concerning the operation of the Bylaws are sufficient to find it is a guarantor.  (Pls.' Opp'n 47-48.)  Plaintiffs, however, never identify an express agreement by YPF to serve as a guarantor, just general statements concerning the Bylaws that Plaintiffs characterize as "guarantees."  Nor do Plaintiffs identify any "legal mandate" compelling YPF to enforce the relevant Bylaws provisions.

The Court therefore finds that YPF was not obligated to enforce Sections 7 and 28 and, consequently, grants YPF's Motion for Summary Judgment.

 b. **Plaintiffs Were YPF Security Holders at the Necessary Times and Therefore Do Have Enforceable Contract Rights as Against the Republic**

The Republic argues that Plaintiffs lack contractual standing to bring their claims because Plaintiffs:  (i) are not

currently security holders and (ii) were not security holders when the Republic acquired Repsol's shares in 2014.

>    *i.  Plaintiffs Held YPF Securities When the*
>        *Republic Triggered the Tender Offer*
>        *Obligation*

The Court begins with the Republic's second argument, that Plaintiffs lack standing because they were not security holders when the Republic acquired Repsol's shares in 2014.  This argument relies on a misreading of the Bylaws.  According to the Republic, Section 28 provides that Section 7's tender offer requirement applies only to "acquisitions made by the" Republic and that "'acquire' means obtaining legal title."  (Republic's Mot. 20-21.)  Because the Republic did not complete the expropriation and gain legal title to Repsol's shares until 2014, the Republic argues that it could not have breached Section 7 before that date.  (Republic's Mot. 23.)

However, pursuant to Section 28, Section 7 applies "if, as a consequence of such acquisition, the National Government becomes the owner, or exercises the control of" the requisite number of shares of YPF by "any means or instrument."  (Bylaws § 28(A).)  Indeed, the Court of Appeals interpreted Section 28(A) to "compel[] Argentina to make a tender offer in accordance with the procedures set forth in the [B]ylaws if 'by any means or instrument' it 'becomes the owner [of], or

27

exercises the control of,' at least 49% of YPF's capital stock."
Petersen II, 895 F.3d at 206.

This reading is required by the plain language of the
Bylaws, where ownership and the exercise of control are
disjunctive.  Thus, the tender offer obligations are triggered
by either acquisition of ownership of more than 49% of YPF's
capital stock or acquisition of control of more than 49% of
YPF's capital stock.  The acquisition or control could occur "by
any means."  (Bylaws § 28.)  This is precisely what occurred.

Pursuant to the plain language of the YPF Expropriation
Law, the control could not possibly have occurred any later than
May 7, 2012, the date of which the Republics "exercise[d] all
the political rights associated with the shares."  (YPF
Expropriation Law Art. 9.)  Thus, by no later than May 7, 2012,
the Republic "exercise[d] the control of . . . at least 49% of
the capital stock" and was therefore obligated to make a tender
offer, which it did not do.  (Bylaws § 28.)  Plaintiffs were
security holders on May 7, 2012, and therefore the Republic's
argument that they lack standing based on the Republic's failure
to acquire legal title until 2014 is meritless.

> ii. *Plaintiffs' Accrued Breach of Contract Claims did not Transfer with their YPF Securities*

The Court also rejects the Republic's argument that Plaintiffs lack standing because they are not currently security holders.  The Republic's argument misapprehends Plaintiffs' claims.  The Republic argues that Plaintiffs lack contractual standing to enforce the Bylaws because an action to enforce bylaws is a corporate claim and Plaintiffs no longer hold the securities that provide the right to enforce this corporate claim.  (Republic's Mot. 16-19.)  But Plaintiffs are not suing to enforce the Bylaws.  Rather, Plaintiffs' claims are based on their accrued breach of contract claims for the damage caused to them when, while they were still security holders, they failed to receive the compensated exit that Sections 7 and 28 promised.  (Petersen Complaint ¶¶ 50-54; Pls.' Opp'n 15-16.)  Plaintiffs do not sue to force the Republic to make a tender offer today or to participate in the corporate governance of YPF but to be compensated for the Republic's failure to make a tender offer in 2012 that would have allowed Plaintiffs to exit YPF entirely.

Properly framed, Plaintiffs' claims survive under both New York and Argentine law.[7]

The Republic's arguments fail under New York law. The "rights in the security against the issuer generally include participatory rights in the corporation, such as the right to attend meetings, vote, and inspect corporate records, as well as rights to corporate assets, such as the right to receive dividends." Consol. Edison, Inc. v. Ne. Utils., 318 F. Supp. 2d 181, 192 (S.D.N.Y. 2004), rev'd on other grounds, 426 F.3d 524 (2d Cir. 2005). Such participatory rights automatically transfer upon the sale of a security. Id. But, pursuant to New York General Obligations Law section 13-101, "[t]here must be some acts or words indicating an intent to transfer an accrued" cause of action, and that "assignment must be express." Id. at 186. Thus, accrued causes of action do not automatically transfer with the sale of a security. Id.; see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 373 n.126 (S.D.N.Y. 2007); Pac. Life Ins. Co. v. Bank of N.Y.

---

[7] The Republic argues that "New York law governs the transfer of YPF ADS, including whether Plaintiffs transferred their right to bring a claim for a breach of YPF's Bylaws." (Republic's Mot. 16.) Plaintiffs dispute this but argue that it makes no matter because they retain standing under either New York or Argentine law. The Court does not decide which law applies because when the claims are properly characterized, Plaintiffs have standing under either body of law.

Mellon, No. 17-cv-1388 (KPF) (RWL), 2022 WL 1446552, at *14
(S.D.N.Y. Feb. 22, 2022); Broadbill Partners L.P. v. Ambac
Assurance Corp., No. 653869/2012, 2014 NY Slip Op 30647(U), at
*10 (Sup. Ct. Mar. 12, 2014).[8]  Here Plaintiffs' breach of
contract claims accrued no later than May 7, 2023, while they
were security holders.  Absent an express assignment, those
accrued causes of action did not transfer with the YPF ADRs
under New York law.

The same result follows from the application of Argentine
law.  The Republic argues that, under Argentine law, "a
shareholder making a claim under corporate bylaws in Argentina
must maintain its shareholder status throughout the proceeding"
or else lose its standing and have its claim extinguished.
(Republic's Mot. 19 (citing Rafael M. Manóvil Rebuttal Expert
Report ("Manóvil Rebuttal") [dkt. no. 368-2] ¶ 25).)  The
Republic cites its expert's opinion in support of this
proposition, but the expert's opinion and the sources he relies

---

[8]  The Republic's heavy reliance on FDIC v. Citibank N.A., No.
15-cv-6574, 2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016) is
misplaced.  That case involved bonds and turned on New York
General Obligation Law 13-107, which provides that "a transfer of
any bond shall vest in the transferee all claims or demands of
the transferor" "[u]nless expressly reserved in writing,"
precisely the opposite of the general rule that an assignment
must be express.  Nor does the Court find out-of-state cases
persuasive where there has been no showing that the relevant
states have a similar express transfer requirement to New York.

on all pertain to participatory rights in a corporation, such as
the right to "challenge[] resolution[s]."  (Manóvil Rebuttal
¶ 25.)  The Republic's argument fails because it relies on two
related propositions with which the Court disagrees, (i) that "a
claim under corporate bylaws" is necessarily a claim to enforce
corporate bylaws and (ii) that Plaintiffs are therefore trying
to enforce the Bylaws.  The Court is unpersuaded that a claim
that arises from corporate bylaws is always a claim to enforce
corporate bylaws or that Plaintiffs' specific claims are
properly characterized as such.  Indeed, as set forth above,
Plaintiffs are not seeking to participate in YPF's management,
force the Republic to make a tender offer today, or enforce the
sanctions contained in the Bylaws.  Thus, even giving the
Republic's statement of Argentine law "respectful consideration"
– even assuming that it is correct – it is irrelevant to
Plaintiffs' claims.  And the Republic makes no other argument
showing that an accrued cause of action for damage to property
automatically transfers with that property.

Plaintiffs, on the other hand, identify the Argentine case
National Civil Chamber of Appeals, Room E, "Perrino, Elizabeth
Liliana c. Tschubarov, Adrián y otro", 09/10/2010. TR La Ley:
AR/JUR/61577/2010).  (Attached as Ex. 136 to Hicks Decls.)
There, the Argentine court found that a transfer of property did

not "involve[] a transfer of the legal standing" to an accrued claim for compensation for damage to that property where the conveying document was silent as to whether the claim for property damage was transferred with the property and no provision of the civil code spoke directly to whether a transfer nonetheless occurred as a matter of law.  (Id. at 4-5.)  Though, as the Republic notes, this case involved a tort claim for damage to real property and not a breach of contract claim (Republic's Reply 8), the Court does not read the Argentine court's reasoning to turn on the source of the claim but on whether there was an accrued claim for compensation and either an express assignment or a statutory directive that an assignment necessarily occurred.  The Court is persuaded that Perrino accurately reflects Argentine law and that Argentine law requires that there be an affirmative and express legal basis, whether contractual or statutory, to find that an accrued claim has been transferred with property.  The Court finds that there is no evidence of an express assignment here and that the Republic has not identified any statutory provision directly applicable to Plaintiffs' claims and, therefore, finds that Plaintiffs did not transfer their breach of contract claims when they transferred their YPF ADRs.  Thus, Plaintiffs retain standing to assert their claims under Argentine law as well.

33

Consequently, the Court finds that Plaintiffs have demonstrated that there is no question of fact as to the first element of their breach of contract claim, that there is a valid contract that Plaintiffs are entitled to enforce, against the Republic.

### 2. Plaintiffs' Have Demonstrated the Remaining Elements of Their Claim Against the Republic

The Court now turns to the remaining elements of Plaintiffs' breach of contract claim against the Republic, which are not in serious dispute.

As to the second element, breach, Plaintiffs argue that the Republic breached Sections 7 and 28 of YPF's Bylaws because the Republic never made the required tender offer.  The Republic does not dispute that the Republic never made any tender offer pursuant to Sections 7 and 28.  (Defendants' Counter 56.1 ¶ 94.) The Court therefore finds that there is no question of fact as to whether the Republic breached Sections 7 and 28.

Plaintiffs satisfy the third element, damages, and the fourth element, attribution of those damages to the Republic, as well.  Plaintiffs argue that they were damaged because they did not receive the cash payment to which they were entitled when the Republic took over YPF and that their damages were caused by the Republic's failure to make a tender offer.  (Pls.' Mot. 28.)

34

The Court finds that Plaintiffs were damaged by the Republic because Plaintiffs were entitled to receive a tender offer that would have provided them with a compensated exit but did not.

Finally, Plaintiffs have satisfied the fifth element because the Republic was subject to strict liability. Plaintiffs argue that they are not required to demonstrate that the breach is due to the Republic's fault because the Bylaws obliged the Republic to achieve a specific result – to undertake a tender offer pursuant to the Bylaws – and Plaintiffs assert that, under Argentine law, if a breaching party promises to achieve a specific result (*obligación de resultado*), the breaching party is strictly liable and the non-breaching party is not required to demonstrate fault. (Pls.' Mot. 29 (citing Hicks Decls., Ex. 29 (Garro Sept. 2021 Report for Pls.) ¶ 17; id., Ex. 34 (Rovira Sept. 2021 Report for Pls.) ¶ 27; Petersen II, 895 F.3d at 206).) Defendants do not dispute that this is an accurate description of Argentine law or that the Bylaws called for a specific result. In any event, the Court agrees that the Bylaws called for a tender offer, which is a specific result.

Outside of the arguments set forth above, the Republic does not challenge the Plaintiffs' articulation of Argentine law regarding the elements of a breach of contract claim or the

35

factual evidence described above demonstrating satisfaction of each of those elements vis-à-vis the Republic.  Thus, Plaintiffs are entitled to summary judgment on their breach of contract claims unless, as the Republic contends, their meritorious claims are nonetheless barred.  Therefore, the Court now turns to the Republic's various legal arguments.

> **B.    The Republic's Argentine Law-Based Arguments as to Breach of Contract**
>
> > **1.    Plaintiffs' Claims are Cognizable Under Argentine Law**

The Republic argues that Plaintiffs' claims are not cognizable for four reasons.  The Republic first argues that Argentine law does not permit one shareholder directly to demand that another shareholder comply with corporate bylaws because, according to the Republic, corporate bylaws do not create bilateral contracts or obligations.  (Republic's Mot. 26.)  The Republic next asserts that a shareholder may only seek to enforce corporate bylaws via the mechanisms set forth in Argentina's General Corporations Law ("GCL").  (Id. at 27.)  The Republic then asserts that, in any event, Argentine law limits Plaintiffs' recovery to the remedies contained in the Bylaws.  (Id. at 28-29.)  Finally, the Republic argues that under Argentine law, Plaintiffs' failure to pursue specific performance bars their damages claim.  (Id. at 29-30.)

36

a. **Plaintiffs' Claims are Based on a Bilateral Obligation and Are Enforceable Against the Republic**

The Court rejects the argument that the Republic's obligations under Sections 7 and 28 were not bilateral.  The Court assumes without deciding that bylaws are usually plurilateral and that plurilateral obligations are not subject to breach of contract claims under Argentine law.  But it does not follow that bilateral obligations transform into plurilateral ones simply because a party or parties put those bilateral obligations into their corporate bylaws.  (See Hicks Decls., Ex. 135 (Manóvil Tr. for Defs.) 90:8-93:21 (Republic's expert acknowledging corporate bylaws can contain bilateral contracts).)  Even accepting that bylaws are usually plurilateral, the question here is not whether bylaws in the abstract are generally plurilateral but whether the specific obligations contained in Sections 7 and 28 are plurilateral or bilateral.

The Court finds that the promises in Sections 7 and 28 are bilateral.  The Republic, which both drafted the Bylaws and ordered YPF to adopt them (Executive Order 1106/93 at 1), promised that it would "make a tender offer for the remainder of YPF's outstanding shares . . . in accordance with the procedures set forth in the bylaws if 'by any means or instrument' it

37

'bec[a]me[] the owner [of], or exercises the control of,' at
least 49% of YPF's capital stock" <u>Petersen II</u>, 895 F.3d at 206-7
(quoting Bylaws § 28) (emphasis added).  In other words, based
on the plain language of the Bylaws, the Republic promised
security holders that <u>it</u> would provide <u>them</u> with a compensated
exit if it reacquired control over the requisite number of
shares.  Security holders accepted that promise when they
purchased shares in YPF.  The promise was not made, and the
obligation was not owed, to YPF or to the world at large but to
specific and identifiable persons, the remaining shareholders,
and was owed by a specific and identifiable person, the
Republic.  This bilateral obligation could as easily have been
created via a shareholder agreement or a simple contract.  It
was thus a bilateral agreement, and the fact that it is
contained in the Bylaws does not change its nature.

### b. <u>Plaintiffs' Claims are Governed by the Argentine Civil Code</u>

The Court also rejects the argument that the GCL governs
and precludes Plaintiffs' breach of contract claims.  The
Argentine Civil Code governs "[u]nless modified" by a provision
in the Argentine Commercial Code, which includes the GCL.  (See
Hicks Decls., Ex. 30 (Garro Dec. 2021 Report for Pls.) ¶ 24
("Unless modified by this Code, the civil law applies to all

matters and business transactions.") (quoting ACC Art. 207).) The question, then, is whether the GCL provisions governing intra-corporate disputes apply to Plaintiffs' claims, thereby displacing the breach of contract claim Plaintiffs bring under the Argentine Civil Code.

The Court finds that they do not.  The Republic argues that the existence of mechanisms in the GCL by which shareholders can propose and challenge shareholder resolutions should be interpreted to require that every dispute related in any way to corporate bylaws proceed via these mechanisms, regardless of whether the dispute relates to corporate resolutions, or even corporate governance or plurilateral obligations.  (Republic's Mot. 27.)[9]  But the GCL by its terms governs challenges to corporate resolutions.  Read broadly, perhaps it governs corporate governance disputes more generally.  But Plaintiffs are not bringing claims challenging corporate resolutions or challenging how YPF has been governed post-nationalization.

---

[9] The Court is unpersuaded that the fact that other shareholders pursued remedies under the GCL evidences its applicability.  The existence of these claims demonstrates no more than that some shareholders considered GCL claims to be viable.  It tells the Court little to nothing about whether the GCL displaces the Civil Code in this instance.  Further, the availability of an alternate route, particularly an imperfect one, does not necessarily mean that the availability of that route eliminates a different one.

They are suing the Republic for breach of its bilateral obligation to make a tender offer upon acquisition of the requisite number of shares, thereby allowing Plaintiffs to exit YPF entirely rather than engage in an intra-corporate battle with the Republic.  This is what Sections 7 and 28 promised, and it is illogical to suggest that Plaintiffs' right directly to enforce the Republic's bilateral obligation was somehow modified or displaced by ill-fitting and indirect intra-corporate procedures governing challenges to resolutions simply because the bilateral obligation was contained in the Bylaws.  Again, the nature of the obligation does not change because of its placement in the Bylaws.  No more does its placement in the Bylaws suddenly subject it to inapposite GCL provisions directed at disputes over corporate resolutions as opposed to bilateral obligations.  The Republic has not pointed to anything in the GCL that governs, or modifies, the claim that Plaintiffs actually bring or any provision of the GCL that states that bilateral obligations to make a tender offer are the proper subject of the intra-corporate dispute resolution provisions contained in the GCL.  The Court therefore finds that the Argentine Civil Code applies.

### c. **Section 7(h) is not a Penalty Clause**

The Republic next argues that, even if it can be sued for
breach of contract, Plaintiffs are not entitled to damages
because Section 7(h) is a penalty clause that serves as
Plaintiffs' exclusive remedy under Argentine law.  (Republic's
Mot. 28-29.)  Article 655 of the Argentine Civil Code provides
that "the penalty or fine imposed [by the contract] takes the
place of compensation for damages and interest, upon a breach."
Contractual penalties are limited by the terms of the contract,
and, under Article 655, the non-breaching party "will not be
entitled to other compensation, even if he proves that the
penalty is not sufficient compensation."  In the Republic's
view, the Bylaws "supply their own explicit 'penalties'—namely,
that shares acquired in breach of the tender-offer obligations
'shall not grant any right to vote or collect dividends or other
distributions that the Corporation may carry out'; or 'be
computed to determine the presence of the quorum at any of the
shareholders' meetings of the Corporation, until such shares of
stock are sold.'"  (Republic's Mot. 28 (quoting Bylaws §§ 7(h),
28(C).)  Thus, per the Republic, the Bylaws define the penalties
for breach of the tender offer obligation, and Plaintiffs are
limited to pursuit of those penalties.

The Court disagrees.  Article 653 of the Argentine Civil
Code provides that:  "The penalty clause may only have as its
object the payment of a sum of money, or any other performance
that may be the object of the obligations, either for the
benefit of the non-breaching party or a third party."[10]  Thus, to
be a valid penalty clause, Article 653 requires that the clause
provide for either (i) "the payment of a sum of money" or (ii)
"any other performance that may be the object of the
obligations."  The Court reads Article 653, which provides a
mechanism for a penalty to replace the damages that would
normally be imposed on a breaching party, implicitly to require
the breaching party to make "the payment of the sum or money" or
to provide the "other performance."

Section 7(h) certainly does not provide for the "payment of
a sum of money" by the Republic, even if the Court credits the
Republic's argument that, in a hypothetical world where the
Republic complied with Section 7(h) and forwent its dividends,
the remaining shareholders would indirectly benefit by receiving
a greater share of the dividends from YPF.  The Republic would

---

[10] The parties have submitted conflicting translations of Article
653 in their various submissions.  The Court, following its own
review of the language contained in Article 653, adopts the
translation set forth by the Republic on page A-6 of the
appendix of selected laws submitted with its Motion for Summary
Judgment (dkt. no. 373-1).

not be paying any sum of money in that scenario; money to which
the Republic was not entitled would simply be distributed
accordingly.

Nor does Section 7(h) call for an alternate "performance"
by the Republic.  To be sure, the sanctions contained in Section
7(h), if enforced, would make it less desirable to breach the
Bylaws and would certainly encourage compliance by an acquiror
who, unlike the Republic, would suffer the consequences of
breach.  But the Court is not persuaded that this alone is
sufficient to serve as a "performance that [is] the object of
the obligations."  Rather, the plain language of Article 653
requires a substitute performance of the obligation at issue,
not just the loss of some rights that might encourage
compliance.  Section 7(h) simply operates to strip the Republic,
or any acquirer, of rights they would otherwise have.  It does
not require an alternative performance of their tender offer
obligations.  Thus, the Court does not find Section 7(h) to be a
penalty clause that bars Plaintiffs' damages.

### d. **Plaintiffs May Pursue Damages**

Finally, the Republic argues that under Argentine law
Plaintiffs were required to seek specific performance or
termination of the relevant Bylaw provisions and that, having
failed to do so, they are not entitled to compensatory damages.

(Republic's Mot. 29-30.)   The Court disagrees.   Article 505 of
the Argentine Civil Code permits the nonbreaching party to seek
the following remedies:  (i) performance from the breaching
party, (ii) performance in-kind from a third party at the cost
of the breaching party, and (iii) damages.   In the Republic's
view, the order in which the remedies are listed imposes an
obligation on the nonbreaching party to pursue the remedies in
that order.   (Republic's Reply 20-21.)   But nothing in the plain
language of Article 505 states that the order of remedies is
mandatory on the nonbreaching party.   Though not binding, the
authorities cited by the Republic's expert certainly suggest
that the breaching party may not avoid specific performance by
offering to pay damages if the nonbreaching party seeks specific
performance (Manóvil Rebuttal ¶ 65 (citing sources)), but it
does not follow from this proposition that the nonbreaching
party – the party meant to be protected and made whole – is so
limited and must accommodate the breaching party's preference to
provide a remedy the innocent nonbreaching party does not want
and which would not make him or her whole.

     The Court does not read Article 889 of the Argentine Civil
Code to change this analysis.   Article 889 provides that:

          If performance becomes impossible by fault
          of the debtor, or if he has made himself
          responsible for force majeure, either

> through a contractual clause that allocates
> to him the risks that they might bring, or
> because he is in default, the primitive
> obligation, either to give or to do
> something, is converted into the obligation
> to pay damages.

The Republic argues that this provision demonstrates that money damages are available ***only*** when performance is impossible due to the breaching party's fault.  (Republic's Mot. 29-30; Republic's Reply 20-21.)  But the word only does not appear anywhere in Article 889 such that it can be read to state that damages are not available under any other circumstances.

Furthermore, Article 889 must be read alongside its sibling, Article 888, which provides that:  "The obligation is extinguished where the performance that forms its matter becomes physically or legally impossible without the debtor's fault." Thus, Articles 888 and 889 are better read to govern when an obligation is extinguished entirely and when a Plaintiff may still pursue a remedy, not to modify Article 505 or to impose impossibility as a requirement for the pursuit of money damages. At base, the Court reads Article 889 simply to provide a straightforward explanation that when specific performance is impossible due to the fault of the breaching party, damages remain an available remedy, as opposed to when specific

performance is impossible through no fault of the breaching party, in which case no remedy is available.

Thus, the Court reads Article 505 to provide Plaintiffs with both the right to pursue damages and the right to elect damages as their remedy instead of specific performance.

### 2.   Plaintiffs' Claims Do Not Challenge the Republic's Sovereign Activity

The Republic next argues that Plaintiffs' claims impermissibly challenge the Republic's sovereign acts.  Before addressing the parties' arguments, a brief explanation of the Bylaws clarifies the issues at play here.  In the normal course, an entity that wished to acquire shares exceeding the amount that would trigger a tender offer obligation was required to provide YPF with notice.  (Bylaws § 7(f)(i).)  This "notice date" would then be used to calculate the tender offer price that the acquiring entity was required to offer to all outstanding YPF shareholders pursuant to certain formulae. (Bylaws § 7(f)(v) (A-D).)

Because the Republic never provided notice and instead acquired the shares via expropriation, Plaintiffs chose a counterfactual notice date, February 13, 2012, that they assert represents the date on which the Republic should have provided notice pursuant to the Bylaws if it did not breach.  (Pls.' Mot.

33-35.)  Using this date as the input, Plaintiffs utilize the formulae set out in Section 7 to calculate the tender offer price that they assert the Republic was required to offer. (Id.)  This represents the amount that Plaintiffs would have received if the Republic abided by the Bylaws.  (Id.)

This, the Republic argues, is equivalent to asserting that the Republic had an obligation to provide notice and commence a tender offer on February 13, 2012, prior to the expropriation of Repsol's YPF shares.  (Republic's Mot. 31-33.)  And this, per the Republic, is necessarily an attack on the Republic's authority to expropriate the shares without abiding by the tender offer requirements.  (Id.)  Because expropriation is a sovereign act, imposing limitations on it implicates both sovereign immunity and the act-of-state doctrine.  (Id.)  Thus, according to the Republic, Plaintiffs' claims are now barred by these doctrines.  (Id.)

The Republic's argument misconstrues Plaintiffs' position. Plaintiffs' argument concerns how damages should be calculated now as a consequence of what the Republic did, not an argument about what the Republic could or could not do before it expropriated the relevant shares.  Under Plaintiffs' theory, the Republic could have expropriated the shares any day it wanted (and the Republic did so).  Plaintiffs simply advocate a theory

of damages that says that the date the Republic did choose controls the date the Republic should have provided notice pursuant to the Bylaws and that this date can be used to calculate what the tender offer price should have been. Plaintiffs' theory of damages calculation does not implicate the Republic's sovereignty in any way.

### 3. Plaintiffs' Claims Are Not Barred by Argentine Public Law

The Republic argues that Article 28 of Argentina's General Expropriation Law bars Plaintiffs' claims for two reasons. First, that Article 28 eliminates any obligations that impede an expropriation or its effects and that, therefore, the tender offer requirements do not apply.  Second, that Article 28 provides Plaintiffs' exclusive remedy because it provides that third parties with rights in the expropriated property must seek their relief from the expropriated party.  Neither argument is availing.

### a. Article 28 Does not Eliminate Plaintiffs' Claims

Article 28 provides: "No action by third parties may impede the expropriation or its effects.  The rights of the claimant shall be considered transferred from the thing to its price or to the compensation, leaving the thing free of any encumbrance." In the Republic's view, enforcing the Bylaws and requiring a

tender offer "would impermissibly 'impede' the expropriation and its 'effects,' by placing an 'encumbrance' on the expropriated property."  (Republic's Mot. 34.)  Thus, in the Republic's view, it received the expropriated shares with "original title" and "free" of encumbrances, such as the tender offer obligation. (Id.)

The Court assumes without deciding that Article 28 eliminates any restrictions that third parties placed on the property itself.  It makes no matter for at least two reasons. First, the Republic, and not a third party, drafted the Bylaws and ordered that they be implemented by the then-wholly-owned YPF.  The Court can understand why, to take the Republic's expert's example, Article 28 would bar a group of homeowners from "agree[ing] among themselves that, if the Republic acquired the property of one of [their homes] through any means, it must offer to purchase the property of all of them."  (Alejandro Juan Uslenghi Opening Expert Report ("Uslenghi Opening") [dkt. no. 366-1] ¶ 108.)  Such conduct would interfere with the Republic's sovereign power without its consent.  The better analogy, however, is a scenario where the Republic agreed with a group of prospective homeowners that it would acquire all of their homes or none of them in order to convince those homeowners to establish a town to the Republic's benefit -- in other words,

where the Republic and not a "third party" imposed the restriction on itself and agreed to abide by it.  That is what occurred with the Bylaws, and, by its plain language, Article 28 does not apply to a restriction created by the Republic itself.

Second, the tender offer obligation is not attached to the shares that the Republic acquired.  The Republic has the sole right to, and use of, the expropriated shares.  Plaintiffs do not claim otherwise.  The "encumbrance," to the extent it can be so termed, derives not from the expropriated shares but from the contractual obligations the Republic undertook when it revised the Bylaws to require it to make a tender offer if it acquired a certain number of shares.  Plaintiffs are not asserting "rights" in the "thing" but contractual rights derived from the Bylaws.

Setting these bars aside, the Republic's remaining arguments that the tender offer requirement would "impede the expropriation or its effects" are unavailing.  The Republic first argues that because it only wanted to acquire a 51% stake in YPF, requiring it to acquire more would be an impediment. (Republic's Mot. 36.)  But as the Court of Appeals previously held, "there is no provision in the YPF Expropriation Law itself . . . that the law compelled Argentina to acquire *exactly* 51% ownership in YPF and no greater ownership position."  Petersen II, 895 F.3d at 208 (internal quotations omitted).  The Republic

50

seeks to inject its preferred interpretation of the YPF Expropriation Law via Article 28, but no part of the YPF Expropriation Law was "impeded" if no provision required it to acquire exactly 51%.

The Republic next argues that the YPF Expropriation Law intended that YPF continue operating as a publicly traded company, which would be incompatible with the Republic's purchase of all the outstanding shares.  (Republic's Mot. 36.) The Republic's ownership of all of the shares at one point in time has nothing to do with whether the shares or the company remain publicly traded.  The Court has no doubt that the Republic could have publicly resold the shares it purchased via the tender offer to investors at an appropriate price.  Nothing about the tender offer requirement prevents this.

Third, the Republic argues that the YPF Expropriation Law provided for the expropriated shares to be distributed at a fixed proportion between the federal government and the provinces of Argentina and that requiring the Republic to acquire a higher percentage would upset this balance.  (Id. at 36-37.)  This assumes that the Republic could not distribute any shares acquired via a tender offer to the provinces to restore the desired balance, which is by no means clear.  But setting this aside, the YPF Expropriation Law governs only the

expropriated shares.  (Hicks Decls., Ex. 112 (YPF Expropriation Law) § 8.)  Nothing about the tender offer requirements "impedes" the actual objects of the law, as expressed in its plain language, from occurring.

### b. **Article 28 Does Not Provide Plaintiffs' Exclusive Remedies**

Finally, the Republic argues that Article 28 "provides specific" and exclusive "avenues of relief for third parties, like Plaintiffs, who claim to have been injured as a result of an expropriation of another's property."  (Republic's Mot. 37.)  The Republic explains that the Plaintiffs' claims have been "transferred from the [expropriated] thing to its price or to the compensation."  (Id. (quoting Art. 28) (alteration in original).)  In other words, whatever Plaintiffs' claims were worth, that amount was included in the compensation the Republic ultimately paid to Repsol for the expropriated shares, and Plaintiffs should have sought compensation from Repsol.  (Id. at 37-38.)  Indeed, Repsol and the Republic agreed, sans the Plaintiffs, that payment to Repsol would extinguish third party claims and that Repsol would either obtain discontinuances from those third parties or indemnify the Republic.  (Id.)

The Court once more disagrees.  As set forth above, Plaintiffs are not enforcing rights against the expropriated

property but against the Republic for its independent breach of its contractual obligations.  The Repsol shares were not the source of the tender offer obligation.  Extinguishing any claims based on the Repsol shares cannot have any effect on claims that are not based on the Repsol shares themselves.  To the extent the Republic believes that its agreement with Repsol encompasses these claims and requires Repsol to indemnify it, it can seek compensation from Repsol.  But their agreement cannot extinguish Plaintiffs' separate rights and claims.

####     C.    The Appropriate Measure of Damages

The Republic vigorously disputes Plaintiffs' calculation of damages, arguing that:  (i) Plaintiffs' damages must be determined in pesos as of the date judgment is entered and then be converted to U.S. Dollars, (ii) the tender offer provisions are invalid because Argentine law precludes disproportionate windfall pricing of shares, (iii) February 13, 2012 is not the proper notice date, (iv) Plaintiffs' application of Formula D is incorrect because it should have been based on quarterly, as opposed to daily, price/income ratios, and (v) Plaintiffs have

applied the wrong prejudgment interest rate.[11]  Save for its
argument regarding the proper notice date, the Republic's
arguments are all legal arguments that the Court can resolve as
a matter of law.  The Court addresses the Republic's sole
factual argument first, before turning to its legal arguments.

### 1.   There is a Question of Fact as to the Proper Notice Date

As set forth above, if the Republic complied with its
obligations, it would have been required to provide YPF with
notice of its intent to acquire a sufficient number of shares to
trigger Section 7 prior to acquiring those shares.  (Bylaws
§ 7(f)(i).)  Plaintiffs assert, and the Republic does not
dispute, that the Bylaws and Argentine regulations establish
that the notice date must precede the consummation of a control

---

[11] The parties also dispute whether the Petersen Plaintiffs are
entitled to consequential damages, which is in part based on a
factual argument regarding the Republic's state of mind.  The
Court reserves judgment on the proper standard for consequential
damages under Argentine law and whether there is a material
factual dispute as to the Petersen Plaintiffs' entitlement to
consequential damages, though it notes that determining the
Republic's state of mind is thorny.  The Petersen Plaintiffs
stated that they would forgo such damages if the Court granted
them summary judgment on their direct damages in order to
expedite the resolution of the dispute.  (Pls.' Reply 72.)
Though, as set forth below, the Court has found an issue of fact
as to the proper calculation of Plaintiffs' direct damages, the
Petersen Plaintiffs may consider this issue of fact sufficiently
minor to forgo consequential damages nonetheless to facilitate a
speedier resolution.

acquisition by at least forty business days.  Section 7(f)(i) of the Bylaws provides that the acquiring party "shall notify [YPF] in writing about the takeover bid at least fifteen business days in advance to the starting date thereof."  (Bylaws § 7(f)(i).) Section 7(f)(vii) of the Bylaws further provides that the tender offer must remain open for "a minimum term of TWENTY (20) days and a maximum term of THIRTY (30) days" from the date the bid is authorized by the Comisión Nacional de Valores de Argentina ("CNV"), Argentina's securities regulator.  (Id. § 7(f)(vii).) CNV regulations require that a tender offer be open for at least twenty-five business days.  (Hicks Decls., Ex. 29 (Garro Sept. 2021 Report for Pls.) ¶¶ 30(h), 31; id., Ex. 34 (Rovira Sept. 2021 Report for Pls.) ¶ 68.)  Adding the fifteen business days' advance notice and the minimum twenty-five business days that the offer must remain open results in a notice date at least forty business days before the tender offer is completed and an acquirer consummates its acquisition.

In the normal course, the "notice date" would be used to calculate the tender offer price that the acquiring entity was required to offer to all outstanding YPF shareholders pursuant to certain formulae.  (Bylaws § 7(f)(v) (A-D).)  Pursuant to the Bylaws, the applicable formula is whichever formula provides the "highest" tender offer price.  (Id. § 7(f)(v).)  It is

undisputed that between February 13, 2012 (Plaintiffs' chosen counterfactual notice date) and May 7, 2012 (the date the Republic asserts it acquired control of the requisite number of shares), Formula D provides for the higher tender offer price. (Defendants' Counter 56.1 ¶ 116.)

The Court agrees that the tender offer price the Republic would have been required to offer if the Republic complied with the Bylaws is the appropriate measure of Plaintiffs' compensatory damages.  Based on the Bylaws, that tender offer price must be calculated by determining the date on which the Republic should have provided notice and applying Formula D based on that date.  The Court also agrees that, based on the Bylaws and Argentine regulations, that counterfactual date is forty days prior to the acquisition of control of the requisite number of shares.

However, the Court finds that there is an issue of fact as to when the Republic acquired control of the shares.  As the Court previously held, the event that triggered the Republic's tender offer obligations was its acquisition of control of the shares, not its intervention in or acquisition of control of YPF.  Plaintiffs assert that the Republic has already admitted that "following the April 16 intervention, it 'occupied 51% of YPF's Class D shares'" (Pls.' Mot. 19 (citing the Republic's

56

Answer, dated July 8, 2019 [dkt. no. 98] at ¶ 36)), implying that the occupation of 51% of YPF's shares occurred on April 16, 2012.  It is based on this date that Plaintiffs identify February 13, 2012 as the appropriate counterfactual notice date.  However, the Republic's Answer does not fix the precise date of the occupation as April 16, stating instead that, following intervention, the Republic "then temporarily occupied 51% of YPF's Class D shares pending implementation of legislation declaring these shares to be of public utility and subject to expropriation."  (Republic's Answer ¶ 36.)   The Intervention Decree itself only states that the intervenor would have the powers of the "Board of Directors and/or the President" of YPF.  (Intervention Decree § 3.)   The Republic now contends that the Intervention Decree "permitted the intervenor to exercise the powers of the YPF Board and/or President of the company—irrespective of share ownership" but that the YPF Expropriation Law is what "provided for the temporary occupation of 51% of YPF's shares."  (Republic's Mot. 23.)   The Republic is bound by its admission that the occupation occurred while the YPF Expropriation Law was pending and cannot now take the position that occupation of the shares did not occur until passage of the YPF Expropriation Law.  See, e.g., W. World Ins. Co. v. Stack Oil Co., 922 F.2d 118, 122 (2d Cir. 1990) (binding defendant to

57

admission made in answer for purposes of summary judgment motion).  Nonetheless, the admission Plaintiffs rely on does not establish the precise date on which the Republic occupied 51% of YPF's shares or precisely what "occupation" of the shares entailed and whether such "occupation" is equivalent to "control" of those shares.  Because the Court cannot identify the date on which the Republic triggered its tender offer obligation, it cannot determine the counterfactual notice date, and thus cannot quantify Plaintiffs' compensatory damages.

### 2.  The Republic's Legal Arguments Fail

The Republic also makes a series of legal arguments in an effort to reduce or eliminate Plaintiffs' damages, all of which the Court rejects.

First, the Republic argues that, pursuant to New York's judgment-day rule, Plaintiffs' damages must be determined in pesos as of the date judgment is entered and then be converted to U.S. Dollars.  (Defs.' Joint Opp'n 42-48 (citing N.Y. Jud. Law § 27(b)).)  The Court disagrees.  The judgment-day rule is limited to causes of action "based upon an obligation denominated in a currency other than currency of the United States."  N.Y. Jud. Law § 27(b).  Where the obligation is not "denominated in a currency other than a currency of the United States" New York's judgment-day rule does not apply.  Nature's

Plus Nordic A/S v. Nat. Organics, Inc., 78 F. Supp. 3d 556, 557-
58 (E.D.N.Y. 2015).  The majority of the cases applying the
judgment-day rule have done so in the context of confirmed
arbitration awards and agreements identifying payment for a sum
certain and denominated in the foreign currency expressly.  See,
e.g., Dye v. Kopiec, No. 16CV2952LGSKNF, 2019 WL 2527218, at *1
(S.D.N.Y. May 10, 2019), report and recommendation adopted, No.
16 CIV. 2952 (LGS), 2019 WL 2525410 (S.D.N.Y. June 19, 2019)
(promissory note); Commissions Imp. Exp. S.A. v. Republic of the
Congo, No. 14-MC-187 (AJN), 2020 WL 4040753, at *2 (S.D.N.Y.
July 17, 2020) (confirmed arbitration award); Weiss v. La
Suisse, Societe d'Assurances sur la Vie, 293 F. Supp. 2d 397,
408 n.5 (S.D.N.Y. 2003) (insurance policy expressly denominated
in Swiss francs).  Here, however, the Bylaws are silent as to
denomination, and Plaintiffs are suing for the breach of the
Republic's obligation to perform its tender offer obligation
under the Bylaws, not for a sum certain denominated in pesos.
As such the judgment-day rule does not apply, and "the Court is
left with the general rule that where damages are sustained in a
foreign currency, 'New York courts apply the breach day rule,
whereby the appropriate measure of damages is the equivalent of
such foreign currency in terms of dollars, at the rate of
exchange prevailing at the date of breach.'"  Nature's Plus

Nordic A/S v. Nat. Organics, Inc., 78 F. Supp. 3d 556, 557–58 (E.D.N.Y. 2015).

Second, the Republic argues that the tender offer price is invalid under Argentine GCL Article 13(5) because it is "inflated."  (Defs.' Joint Opp'n 48-49.)  GCL Article 13(5) invalidates contractual provisions that provide for "the determination of a price to acquire the share of one partner by another that is notably far from the real value at the time it is effective."  Initially, the Court finds that Article 13(5) is inapplicable on its face.  By its plain language, GCL Article 13(5) only applies to provisions that define the price for internal share transfers.  But Section 7 of the Bylaws applies to any acquirer, regardless of its status as a YPF shareholder. It is thus not a provision governing or setting the price for the acquisition of shares by one shareholder from another but by any person acquiring a defined number of shares.  Nor, as a practical matter, did the obligation imposed by Section 7 even derive from the Republic's status as a shareholder.  Rather, it derived from its acquisition of the requisite number of shares regardless of its shareholder status.

Furthermore, as Plaintiffs argue, the Republic does not cite a single case in which GCL Article 13(5) was used to reduce the price to which the selling shareholder was entitled because

of GCL Article 13(5).  (Pls.' Reply 56.)   The Court is persuaded
by the Republic's expert that by its terms Article 13(5) applies
to both upward and downward departures and could theoretically
apply to reduce the amount that an acquirer is required to pay.
(Manóvil Rebuttal ¶ 135.)   However, as the Republic's expert
states, GCL Article 13(5) is meant to "preserve the integrity"
of the shareholder's share (id.) and serves to protect a
shareholder from being "forced" to buy or sell shares at an
unfair price.  (Id. ¶¶ 134, 138 ("[I]t will be equally contrary
to the law to have to acquire the share at a price higher than
the fair one . . . ." (emphasis added)).)   But the Republic was
not "forced" to trigger the tender offer obligation when it did,
nor would it "protect the integrity" of either an acquirer's
share or a seller's share to allow an acquirer unilaterally to
trigger a tender offer obligation at a time when the tender
offer price would be high and then seek refuge from its own
conduct in GCL Article 13(5).  In the absence of any authority
to the contrary, and indeed with the authority it has been
provided indicating that GCL Article 13(5) has been interpreted
to prevent a weaker party from being disadvantaged, the Court
interprets GCL Article 13(5) implicitly to require that the
"unfair" price is being imposed on the acquirer or the seller
and not initiated by their own voluntary conduct.

Third, the Republic argues that Plaintiffs' application of Formula D is incorrect because the calculations should have been based on quarterly, as opposed to daily, price/income ratios. The Bylaws require that the ratio used be the "highest price/income ratio for the Corporation during the two-year period immediately preceding the notice date." (Bylaws § 7(f)(v)(D) (emphasis added).) Over a two-year period, if the day with the "highest" price-to-income ratio does not happen to be one of the days when the company releases quarterly earnings, then the Bylaws clearly require applying a different day's ratio. Thus, Plaintiffs' application of Formula D based on the daily price/income ratios is correct and required by the Bylaws.

Fourth, the Republic argues that Plaintiffs have applied the wrong prejudgment interest rate in seeking to apply New York law to this issue and that Argentine law governs. (Defs.' Joint Opp'n 54-55.) The Republic argues that in Argentina, federal administrative law courts retain jurisdiction over cases involving the Republic and "typically apply prejudgment interest at the average borrowing rate published by the Central Bank of the Argentine Republic." (Id.) Plaintiffs' counter that New York law is appropriate but that the Court has discretion to apply the commercial rate that "Argentine courts apply in commercial matters, which is between 6% and 8%." (Pls.' Reply

73.)  The Court agrees that the commercial rate applied by
Argentine courts is the appropriate measure as this case
involves purely commercial obligations.  However, the Court
reserves judgment on the precise rate it will utilize.

### D.   The Republic's Motion for Summary Judgment on the Good Faith and Fair Dealing Claim

The Republic argues, and Plaintiff agrees, that Argentine
law does not recognize a separate cause of action for breach of
an implied duty of good faith and fair dealing where the alleged
duty is not contained in the contract.  (Republic's Mot. 39;
Pls.' Opp'n 73.)  The Republic's motion for summary judgment on
Plaintiffs' good faith and fair dealing claim is therefore
granted.

## IV. Conclusion

In sum, the Republic's motion for summary judgment (dkt.
no. 360) is GRANTED as to Plaintiffs' claim for breach of the
duty of good faith and fair dealing and is otherwise DENIED,
YPF's motion for summary judgment (dkt. no. 367) is GRANTED, and
Plaintiffs' motion for summary judgment (dkt. no. 359) is
GRANTED as to liability against the Republic but DENIED as to
damages against the Republic and DENIED in its entirety as to
YPF.  The parties' letter motions for oral argument are also
DENIED as moot.

The Clerk of the Court shall close the open motions at dkt. nos. 359, 360, 367, 379, and 411 in Civil Case Number 15-cv-2739.  The Clerk of the Court shall close the open motions at dkt. nos. 289, 291, 294, 308, and 341 in Civil Case Number 16-cv-8569.  Counsel shall confer and inform the Court by letter of how they propose to proceed within fourteen days.

**SO ORDERED.**

Dated:     New York, New York
           March 30, 2023

                    LORETTA A. PRESKA
                    Senior United States District Judge