UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETERSEN ENERGÍA INVERSORA, S.A.U. and PETERSEN ENERGÍA, S.A.U., <br><br> Plaintiffs, <br><br> -against- <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. <br><br> ETON PARK CAPITAL MANAGEMENT, L.P., ETON PARK MASTER FUND, LTD., and ETON PARK FUND, L.P., <br><br> Plaintiffs, <br><br> -against- <br><br> ARGENTINE REPUBLIC and YPF S.A., <br><br> Defendants. | Case Nos.: <br><br> 1:15-cv-02739-LAP <br> 1:16-cv-08569-LAP |

## PLAINTIFFS' POST-HEARING BRIEF

CLEMENT & MURPHY, PLLC

Paul D. Clement
C. Harker Rhodes IV

KING & SPALDING LLP

Israel Dahan
Laura Harris
Reginald R. Smith

KELLOGG, HANSEN, TODD, FIGEL
 & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith

*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ............................................................................................................................ 4

I.  Argentina Exercised Control of Repsol's Shares on April 16, 2012 ................................. 4

II. This Court Should Award 8% Prejudgment Interest from April 16 .................................. 9

III. Argentina's Attack on Prof. Fischel's Calculations Is Forfeited and Meritless ............... 12

i

# TABLE OF AUTHORITIES

**Cases**

*Leddy v. Standard Drywall, Inc.*, 875 F.2d 383 (2d Cir. 1989) ..................................................... 13

*Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194 (2d Cir. 2018) ........... 5, 8

**Statutes**

Argentine Civil Code, Article 508 ................................................................................................ 10

Argentine Civil Code, Article 622 ............................................................................................ 10, 12

Argentine Unified Civil and Commercial Code, Article 768 ....................................................... 11

**PRELIMINARY STATEMENT**

This Court's detailed summary judgment opinion has already resolved the vast majority of this case, establishing that Argentina breached its obligations under the Bylaws "no later than May 7, 2012." ECF No. 437, at 28. The Court's meticulous opinion left only two issues to be resolved: (1) whether Argentina breached earlier by taking direct or indirect "control of [Repsol's] shares" via the Intervention Decree; (2) what "precise rate" of prejudgment interest to apply based on "the commercial rate applied by Argentine courts," which is "between 6% and 8%." *Id*. at 56, 62-63.

The evidence relevant to those two issues is straightforward and largely undisputed. *First*, Argentina acquired and exercised control of Repsol's shares when it issued the Intervention Decree on April 16, 2012. Through the Decree, Argentina displaced the YPF Board and Chairman that Repsol had elected, and installed the Intervenor and Vice-Intervenor in their place—depriving Repsol of the central right of a majority shareholder to select the Board. That seizure of control over Repsol's shares was reflected in the markets, where the share price plunged by 40% after the Decree, while barely budging three weeks later. It was confirmed by Argentina's contemporaneous statements recognizing the change in control, PX-15 at 22, and its contemporaneous actions, as Argentina canceled the shareholders' meeting that Repsol had called for April 25—making it impossible for Repsol to vote its shares or approve the capital distribution on the agenda (which as a result never occurred). And it was reconfirmed by the unambiguous determination of Argentina's own federal appraisal agency of what Argentina took from Repsol—*51% of YPF's shares*—and when it dispossessed Repsol of those shares—*April 16, 2012*.

As the trial showed, Argentina has no real response. The material facts are undisputed. Argentina *concedes* that it took control of YPF *as a company* through the Intervention Decree; it argues only that it somehow avoided taking even indirect control *of the shares* in doing so. But Argentina has never explained (and cannot explain) how it could take total control of a publicly

1

traded company from the majority shareholder without exercising even indirect control over that majority shareholder's shares.  That explains why Argentina did its best, before and during trial, to ignore the key Bylaws language, which requires a tender offer if Argentina exercises control of the shares "directly or indirectly, by any means or instrument."  PX-3 at 22 (Bylaws § 28(A)).  Instead of confronting that broad functional language, Argentina reverts to formalities, arguing that it could not *vote* the shares before May 7 and did not actually vote them until the rescheduled shareholders' meeting on June 4.  The Bylaws' text, however, turns on when Argentina directly or indirectly "exercise[d] the control of" the shares, not when it formally exercised the *voting rights* belonging to the shares.  *Id.*  As with its earlier unsuccessful focus on formal ownership, *see* ECF No. 437, at 27-28, Argentina ignores that the Bylaws' protections were written capaciously and functionally, not narrowly and formally, because investors insisted on a robust precommitment before investing in the state-owned oil company of a nation with a history of economic nationalism.

*Second*, this Court should award prejudgment interest at 8%.  The Court held at summary judgment that "the commercial rate applied by Argentine courts" governs, *id.* at 63, and both the case law and trial make clear that rate is between 6% and 8%.  Argentina's own expert, Dr. Manóvil, confirmed that apart from one outlier panel, every modern decision from the Argentine court for general commercial cases has been in that range or above.  And Prof. Fischel's testimony was undisputed that even the high end of the range—8% simple interest—would undercompensate Plaintiffs for being forced to serve as Argentina's involuntary creditors for over a decade.

Again, Argentina has no real response.  Instead, it ignores the parameters of this Court's summary judgment decision and asks this Court to award *zero* prejudgment interest because the underlying liability is substantial.  But this Court rejected similar no- or low-interest arguments at summary judgment, and the judgment's size only underscores the magnitude of Plaintiffs' harm

2

from being deprived of their contractual due for over a decade. Argentina's appeal to the equities—like its alleged hardship from having to pay what it owes—is beyond irrelevant, especially when Argentina has made no commitment to actually pay the judgment, and when its claims of poverty in this Court are contradicted by its own officials' simultaneous boast that YPF's massive oil and gas reserves enable it to pay the judgment "with one annual EBITDA" and still have "150 years of gas reserves," making the expropriation "a good decision," and "we would do it again." Rhodes Decl. Ex. A (July 28, 2023 statement by YPF Chairman Pablo Gerardo Gonzalez). Vice-Intervenor Axel Kicillof echoed the point, noting that "the numbers are big" because the Vaca Muerta resources are valuable and allow Argentina to pay. Rhodes Decl. Ex. B.

Finally, this Court should reject Argentina's last-minute effort to throw in an entirely new issue by challenging the price/income ratios Prof. Fischel used to calculate damages. Argentina never raised that purported issue in its expert reports, its summary judgment briefing, or *even in its pretrial memorandum*, making the issue thoroughly forfeited and well outside the scope of this trial. And there is a reason Argentina's learned counsel did not raise this purported $3.4 billion issue earlier: Argentina's criticism of Prof. Fischel's calculations is plainly incorrect, as the ratios that Prof. Fischel used were the *only* price/income ratios that were actually used by investors and computed by the financial community for "reporting purposes" on a daily basis "during" the two-year look-back period. PX-3 at 7 (Bylaws § 7(f)(v)(D)). The fact that a single database later also provides revised numbers does not change that reality—and in any event, the Bylaws entitle investors to the *highest* relevant price/income ratio. This Court should find that Argentina breached its Bylaws obligations on April 16, 2012, award prejudgment interest at 8%, reject Argentina's remaining arguments as forfeited and meritless, and enter judgment for Plaintiffs.

3

**ARGUMENT**

**I.     Argentina Exercised Control of Repsol's Shares on April 16, 2012**

The record is clear: Argentina exercised at least indirect control of Repsol's shares, and therefore triggered its tender-offer obligation under the Bylaws, when it issued the Intervention Decree on April 16, 2012. As an initial matter, that follows from the basic purpose of the Decree, since (as Argentina has repeatedly conceded) the Decree gave Argentina total and undisputed control of YPF as a company. *See, e.g.*, ECF No. 466, at 4-5 (Argentina Pre-Trial Mem.); Tr. 28:7-10. To be sure, as this Court has already correctly ruled, the Bylaws' trigger for the tender-offer obligation is direct or indirect control of 49% of YPF's shares, not control of YPF itself. ECF No. 437, at 56. But Argentina has not explained—and cannot explain—how it could wrest control of a publicly traded company from its majority shareholder without exercising even *indirect* control of the majority shareholder's shares. The record here shows precisely why that was impossible: By taking control of the company, Argentina *necessarily* deprived Repsol of the key rights associated with its majority shares, including the right to appoint those exercising the power of the YPF Board. *See, e.g.*, Tr. 79:17-82:18 (Bianchi); Tr. 283:19-24, 285:17-24 (Manóvil).

In all events, the Decree gave Argentina not just control of the company as of April 16, but at least indirect control of Repsol's shares, and deliberately so. *See* PX-11 at 2 (targeting "majority shareholder" because its "interests" were at odds with Argentina's); Tr. 75:7-76:13 (Bianchi). The relevant facts are not in dispute. Before April 16, Repsol had full control of its majority stake in YPF and (as Dr. Manóvil conceded) could use its shares to govern the company. Tr. 273:21-274:9, 278:3-22. It could use those shares to appoint or remove board members, vote at shareholder meetings to approve dividends and direct corporate policy, and exercise all the considerable powers of a majority shareholder. Tr. 79:17-82:18 (Bianchi); Tr. 278:3-22 (Manóvil). After the Decree, by contrast, Repsol had no ability to exercise those powers (as Dr. Manóvil conceded), and

4

Argentina controlled them instead. Tr. 276:2-5. Repsol could no longer appoint or remove those with the powers of the Board, *see* Tr. 79:17-82:18 (Bianchi); Tr. 285:17-24 (Manóvil), as those powers had all been vested in the government-appointed Intervenor, and the Repsol-elected Board was "displaced" and rendered "devoid of any powers, functions, or duties," Tr. 276:2-5, 276:24-277:17 (Manóvil); *see* Tr. 77:9-13 (Bianchi); PX-29 at 131; *see also* Tr. 283:19-24 (Manóvil) (recognizing that Repsol was powerless to remove the Intervenor). Repsol likewise could not vote its shares at any shareholder meeting (and so could not approve the proposed capital distribution), *see* Tr. 279:15-19 (Manóvil); PX-6 at 11, as the Intervenor controlled whether any such meeting was held (and suspended the scheduled meeting to ensure that Repsol would have no ability to vote its shares and no distribution would be made), PX-24; Tr. 278:23-25 (Manóvil). In the words of the Second Circuit: "Argentina did indeed exercise the rights of Repsol's shares, using them to cancel YPF's previously-scheduled dividend payment and [shareholders'] meeting in April 2012." *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 895 F.3d 194, 203 (2d Cir. 2018). While Argentina did not formally *vote* Repsol's shares itself on April 16, it unequivocally *controlled* the shares on that date, as Prof. Bianchi testified. Tr. 83:23-84:23.

The market's reaction confirms the point. After the Decree, YPF shares dropped by over 40%. PX-47; Tr. 188:22-189:11 (Fischel). By contrast, when the Expropriation Law took effect on May 7, YPF shares declined only 3%, making clear that "investors understood that, as a matter of economic substance, the actions that mattered occurred on April 16th, not on May 7th." Tr. 189:7-11 (Fischel). Vice-Intervenor Axel Kicillof likewise understood on April 17 that the Decree had "modif[ied] the control that until now belonged to the Repsol group." PX-15 at 22.

Even more telling is the considered decision of Argentina's federal appraisal agency, the TTN. In its February 17, 2014 decision, the TTN appraised the property that was seized—namely,

5

"fifty-one percent (51%) of YPF Sociedad Anónima equity … held by Repsol." PX-35 at 1. And it appraised that property as of the date on which Repsol was dispossessed, which the TTN concluded was April 16, 2012. *Id.*; *see* Tr. 87:11-88:14 (Bianchi). Argentina has no answer whatsoever to that dispositive what-and-when finding from its own federal appraisal agency.

Instead, Argentina did its best to conflate that February 17, 2014 TTN decision with a *separate* TTN decision issued on February 25, 2014 in connection with the Repsol settlement, *see* PX-36 at 81-82, and to assert the TTN was focused *not* on the expropriation of Repsol's 51% of YPF but on *other* related litigation claims. *See* Tr. 304:5-305:7, 312:21-313:1 (Uslenghi). That strained effort not only ignores the February 17 decision, which pre-dated the settlement, but also contradicts the February 25 decision, which makes explicit (as Judge Uslenghi admitted) that it provided an "appraisal of the shares," PX-36 at 81; Tr. 306:14-19, as of "the date of the dispossession" by the Decree, PX-36 at 82.[1] Again, Argentina's officials agreed. Daniel Martin, the TTN panel's head, told the Chamber of Deputies that the TTN's "appraisal was carried out as of the dispossession date, in accordance with Article 20 of the Expropriation Law, which was April 16, 2012." PX-39 at 5; PLA-7 at 3. Carlos Zannini, then Secretary of Legal and Technical Affairs of the Presidency, concurred that "the taking of possession … was in April 2012." PX-39 at 1.

Argentina's trial presentation only confirmed that Argentina took at least indirect control of Repsol's shares on April 16. It conceded that it controlled YPF as a company on that date, *see supra* p. 4, without offering any explanation for how it could control YPF and correct the majority shareholder's "predatory policy" without even indirectly exercising control of Repsol's shares. PX-11 at 2. It also largely ignored the Bylaws' broad, functional direct-or-indirect and by-any-

---

[1] Ironically, Argentina's strained effort to link the second TTN report's April 16 "dispossession" date to Repsol's *other* claims—namely Argentina's failure to tender for Repsol's 7% YPF stake that was *not* expropriated—*confirms* the tender was due, and the Bylaws breached, on April 16.

6

means language.  PX-3 at 22 (Bylaws § 28(A)).  Instead, Argentina insisted that its tender-offer obligation was not triggered until it acquired and exercised the formal right to vote Repsol's shares, eliciting testimony that Argentina did not actually vote those shares itself until June 4.  *See*, *e.g.*, Tr. 110:2-11 (Bianchi); Tr. 266:25-267:3 (Manóvil).  That may be the best argument Argentina can muster, but it underscores that Argentina is ignoring the Bylaws' text, which triggers the tender-offer obligation when Argentina "exercises the control of" the shares, not when it exercises *the voting rights* of the shares.  Every time Argentina and its witnesses emphasize June 4 as a critical date, they are ignoring the Bylaws' text and this Court's summary judgment ruling, which set May 7 as the latest possible date.  ECF No. 437, at 28; *see* Tr. 83:23-84:23 (Bianchi) (explaining the difference between exercising control of the shares and exercising the voting rights of the shares).[2]

In sum, Argentina's claim that it did not trigger its tender-offer obligation until it acquired or exercised formal authority to vote Repsol's shares is just as wrong and atextual as Argentina's previous (and firmly rejected) position that it did not trigger that obligation until it took formal title in 2014.  ECF No. 437, at 27-28.  To be sure, Argentina *also* exercised control of the shares—by a different "means or instrument," PX-3 at 22 (Bylaws § 28(A))—on May 7, 2012, when the Expropriation Law took effect, and in May 2014, when it took formal title.  *See* PX-11 at 8 (Decree immediately "ensure[d] the full and absolute compliance of the measures … in the [Expropriation] Bill"); Tr. 73:1-4 (Bianchi) (Decree "accomplished the goals of the [E]xpropriation [L]aw").  But the question here is not whether Argentina *also* exercised control on May 7, or acquired different or additional rights on that date; it is just whether the Intervention Decree on April 16 was enough

---

[2] Dr. Manóvil's testimony on *corporate* control for private-law purposes has no bearing on the Bylaws question of when control is exercised over *shares*, which Dr. Manóvil conceded is not an Argentine corporate or private-law concept at all.  *See* Tr. 287:3-19.  His focus on corporate control is doubly irrelevant, since Argentina concedes it acquired control of YPF on April 16.

to give Argentina direct or indirect control of the shares and so trigger its tender-offer obligation.[3] As a matter of Argentine public law and economic reality, the answer is plainly yes. Tr. 71:3-73:4, 74:8-21, 75:17-78:5, 79:5-82:18 (Bianchi); Tr. 183:9-185:25 (Fischel).

Finally, as Prof. Fischel explained, Argentina's position that it could retake control of YPF by executive decree without triggering its tender-offer obligation makes no economic sense. *See* Tr. 177:23-179:20. The Bylaws' tender-offer provision was a precommitment that promised investors, in the Second Circuit's words, "a compensated exit from their ownership position in the firm if Argentina were to decide to renationalize YPF," *Petersen*, 895 F.3d at 200, and that investors relied on in deciding to invest $1.1 billion in the company through the New York Stock Exchange alone, *see* Tr. 181:25-183:8, 187:9-188:21 (Fischel). If Argentina could renationalize YPF by executive decree without taking even indirect control of the shares or triggering its tender-offer obligation—and then extend that executive decree indefinitely, *see* Tr. 281:7-282:1 (Manóvil), DX-22t at 2—that precommitment would have been illusory. Argentina's reading of the Bylaws accordingly fails the financial-markets test: If Argentina made its view of the Bylaws clear in 1993, no reasonable investor would have bought YPF shares. *See* 180:12-183:8 (Fischel). On this record, the only possible conclusion is that Argentina triggered its tender-offer obligation under the Bylaws on April 16, 2012, when it issued the Intervention Decree.[4]

---

[3] For that very reason, there is no contradiction between Prof. Bianchi's testimony at trial that the Intervention Decree triggered Argentina's tender-offer obligation on April 16, and his statements in his first report that the Expropriation Law (on which he was then being asked to focus) also triggered that obligation—especially since all three of his reports make clear that *both* events triggered the tender-offer provision. *See* PX-81 § D; *id.* ¶ 38; *see also* PX-70 ¶¶ 28, 113, 116-121, 133-135, 145; PX-82 ¶¶ 11, 36.

[4] Argentina's gratuitous attacks on the character of two experts who did not testify, *see* Tr. 494:22-495:19, are wholly misguided. Plaintiffs chose not to call Prof. Garro and Prof. Rovira—one of whom is Argentina's own expert's co-author, *see* ECF No. 368-1, at 32 (¶ 69)—because this Court's summary judgment order did not leave open any issues that their testimony would have clarified, as confirmed by the fact that Argentina could have called either witness, but chose not to.

## II. This Court Should Award 8% Prejudgment Interest from April 16

The answer to the second issue presented at trial is equally clear. As this Court has held, "this case involves purely commercial obligations," and so Argentina must pay prejudgment interest at "the commercial rate applied by Argentine courts." ECF No. 437, at 62-63. As Plaintiffs explained at summary judgment (relying on many of the same cases presented at trial), *see id.* at 62, that rate ranges from 6% to 8%. In particular, as the trial record underscores, five of the six panels of the National Court of Appeals for Commercial Matters consistently award prejudgment interest in the 6% to 8% range or above. *See, e.g.*, PLA-9; PLA-10; PLA-15; PLA-21; PLA-81; *see also* Rhodes Decl. Ex. C (collecting cases). Indeed, Dr. Manóvil himself conceded on cross-examination that apart from decisions by one outlier panel, he was not aware of any "[modern] interest rates" in other cases from that court below that range. Tr. 293:9-14.

And for this case, the only appropriate rate within that range is 8%. Argentina paid Repsol for its expropriated YPF shares with $5 billion in government bonds, including debt carrying *compound* interest exceeding 8%. *See* PX-36 at 84. And, as Prof. Fischel testified, even 8% simple interest will substantially undercompensate Plaintiffs, as both Argentina's borrowing rate and Plaintiffs' losses have been far greater and compounding. If Plaintiffs "had made a loan to Argentina for the amount that is owed," then "the interest rate compounded would be much greater than 8 percent." Tr. 174:13-175:22. Argentina presented no contrary testimony, leaving the record clear that any rate below 8% would only exacerbate the injury Plaintiffs have suffered by being forced to serve as involuntary creditors for over a decade.

Because Argentina cannot dispute those simple facts, its lead approach at trial was to ask the Court to ignore them and its own summary judgment ruling, and instead award *no* prejudgment interest *at all*. That cannot be squared with Argentine law, which mandates *some* prejudgment interest award, explaining why Argentina has not identified a single case awarding none. *See*

9

PLA-4 at 2 (Art. 508) (debtor "is also liable" for damages from "delay in the performance of the obligation"); *id*. at 14 (Art. 622) ("[T]he courts shall fix the interest that the debtor must pay."). Nor can it be squared with a proper exercise of this Court's discretion. Contrary to Argentina's suggestion, *see* Tr. 57:8-58:3, the size of the underlying judgment is no reason to *reduce* the award of prejudgment interest. Instead, the size of the judgment only confirms the magnitude of the harm Plaintiffs have suffered from Argentina's failure to meet its obligations for over a decade, and the need for prejudgment interest to compensate for that harm. *See* Tr. 174:13-175:22 (Fischel).

The other purported "equitable" considerations Argentina raises are irrelevant as a matter of Argentine law. The only such "equitable" factor that Argentina's cases consider is whether the interest rate is too high relative to market rates, *see*, *e.g.*, PLA-28 at 2—which is not the case here, given the conceded non-existence of willing hard-currency loans—and Argentina has not cited a single case in which a court adjusted prejudgment interest based on a defendant's supposed inability to pay what it owes. Rather, as Dr. Manóvil admitted, Argentine courts have approved rates above 8% even for a bankrupt defendant. *See* Tr. 288:17-22, 290:16-291:1, 291:22-292:5.

In any event, Argentina should not be heard to appeal to equity unless it is willing to commit to actually paying the judgment when its promised appeals are exhausted—a precommitment that Argentina has been distinctly unwilling to make. And Argentina's claims of poverty are belied by its own officials, who were publicly representing—at the same time that its lawyers were pleading poverty—that YPF's massive oil and gas reserves would allow it to pay the judgment readily, and that despite the looming judgment the expropriation was "a good decision," and "we would do it again." Rhodes Decl. Ex. A; *see* Rhodes Decl. Ex. B (July 30, 2023 statement by Mr. Kicillof that if Argentina had complied with its tender-offer obligation, it "would have paid the same [amount] that [Plaintiffs] are now asking us to pay," and that expropriation "worth it" given YPF's reserves).

10

Argentina's fall-back arguments for lower interest rates are equally unavailing. This Court already rejected at summary judgment Argentina's attempt to reduce its interest obligations by relying on the rates applied by its "federal administrative law courts," ECF No. 437, at 62-63, and Argentina's similar attempts to rely at trial on other inapposite rates are equally unpersuasive.

Argentina primarily asks this Court to apply prejudgment interest at the Argentine national bank's deposit rate plus 2%, based on decisions from one understaffed panel of the National Court of Appeals for Commercial Matters. *See* Tr. 269:7-270:15 (Manóvil). But the cases Argentina cites from that two-judge outlier panel—whose former (and never-replaced) third judge consistently dissented on this issue, *see*, *e.g.*, PLA-17; PLA-51—apply Article 768 of the Unified Civil and Commercial Code, which the parties agree does not apply here because it went into force only in 2015. And the rate that outlier panel applies, as Dr. Manóvil conceded, is one that was invented because "for many years" the Argentine national bank has had "no loans in foreign currencies," Tr. 269:7-25, a fact that underscores that even an 8% rate will give Argentina a better rate than it could secure in the market. Alternatively, Argentina briefly sought at trial to rely on interest awards by the Federal Court of Appeals in Civil and Commercial Matters, *see* Tr. 270:16-271:1—an argument Argentina never raised at summary judgment or in its pretrial brief and that defies this Court's summary judgment ruling. That court hears only cases involving certain defendants or subject matters specified by statute, mostly cases involving the Argentine government or federal agencies. *See* Rhodes Decl. Ex. D (Art. 38); Ex. E (Art. 46); Ex. F (Arts. 66-67); Ex. G (Arts. 67, 73-74). Its interest awards are thus irrelevant to this case involving "purely commercial obligations." ECF No. 437, at 63.

Finally, Argentina asserted at trial that prejudgment interest should run not from the date when the tender offer should have occurred, but from the date Plaintiffs served their complaints.

11

Of course, Argentina never raised that argument at summary judgment, and it is has no bearing on the "precise rate" of prejudgment interest that this Court reserved for trial, *id.*, making the issue both inapposite and forfeited.  Regardless, Argentina's position is meritless.  First, the Argentine Civil Code makes clear that a debtor "owes the interest … from the time of [the obligation's] maturity," PLA-4 at 14 (Art. 622), as Dr. Manóvil conceded in his report, *see* ECF No. 368-2, ¶ 150(iv).  Second, even if (as Dr. Manóvil claimed at trial) interest cannot run until the debtor is on notice of its default, Argentina was plainly on notice by April 17, when Vice-Intervenor Kicillof explicitly repudiated the tender-offer obligation as a "bear trap" for "fools" and confirmed that Argentina knew of its obligations and was "not going to pay," making any further notice futile.  PX-15 at 25-26; *see* PLA-11 at 4 (discussing automatic default upon repudiation).  Third, even if further notice of default were required, Argentina received it no later than May 16, 2012, when Repsol filed a class-action complaint against Argentina "on behalf of a class consisting of all record or beneficial holders of Class D shares of YPF stock," including Plaintiffs.  PX-28 ¶ 44.

In short, as Kicillof's April 17 speech makes clear, Argentina was well aware 11 years ago that it had a commercial obligation to pay up to $19 billion under the Bylaws' tender-offer provision, *see* PX-15 at 25-26, and it consciously chose not to satisfy that obligation.  Under the law and this Court's summary judgment decision, the only proper prejudgment interest award here is 8% simple interest from the date on which Argentina failed to tender.

### III. Argentina's Attack on Prof. Fischel's Calculations Is Forfeited and Meritless

Last and least, this Court should reject Argentina's forfeited and meritless challenge to the price/income ratios that Prof. Fischel used to calculate the tender-offer price under Formula D.  Argentina raised no argument whatsoever along those lines in either its expert's report, *see* Tr. 402:23-403:6 (Harris), or its summary judgment briefing, instead arguing only that Prof. Fischel erred by using daily price/income ratios rather than quarterly ones.  This Court squarely rejected

that argument, holding that Prof. Fischel's "application of Formula D based on the daily price/income ratios is correct and required by the Bylaws." ECF No. 437, at 62. Argentina did not seek reconsideration of that holding on the ground that Prof. Fischel's price/income ratios were wrong. Nor did it raise that purported issue in any of its other pretrial filings, *including even its pretrial memorandum*. On the contrary, its pretrial filings repeatedly confirmed that there were only "two issues" set for trial—the trigger-date and interest-rate issues this Court identified. ECF No. 454, at 4; *see also* ECF No. 452, at 1; ECF No. 466, at 1; ECF No. 457, at 3.

Argentina's attempt to raise this purported $3.4 billion issue for the first time in its opening statement, *see, e.g.*, Tr. 26:21, comes far too late. "Once a district judge issues a partial summary judgment order removing certain claims from a case," the parties may not adduce additional "evidence … in regard to those claims." *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 386 (2d Cir. 1989). At summary judgment, Argentina raised only one challenge to Plaintiffs' price/income ratios: that they should be calculated "quarterly, as opposed to daily." ECF No. 437, at 53; *see* Tr. 402:23-403:6 (Harris). Having "made the strategic decision to develop a record and argue" for quarterly price/income ratios and nothing else, Argentina "cannot now cry about the unfairness of not being permitted to change its strategy, at Plaintiffs' expense." ECF No. 464, at 9.

In any event, this late-breaking argument did not make the summary judgment cut for good reason. The Bylaws calculate the tender-offer price under Formula D by using "the highest price/income ratio for [YPF] during the two-year period immediately preceding the notice date," applying "the regular method used by the financial community for computing and reporting purposes." PX-3 at 7-8 (Bylaws § 7(f)(v)(D)). It is undisputed that on each day "during" the two-year look-back period, the *only* price/income ratio used by investors and "the financial community for computing and reporting purposes" for that day was the ratio that Prof. Fischel used in his

13

calculations, based on the earnings reported as of that date.  That was the ratio reported on that day by Bloomberg, by the Wall Street Journal, by FactSet, and by the Argentine stock exchange itself, and no one else in the financial community applied (or could have applied) any other method on that day.  *See* Tr. 151:18-21, 418:21-23, 420:9-12, 421:9-11, 425:1-12.  And contrary to what Argentina at times suggested at trial, *see*, *e.g.*, Tr. 52:7-53:9, Bloomberg still reports that ratio for that date today (through a point-in-time feature available at no extra cost, *contra* Tr. 516:14-16), as do the Wall Street Journal, FactSet, and the Argentine stock exchange.  *See* Tr. 419:12-16, 420:20-24, 421:16-19, 427:17-23.  That is hardly surprising, as even Argentina's expert Prof. Harris confirmed that calculating price/income ratios on a point-in-time basis is "a function of most data providers," Tr. 429:5, and "a regular method used by the financial community for computing [and] reporting earnings," Tr. 416:25-417:4; *see* Tr. 350:15-17; 409:5-10.

Argentina nevertheless belatedly argues for a different (and lower) ratio, claiming that it was legal error for Prof. Fischel not to use a price/*revised*-income ratio that Bloomberg—and only Bloomberg—subsequently *recalculates* based on *later*-reported earnings information.  *See* Tr. 52:7-53:9.  That argument is meritless.  The Bylaws calculate the price under Formula D using "the highest price/income ratio" for YPF "during" the look-back period for "reporting purposes," PX-3 at 7-8 (Bylaws § 7(f)(v)(D)), not a lower ratio calculated later based on information unavailable in real time.  Put simply, the fact that Bloomberg chooses to provide its users with not only the price/income ratio that it and all other financial services reported on the date in question, but *also* a recalculated ratio based on later-reported earnings information, *see* Tr. 428:5-11, does not change the fact that only the former is the ratio used "during" the look-back period for contemporaneous "reporting purposes," PX-3 at 7-8 (Bylaws § 7(f)(v)(D)).  Contrary to Argentina's suggestion, Formula D does not direct someone calculating the tender-offer obligation

14

to use only the most up-to-date data. Indeed, the look-back portion of Formula D applies only if the historical ratios during the look-back period are higher than the more up-to-date price/income ratio prevailing in the last four reported quarters, *see* Tr. 163:24-165:7 (Fischel), and the Bylaws elsewhere expressly call for adjustments based on subsequent developments where appropriate, PX-3 at 7 (Bylaws § 7(f)(v)(C) requiring adjustment based on "subsequent division of shares"). And even if this Court were to conclude both ratios were potentially applicable under the Bylaws, the Bylaws make clear the "highest" should prevail, *id.*, which is the ratio that Prof. Fischel used.

Finally, only Prof. Fischel's calculations are consistent with the purpose of Formula D. Formula D includes a two-year lookback window to give minority shareholders the benefit of the highest price that investors were willing to pay during that period for YPF shares in relation to reported earnings. *See* Tr. 164:15-166:8, 167:7-16. No investor put new money into YPF based on Bloomberg's revised calculations that were unavailable in real time; all those investment decisions were based on the contemporaneously available price/income ratios reported by Bloomberg and everyone else, i.e., the ratios Prof. Fischel employed. Tr. 158:4-159:20. Prof. Fischel's calculations thus correctly follow both the plain text of the Bylaws and the precommitment that the Bylaws reflect.

In short, Argentina's learned counsel did not simply overlook a viable $3.4 billion defense in its expert reports, its summary judgment briefing, and all its pretrial filings. That purported defense wound up on the cutting-room floor because it belongs there, as it cannot be squared with either the Bylaws or the undisputed record. This Court should find Argentina breached its Bylaws obligations on April 16, 2012, award prejudgment interest at 8%, reject Argentina's remaining arguments as forfeited and meritless, and enter judgment for Plaintiffs accordingly.

Dated: August 4, 2023

Respectfully submitted,

CLEMENT & MURPHY, PLLC

By:   */s/ Paul D. Clement*
Paul D. Clement
C. Harker Rhodes IV*
706 Duke Street
Alexandria, VA 22314
Phone: (202) 742-8900
Fax: (202) 742-8895
Email: paul.clement@clementmurphy.com
          harker.rhodes@clementmurphy.com
*Supervised by principals of the firm who are members of the Virginia bar


KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.

Mark C. Hansen
Derek T. Ho
Andrew E. Goldsmith
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mhansen@kellogghansen.com
          dho@kellogghansen.com
          agoldsmith@kellogghansen.com


KING & SPALDING LLP

Israel Dahan
Laura Harris
1185 Avenue of the Americas
New York, NY 10036
Phone: (212) 556-2114
Fax: (212) 556-2222
Email: idahan@kslaw.com
          lharris@kslaw.com

-and-

16

>Reginald R. Smith
>1100 Louisiana Street, Suite 4100
>Houston, TX 77002
>Phone:  (713) 751-3200
>Fax:  (713) 751-3290
>Email:  rsmith@kslaw.com
>
>*Counsel for Plaintiffs Petersen Energía Inversora, S.A.U., Petersen Energía, S.A.U., Eton Park Capital Management, L.P., Eton Park Master Fund, Ltd., and Eton Park Fund, L.P.*