UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETERSEN ENERGÍA INVERSORA,
S.A.U. and PETERSEN ENERGÍA,
S.A.U.,

                    Plaintiffs,

-against-

ARGENTINE REPUBLIC and YPF
S.A.,

                    Defendants.

ETON PARK CAPITAL MANAGEMENT,
L.P., ETON PARK MASTER FUND,
LTD., and ETON PARK FUND, L.P.,

                    Plaintiffs,

-against-

ARGENTINE REPUBLIC and YPF
S.A.,

                    Defendants.

15 Civ. 2739 (LAP)
16 Civ. 8569 (LAP)

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

LORETTA A. PRESKA, Senior United States District Judge:

       A bench trial was held in this matter on July 26, 27, and
28, 2023.  The factual background of this dispute has been set
forth in the Court's prior opinion on summary judgment in
Petersen Energia Inversora, S.A.U. v. Argentine Republic, 2023
U.S. Dist. LEXIS 57097, at *4 (S.D.N.Y. Mar. 30, 2023) and will
not be repeated here except to the extent necessary to resolve

1

the remaining disputes.[1]  The Court identified one issue for resolution at trial:  the date on which the Republic[2] triggered its tender offer obligations by exercising control over Repsol's shares of YPF.  The Court also reserved judgment regarding the amount of prejudgment interest it would, in its discretion, award to Plaintiffs.  The parties submitted evidence and argument on these issues.  The Republic also availed itself of the opportunity to submit evidence and argument, for the first time, regarding the proper application of Formula D and the date on which prejudgment interest should begin to run.

---

[1] Unless otherwise noted, in making these findings of fact and formulating its conclusions of law, the Court relied on the following sources:  Transcript of Trial held July 26-28, 2023 ("Tr.") [dkt. nos. 487, 489, 491]; Plaintiffs' Trial Exhibits ("PX"); Defendant's Trial Exhibits ("DX"); Plaintiffs' Legal Authorities ("PLA"), [dkt. nos. 470, 478, 481]; and Defendant's Legal Authorities ("DLA") [dkt. no. 469].  The Court also considered:  Plaintiffs' Post-Trial Brief ("Pls.' Post-Trial Brief"), dated August 4, 2023 [dkt. no. 467]; Defendants' Post-Trial Brief ("Def.'s Post-Trial Brief"), dated August 4, 2023 [dkt. no. 482]; and the subsequent (unauthorized) letters submitted by the parties in further support of their Post-Trial Briefs, dated August 7 (the Republic), 9 (Plaintiffs), and 10 (the Republic), 2023 [dkt. nos. 484, 485, and 486].  As with its March 30, 2023 opinion, all docket references are to the Petersen docket (15-cv-2739) unless otherwise noted.
[2] Unless otherwise noted, the Court incorporates the abbreviations from its opinion dated March 30, 2023.

I.   **Findings of Fact and Conclusions of Law**

   A. **The Republic Exercised Indirect Control Over Repsol's shares on April 16, 2012**

The Court finds that the Republic exercised indirect control over Repsol's shares on April 16, 2012.  The Republic took control of YPF on this date via the Intervention Decree. (PX-11 (Argentine Decree No. 530/201).)[3]  Through the intervention, the Republic deprived Repsol of control over its shares and thereby exercised indirect control over those shares. Before April 16, 2012, Repsol, via its ownership and control of a majority of YPF D shares, could use its shares to govern the company and take other actions as a shareholder.  (Tr. 273:21-274:9 (Professor Manóvil testifying that, prior to intervention, shareholders appointed the majority of YPF board, that the CEO of Repsol was chairman of YPF's board, and conceding that "Repsol had the power to select its own CEO and chairman of the board, as chairman of YPF's board, because it was the majority shareholder"); see also Tr. 278:3-22.)  It could use those shares to appoint or remove the persons exercising the powers of the Board, vote at shareholder meetings to approve dividends and direct corporate policy, and otherwise exercise all the considerable powers of a majority shareholder.  (Tr. 79:17-

---

[3] (Dkt. no. 481-10.)

82:18; Tr. 278:3-22.)  Through the Intervention Decree, the
Republic, as a practical matter, eliminated Repsol's ability to
do any of these things.  After the intervention, Repsol could no
longer appoint or remove those with the powers of the Board,
(see Tr. 79:17-82:18; Tr. 285:17-24), as those powers were
vested in the government-appointed intervenor, and the Repsol-
elected Board was "displaced" and rendered "devoid of any
powers, functions, or duties," (Tr. 276:2-5 (Professor Manóvil
conceding that "the purpose of the decree" was to "displace[]"
the board and render it "unable to operate as the board"); Tr.
276:24- 277:17; Tr. 77:9-13; PX-29[4] (Excerpts from YPF's SEC Form
20-F, filed May 16, 2012) at 131; see also Tr. 283:19-24
(Professor Manóvil testifying that Repsol "could not have voted
to remove the intervenor, of course not")).  Perhaps most
critically, Repsol could not vote its shares at any shareholder
meeting (and so could not approve a proposed capital
distribution), (see Tr. 279:15-19 (Professor Manóvil conceding
that "[i]n practice," Repsol "did not have the opportunity" "to
vote [its] shares at a shareholders meeting" following the
intervention); PX-6[5] (Minutes of the March 21, 2012 meeting of
the YPF S.A. Board of Directors) at 11), because the intervenor

---

[4] (Dkt. no. 481-15.)
[5] (Dkt. no. 481-9.)

controlled whether any such meeting was held and suspended the
scheduled meeting to ensure that Repsol would have no ability to
vote its shares and no distribution would be made, (PX-24 (YPF's
SEC Form 6-K, filed April 23, 2012);[6] Tr. 278:23-25 (Professor
Manóvil conceding that the April 25, 2012 shareholder meeting
was suspended by the intervenor)).  `This was by design.  (See
PX-11 at 2 (targeting "majority shareholder" because its
"interests" were at odds with the Republic's).)[7]

Indeed, the Republic's argument that it was simply
maintaining the status quo proves the point.  (Def.'s Post-Trial
Brief at 2 (citing Tr. 259:6-9 (Professor Manóvil testifying
that the purpose of the intervention was to "ensure the
continuity of the company" and to "preserve[] its assets" by
giving the Intervenor the management of YPF)).)  It begs the
question:  the status quo for whose benefit and to what end?  It
is, perhaps, more telling than anything else that the stated

---

[6] (Dkt. no. 481-12.)

[7] The Court acknowledges Professor Manóvil's point that the
ability to block certain actions in narrow circumstances does
not necessarily constitute control (Def.'s Post-Trial Brief at 5
(citing Tr. 286:8-16)), but the Republic's cumulative acts of
control through the Intervention Decree deprived Repsol of the
ability to use its shares in any way the Republic opposed.  The
Court accepts that the Republic did not remove every stick from
Repsol's bundle of property rights.  But it removed enough to
exercise exactly the amount of control necessary to accomplish
its purposes by preventing Repsol from taking any of the actions
the Republic opposed.

purpose of the Intervention Decree was to "preserv[e]" YPF's
"assets" (PX-11 at 8) pending expropriation and that the
intervention power was then immediately used to prevent Repsol
from using its shares to exercise control over those same
assets.  The timeline demonstrates this.  YPF's board (appointed
by Repsol) voted to propose capital distributions at the next
shareholder meeting (where Repsol would command a majority).
(PX-6 at 11.)  The Republic's representative opposed those
capital distributions.  (Id.)  The Republic intervened,
appropriated the rights of the Board to itself, and used those
rights to cancel the shareholder meeting at which those
distributions were scheduled to be approved.  (PX-24.)  The
assets of YPF were certainly "preserved," but not for the
shareholders' (or Repsol's) benefit.  Repsol, as the majority
shareholder, possessed significant authority over how those
"assets" were to be used, and, through the intervention, the
Republic took specific actions to prevent Repsol from exercising
that authority to ensure the Republic would have access to those
assets once the expropriation became official.  This constituted
indirect control over Repsol's shares.

Though not necessary to determine that the Republic
exercised indirect control, it is also telling that Argentine
officials recognized that April 16, 2012 was, for all practical

purposes, the date on which Repsol could no longer use its shares to control the company.  Secretary of Economic Policy and Development Planning and Vice-Intervenor Axel Kicillof stated on April 17 that the Republic had "modif[ied] the control that until now belonged to the Repsol group."  (PX-15[8] (Excerpts of the Transcript of Speech by the Secretary of Economic Policy and Development Planning, Axel Kicillof, on April 17, 2012 to the Argentine Senate) at 22.)  Similarly, in its February 17, 2014 decision, the Republic's federal appraisal agency (the "TTN") appraised the property that was seized – namely, "fifty-one percent (51%) of YPF Sociedad Anónima equity . . . held by Repsol."  (PX-35[9] (TTN Resolution No. 9/2013) at 1.)  And it appraised that property as of the date on which Repsol was dispossessed, which the TTN concluded was April 16, 2012.  (Id.; see Tr. 87:11-88:14.)  Daniel Martin, the TTN panel's head, told the Argentine Chamber of Deputies that the TTN's "appraisal was carried out as of the dispossession date, in accordance with Article 20 of the Expropriation Law, which was April 16, 2012." (PX-39[10] (Transcript of Speeches by Dr. Carlos Zannini and Daniel Martin to the Argentine Chamber of Deputies on April 8, 2014) at

---

[8]  (Dkt. no. 481-11.)
[9]  (Dkt. nos. 481-16 and 481-17.)
[10]  (Dkt. no. 481-21.)

5; PLA-7 (Argentine Law No. 21,499, the General Expropriation Law) at 3 (requiring that the compensation take into account the value of the property at the time of dispossession).)  Carlos Zannini, then Secretary of Legal and Technical Affairs of the Presidency, agreed that "the taking of possession . . . was in April 2012." (PX-39 at 1.)  The Court is unpersuaded by the Republic's attempts to conflate that February 17, 2014 TTN decision with a separate TTN decision issued on February 25, 2014 in connection with the Repsol settlement, (see PX-36[11] (Excerpts of the Argentine Republic and Repsol's Agreement for the Amicable Settlement and Compromise of Expropriation, dated February 27, 2014) at 81-82), and to assert the TTN was focused not on the expropriation of Repsol's 51% of YPF but on other related litigation claims (see Tr. 304:5-305:7; Tr. 312:21-313:1 (Uslenghi)).  That interpretation ignores the February 17 decision, which pre-dated the settlement, and contradicts the February 25 decision, which makes explicit that it provided an "appraisal of the shares," (PX-36 at 81; Tr. 306:14-19 (Judge Uslenghi confirming appraisal was of the Repsol shares)), as of "the date of the dispossession" by the Decree, (PX-36 at 82). These more contemporaneous statements of the Republic and its

---

[11] (Dkt. nos. 481-18 and 481-19.)

representatives are further evidence that April 16, 2012 was the date of dispossession.

The market also recognized that an event having material economic significance had occurred on April 16, 2012.  After the Intervention Decree on April 16, YPF shares plummeted by over 40%.  (PX-47;[12] Tr. 188:22-189:11 (Fischel).)  However, when the YPF Expropriation Law took effect on May 7, 2012, YPF shares dipped a mere 3%.  (PX-47.)  This difference in response to each event shows that investors in the market – like everyone else, including Mr. Kicillof, the TTN, Mr. Martin, and Mr. Zinna – "understood that, as a matter of economic substance, the actions that mattered occurred on April 16th, not on May 7th."  (Tr. 189:7-11 (Fischel).)  YPF's share price thus reflected the reality that the Republic was exercising control of Repsol's shares in every meaningful way by April 16, 2012.

## B. Prejudgment Interest of 8% Simple Interest is Appropriate and Equitable

The question of the rate of prejudgment interest "is entirely a matter for the Court's discretion," though the Court may take into account "'factors' including the 'nature of the obligation,' 'situation,' 'who the parties are,' 'what has been the dispute'—in other words what would be 'equitable.'"  (Def.'s

---

[12] (Dkt. no. 481-22.)

Post-Trial Brief at 13 (quoting Tr. 268:8-22).)  After
considering these factors, the Court determines that 8% simple
interest is appropriate and equitable.  The best evidence of the
fair rate that the Court, in its complete discretion, should
award is the rate that the Republic agreed to in similar
circumstances.  The Republic paid Repsol for its expropriated
YPF shares with $5 billion in government bonds, including debt
carrying compound interest exceeding 8%.  (See PX-36 at 84.)

This rate is well within the range imposed by Argentine
Courts.  Though the Republic has identified courts that award a
lower rate of prejudgment interest, (Tr. 269:7-270:15; DLA-8;
DLA-9; DLA-10; DLA-11; DLA-12; DLA-13; DLA-20; DLA-21; DLA-22;
see also Tr. 270:16-22), five of the six panels of the Argentine
National Court of Appeals for Commercial Matters regularly award
prejudgment interest in the 6% to 8% range or above (see, e.g.,
PLA-9; PLA-10; PLA-15; PLA-21; PLA-81; see also Rhodes Decl. Ex.
C, dated August 4, 2023 [dkt. no. 481-3] (collecting cases)).
Indeed, Professor Manóvil conceded on cross-examination that,
apart from decisions by one outlier panel, he was not aware of
any "[modern] interest rates" in other cases from the National
Court of Appeals for Commercial Matters below that range.  (Tr.
293:9-14.)

The Court also rejects the Republic's complaint that the
cases cited by Plaintiffs lack context or that the Court
requires testimony or "evidence" to help it review Argentine
legal decisions and determine what rate of interest was awarded
in those cases.  (Def.'s Post-Trial Brief at 12-13.)  The
ability to read and count is all that is required to determine
the simple question of the rate of interest that commercial
courts in Argentina have imposed and under what circumstances.[13]
And the Republic's criticism that Plaintiffs have not provided a
basis for "the Court to infer than an Argentine court would
apply a similar rate on the facts of this case," (Def.'s Post-
Trial Brief at 13), applies equally to the Republic's evidence
and testimony.  The Republic did not cite cases or provide
testimony regarding cases with similar factual circumstances or
explain how an Argentine court would evaluate these
circumstances.  Its arguments are based not on identifying
analogous cases but simply identifying courts that have applied
lower rates.  (Def.'s Post-Trial Brief at 13-15; Tr. 269:7-
271:20.)  The Republic's expert finds these cases to be better
reasoned but does not rely on facts unique to those cases that

---

[13] "[T]he court may consider any relevant material or source,
including testimony, whether or not submitted by a party or
admissible under the Federal Rules of Evidence."  Fed. R. Civ.
P. 44.1.

make them more applicable to the circumstances at issue here.
(Tr. 269:13-25.)  With all due respect to Professor Manóvil, his
idea of what is more persuasive does not represent the views of
the Republic on its own laws, (see Def.'s Post-Trial Brief at
13), as evidenced by his concession that there "is no unanimity"
regarding the prejudgment interest rates Argentine courts apply
(Tr. 269:7-12).  And the Court does not agree with Professor
Manóvil that the inability of Argentine banks to offer loans in
foreign currency is a persuasive reason to apply a lower rate.
(Tr. 269:13-25.)  If anything, their inability to provide loans
in foreign currency suggests the rate should be higher, not
lower.

In any event, the Republic does not seriously dispute that
numerous commercial courts in Argentina award interest in the 6-
8% range or that the Court may, in its complete discretion,
impose interest in that range.  Instead, the Republic holds up
equitable arguments with oil-stained hands.  Equity is no refuge
for the Republic.  The Republic forced Plaintiffs to give it a
massive loan after forcibly expelling the members of the YPF
board on April 16, 2012, leading to the Repsol representatives
of YPF fleeing the country.  (Tr. 297:2-8.)  Mr. Kicillof
brazenly declared that it would be "stupid" to comply with "the
law of YPF itself" or "respect[] its bylaws."  (PX-15 at 25.)

The Republic subsequently enacted the legislation that,
purportedly, allowed it to acquire control of YPF without being
"stupid" and complying with the bylaws (PX-15 at 25).   (PX-26[14]
(YPF Expropriation Law).)[15]   It would offend, not serve, equity
to allow the Republic knowingly to violate the bylaws, force
Plaintiffs to be its involuntary creditors for a massive amount
over the course of a decade, and then pay a reduced rate by
crying poverty when the bill comes due.[16]   If the Republic could
not extract a return exceeding 8% <u>simple</u> interest on that
massive loan, it has been a poor steward, and it does not offend
equity for it to bear the consequences.   If it did achieve that
return or more it is not inequitable for it to turn those
proceeds over to Plaintiffs.   It is the size and long duration
of the loan the Republic foisted upon Plaintiffs in knowing
violation of its obligations that results in the large amount of
interest that accumulated – not some exorbitant or usurious

---

[14] PX-26 was not filed on the docket post-trial, but was
previously filed at docket number 363-72.
[15] The Court imputes Mr. Kicillof's statements only to the
Republic's executive branch, as he was Secretary of Economic
Policy and Development Planning and Vice-Intervenor.  But it
takes notice that, through his statements, the Argentine
Legislature was aware that this was the purpose when it passed
the YPF Expropriation Law.
[16] The Court does not impose the 8% interest rate based on the
"forced loan" theory, (<u>see</u> Tr. 174:13-175:22), but does consider
the rate at which the Republic could have borrowed to be
relevant to the Republic's equitable arguments.

interest rate – and it provides no equitable reason to impose a reduced interest rate.  The Republic vigorously took with both hands and stood steadfast in its inequitable refusal to satisfy its obligations to Plaintiffs.  It does not offend equity for it to give back now in equal measure.[17]

The Court accepts that some commercial courts in Argentina have imposed a lower rate, but the Republic has cited no authority requiring that those rates be imposed, and the Court finds the cases cited by the Republic to be less persuasive than the ones cited by Plaintiffs.  The appropriate rate of interest is, as the Republic concedes, entirely up to the discretion of the court considering the question.  The Republic identified some courts that exercised that discretion to grant a lower

---

[17] The Court also rejects the Republic's effort to inject Burford Capital into these proceedings.  This remains a case brought by plaintiffs against a defendant for its wrongful conduct towards them, and the relevant question is what the Republic owes Plaintiffs to compensate them for the loss of the use of their money, not what Plaintiffs have done or will do with what they are owed.  The Republic owes no more or less because of Burford Capital's involvement.  Furthermore, the Republic pulled the considerable levers available to it as a sovereign to attempt to take what it should have paid for and has since spared no expense in its defense.  If Plaintiffs were required to trade a substantial part of their potential recovery to secure the financing necessary to bring their claims, in Petersen's case because it was driven to bankruptcy, and litigate their claims to conclusion against a powerful sovereign defendant that has behaved in this manner, this is all the more reason to award Plaintiffs the full measure of their damages.

14

rate.  Plaintiffs identified some courts that exercised that
discretion to impose a higher rate, findings that the Court
finds better reasoned.  The Court therefore exercises its
discretion to impose a rate of 8% simple interest in order to
compensate Plaintiffs for the loss of the use of their money.

### C. Prejudgment Interest Should Run from May 3, 2012

The Court also rejects the Republic's argument that
prejudgment interest should run from the date Plaintiffs served
their complaints.  The Court is persuaded by the Republic's
argument that, under Argentine law, an obligor must be in
default before interest can run, (Tr. 267:6-268:5; DLA-29
(Argentine Civil Code, arts. 509, 622); PLA 34 (Perez Monica
Lourdes c. Enriquez Miguel Angel s/Ordinario, Cámara Nacional de
Apelaciones en lo Comercial, Sala F, 22 October 2015) at 13
(setting date on which interest began to run based on date of
default pursuant to articles 509 and 622 of the Argentine Civil
Code)), but rejects the Republic's assertion that a "formal
request" is necessary to put the obligor in default (Tr. 267:6-
268:5 (Professor Manóvil testifying only that "normally the
creditor has the obligation to make a formal request to the
debtor" to trigger default) (emphasis added)).  Under Argentine
law, a formal request is not necessary where the obligor has
repudiated the contract by clearly "manifest[ing] its will not

15

to perform."  (PLA-11 (<u>Argencip S.A v. Fondo Compensador Para</u>
<u>Jubilados Y Pensionades Telefonicos</u>, Cámara Nacional de
Apelaciones en lo Comercial, Sala A, 30 June 2010) at 4).)  Such
intent not to perform can be "tacit" and need not be express.
(<u>Id.</u> at 4-5.)  Where it is possible to "undoubtedly infer[]"
from "the acts" of the obligor that it "inten[ds] not to
perform," a formal request for performance is not required to
place the obligor in default.  (<u>Id.</u>)

The Court "undoubtedly infer[s]" that the Republic's acts
"manifest[ed] its will not to perform."  (<u>Id.</u>)  The Court
acknowledges that the Republic's system of government requires
both executive and legislative action in order to enact
legislation and that Mr. Kicillof's statements made prior to the
Argentine Legislature's passage of the YPF Expropriation Law
were not the final word and cannot be directly imputed to the
legislature.  However, Mr. Kicillof's statements can be
attributed to the Republic's executive branch, as he was
Secretary of Economic Policy and Development Planning and the
government appointed Vice-Intervenor.  Thus, by April 17, 2012,
the Argentine executive branch, one of the necessary branches,
clearly expressed its intention not to comply with the tender
offer obligation by sending its representative to advocate for
legislation that would purportedly avoid the obligation.  (PX-15

16

at 25.)  And, on May 3, 2012, the Argentine Legislature, the second necessary branch, passed the YPF Expropriation Law while fully aware that the law was intended to escape the obligation to pay the tender offer.  (PX-26; PX-15 at 25.)  Thus, on May 3, 2012, "it can be undoubtedly inferred" that the Republic did not intend to perform as manifested by its acts.  (PLA-11 at 4-5.) As such, on May 3, 2012, the Republic was in default, and no formal request for compliance was necessary.[18]

Alternatively, even if a formal request is required, Repsol filed a class action on May 16, 2012, suing the Republic for failing to comply with the tender offer requirements on behalf of class members that included Plaintiffs.  (PX-28[19] (Class Action Complaint in Repsol YPF, S.A. v. Republic of Argentina,

---

[18] The Court rejects Professor Manóvil's assertion, supported only by citation to a civil code article not in effect at the relevant time, that the repudiation must be some formalistic communication directly from the debtor to the creditor.  (DX-28 (Manóvil Rebuttal Report) at ¶ 126 (previously filed at dkt. no. 368-2).)  Aside from relying on a provision that was not in effect and did not govern, as a practical matter the acts of a state are public and communicated to the world, of which Plaintiffs are part.  That the communication was directed to others as well does not mean that it was not also directed to Plaintiffs.  It is illogical to say that a communication was not directed at a person because it was directed at other people as well.  In any event, the Argentine law as it stood at the relevant time permitted the repudiation to be "tacit," (PLA-11 at 4-5), meaning that a formal, direct communication cannot be necessary.
[19] (Dkt. nos. 481-13 and 481-14.)

No. 12-cv-3877 (S.D.N.Y. May 15, 2012)) ¶¶ 44, 51-56.)  If the Plaintiffs' current litigation is sufficient to serve as a formal request, (Tr. 268:2-5), prior litigation filed on behalf of Plaintiffs and others similarly situated is also necessarily sufficient to serve as a formal request by all of the Republic's creditors.  Professor Manóvil stated that a demand is necessary because the "allegedly breaching party does not assume the risk that it has breached."  (Expert Report of Rafael M. Manóvil ("Manóvil Expert Report"), dated September 24, 2021 [dkt. no. 368-1] at ¶ 124.)  Repsol's class action addressed this concern by putting the Republic on notice that its creditors believed that it was in breach.[20]  Thus, the Court finds, in the alternative, that even if the Republic did not repudiate the tender offer obligation, the purportedly necessary formal request was made by May 16, 2012.

---

[20] Professor Manóvil also makes the unsupported assertion that "each claimant must make its own demand" and that a creditor "may not rely on a demand made by another similarly situated person." (Manóvil Expert Report ¶ 124.)  Aside from citing no authority for this proposition, a class action is not simply a "demand made by another similarly situated person," (id.), it is a demand by a plaintiff on behalf of all others similarly situated.  Fed. R. Civ. P. 23(a).

### D. Formula D Must Be Calculated Using the Highest Price/Income Ratio During the Relevant Period

In another argument raised for the very first time at trial, the Republic asserts that Professor Fischel's use of contemporaneously reported earnings to calculate the price/income ratio "is not the 'regular' method of computation that would be used by the 'financial community' for calculating a tender offer price as of February 13, 2012." (Def.'s Post-Trial Brief at 10 (emphasis added) (quoting Tr. 342:20-343:14).) Professor Fischel calculated price/income ratios for each day in the look-back period by using the prior four quarters of earnings available as of each day in the look-back period, as opposed to those available as of the tender offer notice date. (Tr. 239:7-21.)  In other words, his calculation for the price/income ratio on February 22, 2010 (the highest price/income ratio during the look-back period at 27.1) relied on the earnings information that was available to investors deciding whether to invest in YPF as of February 22, 2010.  (Tr. 158:4-159:20.)  This resulted in the use of Q-4 2008 earnings, which were available on that date, instead of the higher Q-4 2009 earnings, which were not reported until February 25, 2010 (Tr. 205:2-22; Tr. 388:15-19) and could not have been relied on by an investor on February 22, 2010 (Tr. 158:4-159:20).  The

19

Republic argues that the financial community would, on February 13, 2012 (the notice date), use the most recent four quarters of earnings available to calculate price/income ratios, as Bloomberg does by default once those numbers are available. (Def.'s Post-Trial Brief at 10 (citing Tr. 238:25-239:6; Tr. 370:1-5; Tr. 365:10-366:14; Tr. 234:16-236:5; DX-201).)  This would result in the use of the higher Q-4 2009 earnings to calculate the price/income ratio, which would reduce the ratio as calculated for February 22, 2010 from 27.1 to 18.05.  (Tr. 238:16-20.)  The use of the lower 18.05 ratio would result in a lower tender offer price and an approximate $3.4 billion reduction in Plaintiffs' damages.  (Pls.' Post-Trial Brief at 15; Def.'s Post-Trial Brief at 9.)

The Republic misreads Formula D.  Formula D requires that the tender-offer price be calculated using "the highest price/income ratio for [YPF] <u>during</u> the two-year period immediately preceding the notice date," applying "the regular method used by the financial community for computing and reporting purposes."  (PX-3[21] (YPF Bylaws § 7(f)(v)(D) at 7-8) (emphasis added).)  It does not say that the "regular method used by the financial community" shall be the method that would

---

[21] (Dkt. no. 481-8.)

be used on the date of the tender offer, it says that the ratio
to be used is the "highest" one produced by the "regular method"
used by "the financial community for computing and reporting
purposes" "during" the relevant time period.  (Id.)  The
Republic's interpretation, in other words, attempts to insert a
timing requirement for the computing and reporting that does not
appear in the text and which would nullify the requirements that
do appear in the text, that the price/income ratio be the
"highest" one and that it be one "comput[ed] and report[ed]"
"during" the look-back period.  The Republic's interpretation is
thus contrary to the plain language of Formula D.

The price/income ratio that Professor Fischel used was the
ratio reported on each day "during" the look-back period by
Bloomberg, the Wall Street Journal, FactSet, and the Argentine
stock exchange itself.  (See Tr. 151:18-21; Tr. 418:18-419:16;
Tr. 420:9-12; Tr. 421:9-11; Tr. 425:1-12.)  All of these
entities are members of the financial community.  (Tr. 416:25-
417:4; Tr. 420:6-8; Tr. 421:4-6.)  Further, as Professor Harris
testified, many "financial reports that come out every day" use
the daily price/income ratio "every day" as their "regular
method . . . for computing reporting earnings."  (Tr. 416:25-
417:4.)  Thus, the Court finds that Professor Fischel's
calculations rely on the price/income ratio derived from the

"regular method" used by the "financial community" to "report[]
and comput[e]" the relevant ratio "during" the two year look-
back period and are the proper inputs pursuant to the text of
Formula D.

In any event, even if the Court adopted the Republic's
interpretation, The Wall Street Journal, FactSet, and the
Argentine stock exchange still compute and report the
price/income ratio relied on by Professor Fischel to this day by
default, and this ratio remains available on Bloomberg (though
it is not the ratio Bloomberg calculates or reports by default).
(See Tr. 419:12-16; Tr. 420:20-24; Tr. 421:16-19; Tr. 427:17-
23.)  Accepting that Bloomberg recalculates the price/income
ratio that it reports by default, (DX-201), and that Professor
Harris testified that this is the way it is done in finance and

by financial professionals, (Tr. 370:1-5; Tr. 365:10-366:14),[22]

the fact remains that three entities that are admittedly members

of the financial community, (Tr. 416:25-417:4; Tr. 420:6-8; Tr.

421:4-6), all compute and report the ratio in the same way as

Professor Fischel and continue to do so.  Thus, in determining

which method is the "regular method" used by the financial

community, the Court is left to weigh a largely untested expert

opinion and the methodology used by one member of the financial

community against the methodology that is indisputably used by

three members of the financial community.  On this record, the

Court finds based on the weight of the evidence that the

"regular method" used by the majority of the financial community

for computing and reporting the relevant ratio, even as of

---

[22] Since the proceeding was a bench trial, the Court permitted
the parties significant latitude in their examinations but is
cognizant that the Republic did not previously raise this issue
– even in its pretrial memorandum – and that the basis for the
introduction of Professor Harris's testimony on this point was a
single line on a chart, a sentence in a footnote, and the
underlying data.  (DX-34 (Harris Expert Report) at p. 37, Fig.
12 & App'x C8 & C9 (previously filed at dkt. no. 398-24).)  In
other words, the Court recognizes that Plaintiffs had little (if
any) basis to challenge or prepare to meet this "opinion" by
Professor Harris prior to its being sprung on them at trial.  As
such, the Court takes the testimony for what it is worth
considering its, at best, implicit disclosure in Professor
Harris's report and extremely minor prominence, as well as the
Republic's decision to remain silent regarding its intention to
explore this issue until the last possible moment.

February 13, 2012, was the methodology used by Professor Fischel in his calculations.

In the alternative, even if the Court found that Professor Harris' methodology was <u>also</u> a "regular method used by the financial community for computing and reporting purposes" Formula D requires the use of the highest price/income ratio. (PX-3 at 7-8.)  Thus, as between two methods regularly used by the financial community, Formula D by its terms breaks the tie and prescribes the use of the one that produces the "highest" ratio.  As such, even if both Professor Fischel's method and Professor Harris' method are a "regular method," Formula D requires the application of Professor Fischel's method because it produces the higher ratio.

## II.   Conclusion

For the foregoing reasons, the Courts finds that the Republic exercised indirect control over the requisite number of Repsol's shares on April 16, 2012, thereby triggering its tender offer obligations.  The Court also finds that prejudgment interest of 8% simple interest is appropriate and that it should run from May 3, 2012.  Finally, the Court finds that Professor Fischel's calculation of the tender offer price is correct and relies on the price/income ratio required by Formula D.

The parties are directed to submit a proposed judgment consistent with these findings of fact and law.

**SO ORDERED.**

Dated:       September 8, 2023
             New York, New York

LORETTA A. PRESKA
Senior United States District Judge

25